AO 241 (Rev. 5/85)

**FILED**

MAY 26 2009

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____

PETITION UNDER 28 USC § 2254 FOR WRIT OF
HABEAS CORPUS BY A PERSON IN STATE CUSTODY

| **United States District Court** | District Eastern District of California | |
|---|---|---|
| Name Paul Whitmore | Prisoner No. G40654 | Case No. |

Place of Confinement
North Kern State Prison

Name of Petitioner (include name under which convicted)

Paul Gordon Whitmore

Name of Respondent (authorized person having custody of petitioner)

v. Lydia C. Hense, Warden NKSP

The Attorney General of the State of: California

**PETITION**   1: 09 CV 00920   HC

1. Name and location of court which entered the judgment of conviction under attack Superior Court of California, County of San Diego

2. Date of judgment of conviction November 2005

3. Length of sentence 467 years 8 month to Life

4. Nature of offense involved (all counts) 21 - PC 288(a), 9 - PC 269, 18 - PC 311.4, 1 - PC 288(b), 1 - 647.6, with enhancements under 667.61 (b), (c), & (e)

5. What was your plea? (Check one)
   (a) Not guilty ☒
   (b) Guilty ☐
   (c) Nolo contendere ☐
   If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment, give details:

6. If you pleaded not guilty, what kind of trial did you have? (Check one)
   (a) Jury ☒
   (b) Judge only ☐

7. Did you testify at the trial?
   Yes ☐   No ☒

8. Did you appeal from the judgment of conviction?
   Yes ☒   No ☐

AO 241   (Rev. 5/85)

9.   If you did appeal, answer the following:

(a) Name of court California Court of Appeals, 4th Circuit

(b) Result Affirmed

(c) Date of result and citation, if known May 8, 2008   D048294

(d) Grounds raised Same 11 issues raised in section 12; appellant's opening brief is apached.

(e) If you sought further review of the decision on appeal by a higher state court, please answer the following:

(1) Name of court Supreme Court of California

(2) Result denied hearing

(3) Date of result and citation, if known August 2008

(4) Grounds raised Same 11 issues

(f) If you filed a petition for certiorari in the United States Supreme Court, please answer the following with respect to each direct appeal: No

(1) Name of court _____

(2) Result _____

(3) Date of result and citation, if known _____

(4) Grounds raised _____

10.   Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, or motions with respect to this judgment in any court, state or federal?
Yes ☐   No ☒

11.   If your answer to 10 was "yes," give the following information:

(a) (1) Name of court _____

(2) Nature of proceeding _____

(3) Grounds raised _____

(3)

AO 241   (Rev. 5/85)

_____

_____

_____

(4)  Did you receive an evidentiary hearing on your petition, application or motion?
Yes  ☐    No  ☐

(5)  Result  _____

(6)  Date of result  _____

(b)  As to any second petition, application or motion give the same information:

(1)  Name of court  _____

(2)  Name of proceeding  _____

_____

(3)  Grounds raised  _____

_____

_____

_____

_____

(4)  Did you receive an evidentiary hearing on your petition, application or motion?
Yes  ☐    No  ☐

(5)  Result  _____

(6)  Date of result  _____

(c)  Did you appeal to the highest state court having jurisdiction the result of action taken on any petition, application or motion?
(1)  First petition, etc.        Yes  ☐    No  ☐
(2)  Second petition, etc.      Yes  ☐    No  ☐

(d)  If you did *not* appeal from the adverse action on any petition, application or motion, explain briefly why you did not:

_____

_____

_____

12.  State *concisely* every ground on which you claim that you are being held unlawfully.  Summarize *briefly* the *facts* supporting each ground.  If necessary, you may attach pages stating additional grounds and *facts* supporting same.
    CAUTION: In order to proceed in the federal court, you must ordinarily first exhaust your available state court remedies as to each ground on which you request action by the federal court.  If you fail to set forth all grounds in this petition, you may be barred from presenting additional grounds at a later date.

Note: All 11 (eleven) grounds for relief are listed in attached, hand-written petition. Please consider all 11, not just the four that fit in this form.

AO 241   (Rev. 5/85)

For your information, the following is a list of the most frequently raised grounds for relief in habeas corpus proceedings.  Each statement preceded by a letter constitutes a separate ground for possible relief.  You may raise any grounds which you may have other than those listed if you have exhausted your state court remedies with respect to them.  However, *you should raise in this petition all available grounds* (relating to this conviction) on which you base your allegations that you are being held in custody unlawfully.

Do not check any of these listed grounds.  If you select one or more of these grounds for relief, you must allege facts.  The petition will be returned to you if you merely check (a) through (j) or any one of these grounds.

(a)  Conviction obtained by plea of guilty which was unlawfully induced or not made voluntarily with understanding of the nature of the charge and the consequences of the plea.

(b)  Conviction obtained by use of coerced confession.

(c)  Conviction obtained by use of evidence gained pursuant to an unconstitutional search and seizure.

(d)  Conviction obtained by use of evidence obtained pursuant to an unlawful arrest.

(e)  Conviction obtained by a violation of the privilege against self-incrimination.

(f)  Conviction obtained by the unconstitutional failure of the prosecution to disclose to the defendant evidence favorable to the defendant.

(g)  Conviction obtained by a violation of the protection against double jeopardy.

(h)  Conviction obtained by action of a grand or petit jury which was unconstitutionally selected and impaneled.

(i)  Denial of effective assistance of counsel.

(j)  Denial of right of appeal.

A.  Ground one: Petitioner's 6th Amendment right to confront and cross-examine witnesses was denied by allowing document to be read to the jury.

Supporting FACTS (state *briefly* without citing cases or law): Over defence objections, the court allowed prosecution to read to the jury a 91 page document compiled by the Danish National Police. This document was reputed to be a "transcript" of an "ICQ chat" between defendant and Danish defendants Eggert and Bente Jensen. Prosecution never established that the Jensens were "unavailable" and even admitted the prosecution could produce them if they wanted to ("I imagine it could be done" 8 RT 528). Please see Attachment A, pps 20-35.

B.  Ground two: Petitioner's 6th and 14th Amendment rights to Due Process and Fair Trial were denied when the court allowed evidence without sufficient foundation.

Supporting FACTS (state *briefly* without citing cases or law): The court allowed evidence to be admitted, over numerous defence objections, from a computer in Denmark. Images and documents were never authenticated, the computer never checked for correct functioning, witnesses not asked or required to identify themselves. The Denmark computer was left in an unlocked office, unattended, for at least a day and a night, abrogating the chain of evidence. Danish police destroyed the computer before the defence (or US experts) could examine it. Please see Attachment A, pps 36-46 for more facts.

AO 241   (Rev. 5/85)

C.  Ground three: Petitioner's 6th and 14th Amendment rights to Due Process and Fair Trial
were denied by jury convictions without sufficient evidence in Counts 7,13,20,21,22,25,31,32
41 and 55

Supporting FACTS (state *briefly* without citing cases or law): Images presented to the jury did not
represent child pornography in that they did not show sexual behavior nor
exclusive genital display. Nudity isn't pornography. Petitioner asks for a
judgement of "not guilty" for each of these counts. Please see Attachment A,
pps 47 through 54 for further facts.

D.  Ground four: Petitioner's 6th and 14th Amendment rights to Due Process and Fair Trial were
denied when prosecutor was allowed to use multiple images for each count of molest and
production of pornography.
Supporting FACTS (state *briefly* without citing cases or law): Multiple images were allowed as the basis
of most charges of 288(a) and 311.4. Some counts had as many as 70+ images, for a
single act. There is no way to determine which image the jury member(s)
thought were "pornographic" or "proved" the molest acts alleged. No effort was made to
ensure each juror agreed on each image. Individual acts must be proved for
conviction and each juror must agree on each act. Procedure used was hopelessly
flawed. Please see Attachment A, pps 55 to 60 for more facts.

* Seven (7) additional grounds for relief are in hand-written motion attached to this term, pps 6-

13.  If any of the grounds listed in 12A, B, C, and D were not previously presented in any other court, state or federal, state
*briefly* what grounds were not so presented, and give your reasons for not presenting them:
all have been presented to Appeals Court & CA Supreme Court

14.  Do you have any petition or appeal now pending in any court, either state or federal, as to the judgment under attack?
Yes ☐   No ☒ :

15.  Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked
herein:
(a)  At preliminary hearing Gary Roberts, esq., San Diego County, Private
Conflict Counsel.
(b)  At arraignment and plea Gary Roberts

AO 241   (Rev. 5/85)

(c) At trial _Gary Roberts_

(d) At sentencing _Gary Roberts_

(e) On appeal _Patrick Ford, esq, 1901 First Ave, Ste 400, San Diego, CA 92101_

(f) In any post-conviction proceeding _Gary Roberts_

(g) On appeal from any adverse ruling in a post-conviction proceeding _Patrick Ford._

16. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?
Yes ☒   No ☐

17. Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?
Yes ☐   No ☒
(a) If so, give name and location of court which imposed sentence to be served in the future: _____

(b) Give date and length of the above sentence: _____

(c) Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?
Yes ☐   No ☐

Wherefore, petitioner prays that the Court grant petitioner relief to which he may be entitled in this proceeding.

_____
Signature of Attorney (if any)

I declare under penalty of perjury that the foregoing is true and correct.  Executed on

_5/11/09_
Date

_____
Signature of Petitioner

(7)

# IN THE UNITED STATES DISTRICT COURT-EASTERN DISTRICT of CALIFORNIA

PAUL GORDON WHITMORE )
      Petitioner )
                  )
V.               )  USD Court #:
                  )
LYDIA C. HENSE, Warden, )
  North Kern State Prison )
       Respondant )

# PETITION UNDER 28 USC 2254 FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

## Introduction

Now comes the Petitioner, PAUL GORDON WHITMORE, in pro per. I am a pro se litigant, representing myself in this instant action. As I am not learned nor lettered in the law, I pray the court grant me consideration of this petition without holding me to the standards of form and procedure normally expected of litigants represented by skilled and experienced lawyers. (Borzda v Hockler (1984), 724 F2d 444, 447 and Bretz v Kelman (9th Circuit 1985) 773 F2d 1026, 1027)

(1)

## Appropriateness of Petition

28 USC 2254 as amended by the "Antiterrorism and Effective Death Penalty Act of 1996," allow a person in state custody to petition for a writ of Habeas Corpus when the Petitioner has exhausted remedies available in the state court (or if there is an absence of procedures for remedy or the available remedies are rendered ineffective to provide protection of the Petitioner's rights). In this case, Petitioner has been tried and convicted in Superior Court of the State of California, San Diego County, in November of 2005. The conviction was affirmed by the California Court of Appeals 4th Circuit on May 8, 2008. The Supreme Court of California denied review in August of 2008. These facts may be verified by independent investigation.

Further, the claim of the petitioner must involve; a decision that was contrary to or an unreasonable application of established law, or a decision based on an unreasonable determination of the facts in light of the evidence presented in state court. Each of the eleven (11) grounds for relief presented in this petition meet one or both of these criteria.

Finally, the petitioner must file within one year from the final decision from the highest state authority. The Supreme Court of California denied hearing in August 2008, less than one year before this instant petition was filed in ~~State to~~ U.S. District Court.

(2)

Statement of Facts and Case

Petitioner asks the court to refer to Attachment A, "Appealants Opening Brief", pps 4 through 19, with the following additional information:

Counsel for the appealant (now Petitioner) filed the Opening Brief before the California Court of Appeals, 4th Circuit, on April 2, 2007. Oral arguement was held in April 2008 and the decision to affirm conviction was recieded on May 8, 2008. That same month, counsel for appealant then petitioned the Supreme Court of California for review. This was denied in August 2008.

Petitioners "slow plea" in related charges before the US District Court, Eastern District of California, was set aside due to a finding of ineffectie assistance of Counsel. The Government withdrew its complaint and charges were dismissed in October 2008. Petitioner was remonded to the California Department of Corrections on November 18, 2008.

Grounds for Relief

As per Section 12 of the 28 USC 2254 Petition Form, the Petitioner has not cited any legal references. For each "grounds" listed, Petitioner is aware of several relevant appeals and Supreme Court ~~judges~~ decisions. Petitioner asks the court to refer to Attachment A, "Appellant's Opening Brief," for additional facts, legal citations and arguments.

The first four (4) Grounds for Relief are repeated from the Petition Form, section 12. The last seven (7) are only in this petition, not the form. Petitioner asks the court to consider all eleven (11) Grounds for Relief with the same intent and judicial interest.

Section 12:

A. Ground one: Petitioner's 6th Amendment right to confront and cross-examine witnesses was denied by allowing document to be read to the jury.

Supporting FACTS: Over defense objections, the court allowed prosecution to read to the jury a 91 page document compiled by the Danish National Police. This document was reputed to be a "transcript of an ICQ chat" between defendant and Danish defendants Eggert and Bente Jensen. Prosecution never established that the Jensen's were "unavailable" and even admitted that the prosecution could produce them if they wanted to ("I imagine it could be done" 8RT 528). Please see Attachment A, pps 20-35.

(4)

B. Ground two: Petitioner's 6th and 14th Amendment rights to Due Process and Fair Trial were denied when the court admitted evidence without sufficient foundation.

Supporting FACTS: The court allowed evidence to be admitted, over numerous defence objections, from a computer in Denmark. Images and documents were never authenticated, the computer never checked for correct functioning, witnesses not asked or required to identify themselves. The Denmark computer was left in an unlocked office, unsupervised, for at least a day and a night, abrogating the chain of evidence. Danish police destroyed the computer before defence (or US) could examine it. Please see Attachment A, pps 36-46 for more facts.

C. Grounds three: Petitioner's 6th and 14th Amendment rights to Due Process and Fair Trial were denied by jury conviction without sufficient evidence in Counts 7, 13, 20, 21, 22, 25, 31, 32, and 41 and 55.

Supporting FACTS: Images presented to the jury did not represent child pornography in that they did not show sexual behavior nor exclusive genital display. Nudity isn't pornography. Petitioner asks for a judgement of "not guilty" for each of these counts. Please see Attachment A, pps 47-54 for further facts.

D. Grounds four: Petitioner's 6th and 4th Amendment rights to Due Process and Fair Trial were denied when prosecution was allowed to use multiple images for each count of molest and production of pornography.

Supporting FACTS: Multiple images were allowed as the basis for

most charges of PC288(a) and 311.4. Some counts had as many as $70^+$ images for a single act. There is no way to determine which images the jury member(s) thought were "pornographic" or "proved" the alleged act. No effort was made to ensure each juror agreed on each image. Individual acts must be proved for conviction and each juror must agree on each act. Procedure used was hopelessly flawed. Please see Attachment A, pps 55 to 60 for more facts. Charges involved are counts: 8, 9, 10, 11, 13, 14, 15, 16, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 37, 38, 40, 41, and 55.

NOTE: The remaining seven (7) grounds are not repeated from the 2254 Petition Form, section 12. Petitioner asks the court to view these additional grounds with the same intent and judicial interest as the previous four.

E. Ground five: Petitioner was denied his right to Jury Trial under the 6th Amendment and 6th and 14th Amendment rights to Due Process and Fair Trial by the courts use of defective jury forms in reference to enhancements under 667.61(e)(5-6).

Supporting FACTS: Over defence objections, The Court used jury forms that did not use the language required by California law and Supreme Court decision(s). Verdict forms used the language "DID\DID NOT" rather

(6)

Than the language in 667.61 which asks for a
"True finding. The "true" language is mandatory.
Due to the failure of the jury to make a "true"
finding, Petitioner asks the court to set aside the
"did" finding and enter a "not true" verdict, as a
retrial would consititute double-jepardy under the
5th Amendment. This applies to enhancements only,
to counts 1, 9, 10, 11, 14, 15, 16, 17, 18, 24, 29, 33, 36, 37, 38,
43, 44, 46, 48, 49 and 50. Please see Attachment
'A' pps 60-64 for further facts.


F. Ground Six: Petitioner was denied right to trial by
Jury guaranteed by the 6th Amendment and 6th and 14th
Amendment rights to Due Process and Fair Trial when
the court and jury used a hopelessly flawed procedure
to find the Petitioner "did" commit alleged acts against
multiple victims under 667.61.
Supporting FACTS: On counts charged with multiple-victim
enhancement, each verdict form had both the charge
and enhancement on each form. Petitioner was not
convicted under law until the jury was polled in court.
Therefore, the jury finding of "did" commit acts when
convicted of multiple victims could not have been true
as the jury was still in deliberations and had not returned
any verdict(s) to the court to establish a "conviction."

This is a hopelessly flawed procedure and requires bifurcation on the retrial. Please see attachment "A" pps 64-70 for further facts. (This applies to counts: 1,9,10,11,14,15,16,17,18,24,33,36,37,38,43,44,46,48, 49 and 50.)

G. Ground Seven: Petitioner was denied 6th and 14th Amendment rights to Due Process and Fair Trial when the court failed to correctly instruct the jury on the "tying or binding" enhancement and the jury convicted with insufficient evidence to support the convictions on 667.61 (e)(6). (Counts 1,9, 10, 33 and 37.)

Supporting FACTS: The defence was denied its motion to instruct the jury based upon People v Campbell (2000) where the enhancement clearly is defined to refer increansed vunrability of the victim. This was not the case as alleged victim "M" stated Petitioner always released her when asked and she could often release herself, especially with the toy handcuffs. Since this is clearly not what the legislature had in mind, the Petitioner asks the court to enter a "not true" finding as a retrial world consitute double-jepardy under the 5th Amendment. Please see Attachment 'A' pps 7?-76 for more facts.

H. Ground Eight: Petitioner was denied his 6th and 14th Amendment rights to Due process and 6th Amendment right to Trial by Jury when the court gave the jury "verdict worksheets."

(8)

Supporting FActs: There exists no legal authority for a court to, over defence objections, provide "worksheets" to a jury for their deliberation. This was an invasion by the court of the jury's fact-finding province and, due to its format and language, was nothing more than the judge telling the jury the Petitioner was guilty on all counts. This greatly reduced the prosecution's burden of proof. This affected all counts and enhancements. The trial lasted 5 weeks with 55 counts, most with LIOs and enhancements, yet the jury deliberated only 5 hours; Proof of the contamination of the "Verdict worksheets." Please see Attachment "A" pps 76-81 for more facts.

I. Ground Nine: Petitioner was denied 6th and 14th Amendment rights to Due Process and Fair Trial when the court and jury convicted without sufficient evidence on Count 2.

Supporting Facts: Count two (2) is aggravated sexual assault of a child, alleging sodomy in this case. Sodomy requires the actual penetration of the anus, regardless of how slight. The record is void of any evidence of penetration on this count. Petitioner asks for a verdict of "not guilty" as retrial would constitute double jeopardy under the 5th Amendment. Please see Attachment "A" pps 82-84 for further facts.

J. Ground Ten: Petitioner was denied 6th and 14th

(9)

Amendment guarantees of Due Process when the court abused ~~discresstion~~ discretion and denied defence motion to severe child pornography counts from other counts.

Supporting FACTS: Defence moved to separate trials of life-counts from "lesser counts" and separate trials for child abuse from child pornography — both were denied. The presence of so many images from the child pornography was prejudicial to the abuse counts and the severity of the abuse charges so great that it was prejudicial to the pornography counts. Evidence in the pornography counts wouldn't have been admissable in the abuse counts and vice versa. Petitioner was practically denied his right to testify in his behalf due to the combination of the two types of charges; especially in respect to the so-called "ICQ chat". The prejudice is evidenced in the jury's rapid decision — 5 hours for 55 counts over 5 weeks of trial. The convictions must be overturned and severance granted on retrial. Please see Attachment "B" pps 85-89 for more facts.

K. Ground Eleven: Petitioner was denied 6th and 14th Amendment rights to Due Process and Fair Trial by the cumulative prejustice of the multiple, serious and constitutional errors.
Supporting FACTS: T prejudicial effect of the inadmissable evidence, hearsay evidence being allowed without foundation,

(10)

denial of the right to confrontation and cross-examination, violation of the chain of evidence, insufficient evidence on numerous counts, denial of right to unanimous jury verdict, flawed jury forms, unpresidented use of jury "worksheets", flawed and hopeless procedures on life-court enhancements, court's invasion of the jury's fact-finding province, and other errors as noted above (and in Attachment 'A') denied the Petitioner a fair trial and requires reversal of the whole conviction. Please see attachment 'A' for more facts.

I ask the court to also consider the legal analisys and arguement noted in the ~~Plaintiff~~ "Appellant's Rebuttal" to the California Court of Appeals, 4th district.

## Prayer to the Court

The Petitioner prays the court to allow him to proceed in forma pauperis. Please see attached form AO-240.

Petitioner prays the court to order trial transcripts and trial exhibits for it's inspection. Petitioner further prays the court to order the Appellant's Brief and Rebuttal for it's inspection as well. (CA Appeals Cart, 4th Circ.)

Petitioner prays the court to appoint counsel to represent him before this court in this action. Petitioner prays the court to order and grant him relief to which he is entitled.

I declare under penalty of perjury that the foregoing is true and correct. Executed on:

_____          _____
date                                      Petitioner

Paul Whitmore G40654
NKSP D5A 221 up.
PO Box 5005
Delano, CA 93216-5005

(13)

Attachment A

Court of Appeal Fourth District
RECEIVED
APR 2 - 2007
Stephen M. Kelly, Clerk
DEPUTY

IN THE COURT OF APPEAL - STATE OF CALIFORNIA
FOURTH APPELLATE DISTRICT
DIVISION ONE

PEOPLE OF THE STATE OF CALIFORNIA,)
)
Plaintiff and Respondent, )    Court of Appeal
)    No. D048294
v. )
)    Superior Court
PAUL GORDON WHITMORE, )    No. SCD165314
)
    Defendant and Appellant. )

APPEAL FROM JUDGMENT OF THE
SAN DIEGO COUNTY SUPERIOR COURT,
THE HONORABLE GALE E. KANESHIRO, JUDGE

APPELLANT'S OPENING BRIEF

PATRICK MORGAN FORD
Attorney at Law
1901 First Avenue, Suite 400
San Diego, CA 92101
(619) 236-0679
State Bar No. 114398

Attorney for Appellant
PAUL GORDON WHITMORE

By appointment of the Court of Appeal
under Appellate Defenders, Inc.
independent case system

APR 1 6 2007

## TOPICAL INDEX

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Statement of Appealability . . . . . . . . . . . . . . . . . . . . . . . . . 4

Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Statement of the Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

I     Appellant was denied his Sixth Amendment right to confront
and cross-examine the witnesses against him where the trial
court permitted the prosecution to read a 91 page transcript
of an alleged "ICQ chat" between appellant and the Jensens,
after finding the Jensens were beyond the reach of the court's
subpoena power, because the prosecutor failed to establish
that they were truly "unavailable." . . . . . . . . . . . . . . . . . . . . . 21

II    The trial court erred in admitting evidence for which the
prosecution failed to establish a sufficient foundation, thereby
violating appellant's statutory rights under the Evidence Code
and further deprived him of a fair trial guaranteed by the Due
Process Clause of the Fourteenth Amendment . . . . . . . . . . . . . . . 37

III   There was insufficient evidence to sustain the convictions in counts 7,
13, 20, 21, 22, 25, 31 32, 41, and 55 for violating Penal Code section
311.4(b), posing a minor for photos involving sexual conduct for
commercial purposes. . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

IV   Appellant was denied due process of law and his right to a unanimous
verdict where the prosecutor was permitted to submit multiple images
as the basis for most of the child pornography and child molest counts
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

V    The trial court erred in presenting a defective verdict form as to
the special allegations under Penal Code section 667.61, subds.

(e)(5)-(6), and therefore the jury's findings as to these allegations
on counts 1, 9, 10, 11, 14, 15, 16, 17, 18, 24, 29, 33, 36, 37, 38, 43,
44, 46, 48, 49, and 50 must be set aside as having deprived appellant
of his statutory and constitutional rights . . . . . . . . . . . . . . . . . . . . . 61

VI    The multiple life counts imposed as to the counts involving M., must
be run concurrently under Penal Code section 667.61, because the
procedure used by the jury in finding that appellant "did" commit
the multiple victims allegations was hopelessly flawed . . . . . . . . . . 65

VII    There was insufficient evidence to support the allegations that
appellant engaged in "tying or binding" the victim M., and the
trial court failed to properly instruct the jury as to this enhancement
under Penal Code section 667.61 subd. (e)(6), which was alleged in
counts 1, 9, 10, 33, and 37, thereby depriving appellant of due
process of law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

VIII    The trial court's use of verdict "worksheets" denied appellant's
right to due process of law and to a trial by jury under the
Sixth and Fourteenth Amendments . . . . . . . . . . . . . . . . . . . . . . . 77

IX    There was insufficient evidence to sustain the charge of aggravated
sexual assault of a child pled in count two, based solely on the images
contained in a video . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

X    Denial of appellant's motion to sever the child pornography counts
from the other offenses was an abuse of discretion which denied
appellant due process of law . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

XI    The cumulative prejudice of the multiple errors requires reversal
of the entire judgment of conviction . . . . . . . . . . . . . . . . . . . . . . . 91

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

# Table of Authorities

Cases (Federal courts)

*Apprendi v. New Jersey*
(2000) 530 U.S. 466 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53,55,69,71

*Barber v. Page*
(1968) 390 U.S. 719 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Bean v. Calderon*
(9th Cir. 1998) 163 F.3d 1073 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

*Blackmer v. United States*
(1932) 284 U.S. 421 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Blakely v. Washington*
(2004) 542 U.S. 296 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*Brady v. Maryland*
(1963) 373 U.S. 83 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Carella v. California*
(1989) 491 U.S. 263 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

*Clark v. Allen*
(1947) 331 U.S. 205 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Chambers v. Mississippi*
(1973) 410 U.S. 284 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Chapman v. California*
(1967) 386 U.S. 18 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30,65

*Crawford v. Washington*
(2004) 541 U.S. 36 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2,29

*Cunningham v. California*
(2007) – U.S. – . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55,67

iv

*Cupp v. Naughten*
   (1973) 414 U.S. 141 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*D'Aquino v. United States*
   (9th Cir. 1951) 192 F.2d 338 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Duncan v. Louisiana*
   (1969) 391 U.S. 145 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69,71

*Estelle v. McGuire*
   (1991) 502 U.S. 62 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Green v. California*
   (1970) 399 U.S. 149 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Green v. White*
   (9th Cir. 2000) 232 F.3d 671 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

*Griffin v. Illinois*
   (1956) 351 U.S. 12 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Hardy v. United States*
   (1964) 375 U.S. 277 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Hopkirk v. Bell*
   (1806) 7 U.S. 454 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*In re Winship*
   (1970) 397 U.S. 358 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

*Jackson v. Virginia*
   (1979) 443 U.S. 307 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42,51,73

*Lilly v. Virginia*
   (1999) 527 U.S. 116 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Michigan v. Lucas*
   (1991) 500 U.S. 145 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Ohio v. Roberts*
(1980) 448 U.S. 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Needer v. United States*
(1999) 527 U.S. 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

*Pointer v. Texas*
(1965) 380 U.S. 400 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Pointer v. United States*
(1894) 151 U.S. 396 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

*Rock v. Arkansas*
(1987) 483 U.S. 44 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*United States v. Caldwell*
(9th Cir. 1993) 989 F.2d 1060 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

*United States v. Gifford*
(ED Penn. 1988) 684 F.Supp. 125 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*United States v. Gordon*
(1st Cir. 1980) 643 F.2d 639 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*United States v. Johnpoll*
(2nd Cir. 1984) 739 F.2d 702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*United States v. Lane*
(1986) 474 U.S. 438 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

*United States v. Marchese*
(U.S. Dist. Colo. 1994) 842 F.Supp. 1307 . . . . . . . . . . . . . . . . . . . . . . 26

*United States v. Valenzuela-Bernal*
(1980) 458 U.S. 858 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*United States v. Villard*
(3rd Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46,47

*United States v. Villard*
    (D. NJ 1988) 700 F.Supp. 803 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*United States v. Wiegand*
    (9th 1987) 812 F.2d 1239 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Ware v. Hylton*
    (1796) 3 U.S. 199 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Washington v. Texas*
    (1967) 388 U.S. 14 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28


Cases (State courts)

*In re Brown*
    (1998) 17 Cal.4th 873 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*In re Hall*
    (1927) 88 Cal.App. 212 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*In re Ulysses D.*
    (2004) 121 Cal.App.4th 1092 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Chaplin v. Sullivan*
    (1945) 67 Cal.App.2d 728 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*McAllister v. George*
    (1977) 73 Cal.App.3d 258 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*People v. Adams*
    (1993) 19 Cal.App.4th 412 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

*People v. Apalatiequi*
    (1978) 82 Cal.App.3d 970 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*People v. Balderas*
    (1985) 41 Cal.3d 144 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

*People v. Bento*
(1998) 65 Cal.App.4th 179 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

*People v. Bradford*
(1997) 15 Cal.4th 1229 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

*People v. Buffum*
(1953) 40 Cal.2d 709 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

*People v. Cantrell*
(1992) 7 Cal.App.4th 523 . . . . . . . . . . . . . . . . . . . . . . . . . . 43,45

*People v. Campbell*
(2000) 82 Cal.App.4th 71 . . . . . . . . . . . . . . . . . . . . . . . . . . 64-66

*People v. Castro*
(1901) 133 Cal. 11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*People v. Catlin*
(2001) 26 Cal.4th 81 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76,77

*People v. Clark*
(1943) 59 Cal.App.2d 760 . . . . . . . . . . . . . . . . . . . . . . . . . . 69,70

*People v. Collins*
(2976) 17 Cal.3d 687 . . . . . . . . . . . . . . . . . . . . . . . . . . . 50,51,59

*People v. Cromer*
(2001) 24 Cal.4th 889 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*People v. Cuccia*
(2002) 97 Cal.App.4th 785 . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

*People v. Daniels*
(1991) 52 Cal.3d 815 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

*People v. Deletto*
(1983) 147 Cal.App.3d 458 . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*People v. DeSimone*
   (1998) 62 Cal.Ap..4th 693 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

*People v. Diedrich*
   (1982) 31 Cal.3d 263 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*People v. Figueroa*
   (1986) 41 Cal.3d 714 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65,71

*People v. Flood*
   (1998) 18 Cal.4th 470 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .... 65

*People v. Gibson*
   (2001) 90 Cal.App.4th 371 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*People v. Godinez*
   (1992) 2 Cal.App.4th 492 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

*People v. Green*
   (1995) 31 Cal.App.4th 1001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

*People v. Hamilton*
   (1963) 60 Cal.2d 105 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*People v. Hendricks*
   (1987) 43 Cal.3d 584 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

*People v. Hernandez*
   (2003) 30 Cal.4th 835 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

*People v. Herrera*
   (2000) 83 Cal.App.4th 46 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*People v. Hill*
   (1998) 17 Cal.4th 800 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

*People v. Holman*
   (1945) 72 Cal.App.2d 75 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

*People v. Holmes*
   (1960) 54 Cal.2d 442 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

*People v. Johnson*
   (1980) 26 Cal.3d 557 . . . . . . . . . . . . . . . . . . . . . . . . . 42,51,64,73

*People v. Kiihoa*
   (1960) 53 Cal.2d 748 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*People v. Kirk*
   (2006) 141 Cal.App.4th 715 . . . . . . . . . . . . . . . . . . . . . . . . . . 61

*People v. Kongs*
   (1994) 30 Cal.App.4th 1741 . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*People v. Lepe*
   (1997) 57 Cal.App.4th 977 . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*People v. Louis*
   (1986) 42 Cal.3d 969 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20,28

*People v. Lucas*
   (1995) 12 Cal.4th 415 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32,36

*People v. Mack*
   (1931) 115 Cal.App. 588 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

*People v. Marquez*
   (1992) 1 Cal.4th 553 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

*People v. Martinez*
   (1986) 188 Cal.App.3d 19 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

*People v. McElrath*
   (1985) 175 Cal.App.3d 178 . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

*People v. Medina*
   (2005) 132 Cal.App.43th 149 . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*People v. Morales*
  (1989) 48 Cal.3d 527 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

*People v. Musselwhite*
  (1998) 17 Cal.4th 1216 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

*People v. Pizarro*
  (2003) 110 Cal.App.4th 530 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*People v. Reilly*
  (1970) 3 Cal.3d 421 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42,64

*People v. Ribera*
  (2005) 133 Cal.App.4th 81 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

*People v. Russo*
  (2001) 25 Cal.4th 1124 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*People v. Sandoval*
  (1992) 4 Cal.4th 155 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

*People v. Sandoval*
  (2001) 87 Cal.App.4th 1425 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 26,27

*People v. Spurlock*
  (2003) 114 Cal.App.4th 1122 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*People v. St. Martin*
  (1970) 1 Cal.3d 524 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

*People v. Watson*
  (1956) 46 Cal.2d 818 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40,79

*People v. Westmoreland*
  (1976) 58 Cal.App.3d 32 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*People v. Williams*
  (1901) 133 Cal. 165 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*People v. Winson*
  (1981) 29 Cal.3d 711 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Pierburg GMBH & Co. KG v. Superior Court*
(1982) 137 Cal.App.3d 238 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Volkswagenwerk Aktiengesellschaft v. Superior Court*
(1981) 123 Cal.App.3d 840 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Williams v. Superior Court*
(1984) 36 Cal.3d 441 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

Constitutions

United States Constitution

- Article VI, second clause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

- Fourteenth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28,30

- Sixth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

California Constitition

- art. I, section 15 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

- art. I, section 16 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50, 51,59

Statutes

Evidence Code

- 140 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

- 240 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20,21

- 250 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

- 350 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

- 403 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

- 1240 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

- 1291 .................................................... 20

- 1401 subd. (a) ......................................... 32

- 1410 through 1441 ..................................... 32

- 1421 .................................................. 37

- 1522 subd. (a) ........................................ 39

Penal Code

- 286 subd. (a) ......................................... 73

- 288 .................................................. 43

- 288 subd. (a) ......................................... 51

- 311 subd. (h) ......................................... 43

- 311.4 subd. (b) ....................................... 51

- 311.4(d) .............................................. 43

- 667.61 ............................................... 57

- 667.61 subd. (e)(5) ................................... 54

- 667.61 subd. (i) .................................... 54,56

- 686 subd. (3) ......................................... 20

- 954 .................................................. 75

- 1158 ................................................. 53

- 1181 subd. (9) ........................................ 37

Treaties

Bi-Lateral Mutual Agreement for Legal Assistance (109-13) .................... 25

Convention on Cybercrime ............................................... 24

    Title 3, article 9 .................................................. 25

Treaty on Extradition with Denmark (93-21) ................................ 25

    Article 3, section 6 ............................................... 26

xiv

IN THE COURT OF APPEAL - STATE OF CALIFORNIA
FOURTH APPELLATE DISTRICT
DIVISION ONE

PEOPLE OF THE STATE OF CALIFORNIA,)
                             )
          Plaintiff and Respondent, )    Court of Appeal
                             )    No. D048294
v.                           )
                             )    Superior Court
PAUL GORDON WHITMORE,     )    No. SCD165314
                             )
              Defendant and Appellant. )

APPEAL FROM JUDGMENT OF THE
SAN DIEGO COUNTY SUPERIOR COURT,
THE HONORABLE GALE E. KANESHIRO, JUDGE

---

APPELLANT'S OPENING BRIEF

---

### Introduction

In late 2001, police officials in Sweden and Denmark launched an investigation into international trafficking of child pornography utilizing the Internet. The investigation exposed instances of the most sordid sexual exploitation of children ever encountered by law enforcement. Some of the suspects, including appellant, were alleged to have taken photographs and videos while molesting their own and other young children, and exchanged these with other pedophiles over the Internet. Numerous suspected child molesters

1

were identified from a computer seized in Denmark. The initial investigation reached other countries as well, including Sweden, Switzerland, Germany, France, Belgium, and Great Britain. Some of the participants were living in the United States. In July, 2002, United States Attorney General John Ashcroft, and Customs Commissioner Robert Bonner, held a joint news conference announcing the arrests of at least 25 suspects in this country, with approximately 50 more expected.[1] By then, acting on information provided by Interpol, the investigation had broadened to include suspects in Australia, Canada, Israel, Italy, Japan, South Korea, New Zealand, Portugal, Russia, Spain, Sweden, Taiwan and Turkey.[2]

Appellant, a licensed marriage, family and child counselor, was among those arrested, along with a Catholic priest, teachers' aides, members of law enforcement and the military.[3]   Brooke Rowland, another San Diego resident, was originally a co-defendant in the case. Rowland entered a negotiated guilty plea prior to trial and received a sentence of 15 years-to-life.

The trial lasted five weeks, and the jury deliberated for just five hours.

---

[1] The investigation was code named "Operation Hamlet," in apparent reference to the line from Shakespeare's, Hamlet, "Something is rotten in the state of Denmark." (Spoken by Marcellus in Act I, Scene IV.)

[2] See www.CNN.com, July 2, 2002.

[3] See www.CNN.com, February 19, 2002.

2

Appellant was convicted of 54 felony counts, many involving the sexual abuse of his own young daughter. Judge Kaneshiro thereafter expressed personal outrage at appellant's depraved conduct. He was sentenced to 467 years and eight months-to-life in state prison.

Appellant had entered a "slow plea" to related charges in the United States District Court, Eastern District of California, at Fresno, where sentencing was continued pending completion of this case. At the time he waived jury trial, appellant acknowledged the federal government would be seeking a prison term of 40 years, to run concurrent with any sentence imposed in this case.

Appellant raises numerous issues on appeal, including admissibility and sufficiency of the evidence, instructional errors, *Crawford* error, as well as procedural and substantive due process violations. Essentially, highly incriminating evidence was introduced as trial with little or no regard for the rules of evidence or relevant constitutional protections. The most egregious violations involved the introduction of statements from a Danish witness who was not present at trial and was never made available for cross-examination.

### Statement of Appealability

This is an appeal from a final judgment of conviction following a jury trial. It is authorized by Penal Code section 1237.

////

3

## Statement of the Case

Appellant, Paul Gordon Whitmore, was charged by way of information with 22 counts of lewd acts with a child (Penal Code section 288(a)). In four of those counts it was alleged that he engaged in tying and binding his victim(s) (Penal Code section 667.61(c)), and in each count it was alleged that appellant committed the acts against multiple victims. (Penal Code section 667.61(b)(c)(e).) (3 CT 703.)

Appellant was further charged with nine counts of aggravated sexual assault on a child (Penal Code section 269), 19 counts of producing child pornography for commercial purposes (Penal Code section 311.4(b)), one count of child abuse (Penal Code section 273a(a)), one count of exhibiting harmful matter to a minor via electronic means (Penal Code section 288.2(b)), one count of child molest (Penal Code section 647.6(a)), and one count of attempting to dissuade a witness from reporting a crime. (Penal Code section 136(b)(1).) (3 CT 703.)[4]

Prior to trial, appellant rejected the court's offer of a pre-plea indicated sentence of 25 years-to-life. (7 RT 371.)

---

[4] As noted above, appellant was originally charged jointly with co-defendant Brooke Rowland. However, on the eve of trial, Mr. Rowland entered a negotiated plea of guilty, and so the court modified the reading of the information to the jury to omit references to Mr. Rowland. (6 RT 354; 7 RT 503.)

4

At the close of the prosecution's case, the court granted appellant's motion under Penal Code section 1118.1 motion to dismiss counts 12, 47 and 53. (25 RT 3089.) Count 34, charging a violation of Penal Code section 286, was amended by replacing a reference to sodomy with "289(a), penetration by a foreign object." (25 RT 3083.)

Following a four week jury trial, appellant was convicted of all counts, except one count of committing a lewd act against a child. The single count of child abuse was dismissed. (5 CT 827-877.)

After denying various new trial motions, the court stated, "I will indicate to you, Mr. Whitmore, that this is the most egregious, most horrible and most distressing case I have handled in my 28 years in the California criminal justice system . . . your actions have been the most depraved and you are the most despicable individual I have come across. You have expressed and shown absolutely no remorse for your actions . It appears that you still believe that you had the absolute right to sexually molest all of these children." (29 RT 3617-3618.)

The court stayed sentencing of three counts under Penal Code section 654 (29 RT 3625, 3626) and imposed an aggregate determinate sentence of 42 years and eight months (29 RT 3629), to run consecutive to an indeterminate term of 425 years-to-life. (29 RT 3636.)

5

Appellant timely filed a notice of appeal (5 CT 1112) and, following a

formal restitution hearing, an amended notice of appeal. (5 CT 1112a.)

### Statement of the Facts

*The Prosecution's Case*

Save the Children is an international, non-governmental organization

which promotes the welfare of children and assists law enforcement in

uncovering child abuse. (10 RT 785.) In November, 2001, the Swedish branch

of the organization received a tip regarding a photographic image on a Web site

depicting a minor female being sexually abused. (10 RT 786.) The background

of the image, i.e., electrical outlets, furniture, and a t-shirt with a company

logo worn by an adult male in the photograph led the Save the Children director,

Per-Erik Åström, to believe the photograph may well have been taken in

Denmark. (10 RT 788.) The logo on the man's shirt identified a small company

named Danish Netsurf, located in Ringkoebing, Denmark. (10 RT 790.) The

girl in the image had physical features typical of a young Scandinavian female

and was being subjected to sadistic treatment. (10 RT 788-789.)

The Web site where this image was located was actually a "news group."

(10 RT 788.) A news group is similar to what used to be called a "bulletin

board" – it displays a series of e-mails and attachments posted by people

interested in a particular subject, and the replies the e-mail generates. (10 RT

6

789.) The image brought to Åström's attention was one of a series of approximately 15 photographs which depicted "very rude and very awful doings with this girl." (10 RT 791.)

The organization works closely with the Swedish National Criminal Police, also in Stockholm. (10 RT 786, 791.) A copy of the images was transferred to a compact disk and delivered to the National Police. (10 RT 791.) At the time of trial, the images were still available on the Internet via various Web sites located around the world. (10 RT 791.) At trial, Åström stated that, although the man's face was not shown, other features of the man in the images did not resemble appellant. (10 RT 794.)

Arne Pallesen, is a criminal investigator with the Ringkoebing Police in Denmark. (10 RT 800.) On November 16th, 2001, based on information he received from Swedish police, he went to the residence of Eggert Jensen to investigate. (10 RT 802.) The information included a photographic image of a young girl being subjected to sadistic sexual abuse. (10 RT 802; People's Exhibit No. 44.) Jensen's house was in the small nearby town of Tarm. (10 RT 802.) Pallesen searched the residence and confiscated Jensen's computer. (10 RT 805, 810.) Much of the data on the computer was encrypted. (8 RT 654.) He recognized Eggert Jensen as the male adult depicted in the photograph, and Jensen's nine year-old stepdaughter as the young girl in the image. (10 RT

7

803.)

An empty envelope with a United States postmark bore the name of the sender, "Paul Whitmore." (10 RT 812.)  A similar envelope with a San Diego post office box as the return address showed the name, "Cherry Blossom." (10 RT 815.)  A third envelope bore the name Eggert Jensen and "Gussi," an alias he used on the Internet. (10 RT 813.)   Jensen and his wife were arrested. (10 RT 806.)

A forensic computer examiner with the Danish National Police conducted an examination of Jensen's computer, utilizing the EnCase program.[5]  (10 RT 826.) One of the three volumes found on Jensen's computer hard drive was encrypted. (10 RT 829.)   Jensen revealed the password to "unlock" the encrypted volume.  (10 RT 842.)[6]  The image originally obtained by Swedish officials depicting Jensen subjecting his stepdaughter to bondage and other sexual acts (People's Exhibit 44) was found on Jensen's hard drive. (10 RT 848.) Numerous images and videos showing children involved in sexual acts were found in the data on Jensen's computer. (10 RT 857.)   Some of this material was traced  to appellant. (10 RT 857.) The information the examiner obtained was

---

[5] EnCase is widely used by law enforcement to conduct forensic examinations of computer data storage devices. (7 RT 386; 10 RT 824; 13 RT 1194; 19 RT 2297.)

[6] Jensen used two different encryption programs, BestCrypt and Pretty Good Privacy, to prevent others from accessing these areas of his hard drive. (10 RT 843.)

8

given to Lars Underbjerg, the lead Danish investigator. (10 RT 845, 853.)

The initial investigation revealed approximately 30 to 40 different suspects located in several countries, including the United States. (10 RT 859.) Underbjerg was able to trace some of the pornography found on Jensen's computer as having been sent by appellant. (10 RT 875.)  That material included images and videos of appellant's daughter and other young girls he was abusing. (10 RT 887.)  The videos included titles such as "bond[age]108," "butt_fuck," "Finger-butt," and "suck1." (10 RT 897.)   On much of the material depicting his daughter, "M.," appellant referred to her as "Menz" in the titles. (10 RT 875.)  In a message from "Mawashi," an alias used by  appellant, he recommended that others use the BestCrypt program to secure their illegal material.  (10 RT 881, 887.)

Underbjerg began working on the investigation involving appellant with San Diego Sheriff's Investigator, Stephanie Guerra. (10 RT 878; 11 RT 952.) She first received information on the case from the U.S. Customs Cyber Smuggling Center in Alexandria, Virginia, on January 25, 2001. (11 RT 951.)

Guerra identified appellant's daughter, "M.," by contacting the elementary school  near appellant's home in San Diego. (11 RT 955.) She believed that appellant's daughter may have been a victim of continuing abuse, and drafted an affidavit for a search warrant. (11 RT 957.)  She also contacted

9

Child Protective Services. (11 RT 957.) A Customs Agent in San Diego contacted Guerra and informed her of another suspect, Lloyd Emmerson, living in Clovis, (Fresno County) California, who may also have been involved with the targeted group of pedophiles. (11 RT 960; 13 RT 1082, 1100.)

Guerra contacted an investigator with the Clovis Police Department. (11 RT 960.) On Sunday, January 27th, 2002, Guerra prepared an affidavit and drove to a judge's house to have the search warrant signed. (11 RT 964.) The warrant was executed at appellant's home that evening. (11 RT 966.) Sixteen law enforcement officers served the warrant; they represented the San Diego Sheriff's Department, San Diego Police Department, United States Customs (now Immigration and Customs Enforcement), United States Naval Investigative Service and the United States Postal Inspection Service. (11 RT 1065.) Appellant was arrested at the time of the search. (11 RT 967.) Appellant's wife, son and daughter were present when police arrived. (11 RT 968.)

Upon entering the house, Guerra noticed two recliner chairs in the living room that were identical to those she had seen in images provided by Inspector Underbjerg. (11 RT 969.) She also recognized a wicker chair from images received from Denmark officials. (11 RT 971.) Sexual devices were found and confiscated. (13 RT 1079.) In appellant's house, she found a padded mailing envelope addressed to the subject of the Clovis investigation, Lloyd Emmerson.

10

(11 RT 975.) The return address contained the initials, D.C.B. (11 RT 977.)

She later learned that appellant used "Digital Cherry Blossom" as an alias on the

Internet. (11 RT 977.) All of the computers in the home were seized, as were as

several media storage items including CDs, floppy disks and zip disks. (11 RT

980.) Police also found multi-colored ropes and handcuffs similar to those

appearing in photographs depicting young girls in bondage situations. (11 RT

982.) Photographs of former co-defendant Rowland's minor children were also

found, as were sexually explicit photographs of other children, some appearing

to be as young as four years old. (13 RT 1041.)

Appellant's wife later telephoned Guerra and informed her that she had

found items the police had overlooked in the search. (11 RT 987.) Guerra went

to appellant's home on February 27, 2002, and was shown several "dildos," and

other sexual devices, which she confiscated. (11 RT 988; 12 RT 1016, 1018; 13

RT 1073; 18 RT 1990.)

Over defense objection, a police officer witness read to the jury a 91 page

"chat log" taken from Jensen's computer, allegedly consisting of text messages

between appellant and Jensen, and appellant and Jensen's wife. (11 RT 994; 12

RT 1003, 1007; 13 RT 1104, 1114.)

On January 26, 2002, Clovis police served a search warrant on the

residence of Lloyd Emmerson. (13 RT 1153.) Officers seized Emmerson's

11

computer and removable storage media. (13 RT 1155.) Police copied to compact disks and provided to Detective Guerra, a compilation of images found at the Emmerson residence. (13 RT 1158.) Emmerson's computer also contained images of appellant's daughter, "M.," and other young girls connected to appellant, engaged in sexual situations. (13 RT 1160, 15 RT 1403; People's Exhibits 86 -117, 120-133.) Police found images of appellant engaging in sexual conduct with Emmerson's daughter. (15 RT 1406; 16 RT 1585.) Much of Emmerson's data was encrypted using both BestCrypt and Pretty Good Privacy. (14 RT 1235.) "Daj," "Dajmar," "Mawasha Domo," "Bruno Canner," "Knocksbodden," and "Bacha Kichar" were allegedly nicknames appellant used in communications with Emmerson. (14 RT 1291, 1333.) A forensic examiner offered the opinion that appellant developed a Web site containing images of his daughter, which he signed "Mawasha." (14 RT 1335.)

Emmerson's wife testified that her husband and appellant were friends. (16 RT 1591.) Appellant and his daughter had visited their home. (16 RT 1594.) Her husband took "school pictures" of the girls. (16 RT 1595.) She identified photos of her three daughters, some with appellant in their living room. (16 RT 1593.)

Emmerson's 12 year-old daughter testified she had met appellant and his daughter and identified photos, although she did not recall any activity with

12

them. (16 RT 1643.)

Appellant's sister-in-law testified that her daughters (nine and fifteen years-old) occasionally visited the Whitmore house. (16 RT 1646.) She once found a pack of condoms in her nine year-old's backpack and her daughter said she received them from appellant. (16 RT 1649.) Once, after returning from appellant's house, her daughters seemed tense and scared and never visited again. (16 RT 1651.) The older sister testified about visiting her cousin's house where appellant photographed her. (16 RT 1680.)

Tabatha S., appellant's wife's young cousin, testified about visiting appellant's house and his taking photographs of her, clothed and nude. (17 RT 1742, 1749.) Appellant had shown her videos of his daughter, "M.," naked and tied up, as well as one of four naked boys touching each other. (17 RT 1730.) Appellant also showed her a video of "M." touching his penis. (17 RT 1732.) She watched as appellant took nude photos of his daughter. (17 RT 1755.) Appellant also took photos of Tabatha and his daughter nude, playing with a "dildo."[7] (17 RT 1759.) Appellant had her touch his penis, and he touched her vagina, breasts and buttocks. (17 RT 1767, 1776.) She also masturbated appellant. (RT 1776.)

---

[7] A phallic sexual device or "toy."

13

Appellant's former wife, Lisa, testified they were married in 1982. (17 RT 1791.) Appellant was a licenced marriage, family and child counselor, with a master's degree in educational psychology. (17 RT 1794, 1799.) They had a son in 1988 and a daughter in 1991. (17 RT 1793.) Their son and daughter suffered from Attention Deficit Disorder. (17 RT 1802.) Appellant spent most of his free time on his computer, and Lisa had seen innocuous photos he had taken of their daughter and niece. (17 RT 1828.) While Lisa used a computer in her employment at Kaiser Hospital, appellant was more technologically advanced as he spent a great deal of time on his computer and had certifications in Microsoft software, web design and digital photography. (17 RT 1826.)

She never realized what was taking place until the night police came to their home and showed her nude photographs appellant had taken of her daughter. (17 RT 1875.) Appellant had showered with their daughter until she was eight or nine years-old when Lisa put an end to it. (17 RT 1880.)

After their children were born, appellant and Lisa began experiencing "intimacy problems" in their marriage and engaged in sexual relations with increasing infrequency. (18 RT 1993.) In the years prior to appellant's arrest, he had stopped going to marital counseling with his wife. (18 RT 2012.)

Appellant's daughter, "M." was 13 years-old when she testified. (18 RT 2020.) Beginning in the third grade, M. spent a great deal of time at home with

14

Tabatha. (18 RT 2025.) She had her own computer and never used her father's,
but he occasionally showed her pictures on his computer. (18 RT 2027.) These
were photos he had taken of her, both clothed and naked. (18 RT 2028.) He
also showed her photos of other young girls. (18 RT 2029.) Her father never
identified the other girls in the nude photos. (18 RT 2030.)

Appellant photographed her with a digital camera and sent the photos to
Lloyd Emmerson or Brooke Rowland. (18 RT 2032.) She was always clothed in
photos taken outside, but photos taken inside the house showed her clothed and
naked. (18 RT 2033.)

Appellant usually photographed her in the living room because it was
large and he could use a blue sheet tacked on the wall behind her. (18 RT 2035.)
She identified herself and other girls appearing in various photographs. (18 RT
2035; People's Exhibits 75, 83, 86, 100, 101, 110, 113, 111, 112, 125. )
Sometimes her father tied her up before taking the photos and she could not free
herself. (18 RT 2044.) One set of photos of "M." and Rowland's daughter,
were taken by appellant and Rowland. (18 RT 2035; People's Exhibits 111,
112.)

Other photos showed her naked with her father touching her buttocks with
his penis. (18 RT 2048; People's Exhibit 72.) Another showed her performing
oral sex on her father, and another with a "dildo" in her anus, placed there by

15

her father. (18 RT 2050; People's Exhibits 87, 96 and 97.) She told her father she did not like taking the photos but she believed she needed to do this for him. (18 RT 2056.)

Her father usually made videos of her on Saturdays when her mother and brother were not home. (18 RT 2059.)

She said that appellant had been a good father to her except when taking photos, especially the ones involving sexual acts. (18 RT 2064.) Both Rowland and Emmerson had touched her while her father was present and she saw her father touch the Emmerson girls. (18 RT 2069.)

Appellant's son testified that when he was very young his father had taken nude photos of him, but not in an overtly sexual manner. (19 RT 2230.) When he was 11 or 12 years old, his father showed him pornographic images of children on his computer. (19 RT 2217.) He told his father he thought they were disgusting and his father never showed him such photos again. (19 RT 2218.) He never saw pornographic images of his sister. (19 RT 2220.)

When his mother was gone, his father would take his sister and her cousin into his bedroom and close the door. (19 RT 2231, 2271.) He did not realize what was occurring and was shocked when police came and arrested his father. (19 RT 2217.)

A U.S. Customs computer forensic examiner testified regarding the

16

material he found on the computers, storage media and cameras seized from appellant's residence. (19 RT 2294.) Much of this material was encrypted with one or more programs – BestCrypt, Pretty Good Privacy, Stealth Encryptor and Top Secret Messenger – so he was unable to access it. (19 RT 2321, 2325.) Other programs on the computers had the capacity to completely erase files so they could not be recaptured by programs such as EnCase. (19 RT 2333.)

Among the material he was able to access, he found bondage videos, nude young girls wrestling, and girls painting their toenails. (19 RT 2342.) He compiled a CD of child pornography images he had recovered from CDs and other storage media taken from appellant's house. (19 RT 2347, 2353; People's Exhibits 169, 170.)

Another forensic examiner testified as to the email data he found on appellant's computers where appellant used the nicknames Paul, Mawashi and Bruno Kanner. (20 RT 2392.) He also testified as to child pornography images he found on "loose media" taken from appellant's home, i.e., CDs, floppy disks and zip disks. (20 RT 2402.)

Appellant's former co-defendant, Brooke Rowland, testified for the prosecution. He acknowledged he was doing so only in exchange for a letter from the prosecutor stating he had cooperated, and to spare his daughters from having to testify. (21 RT 2633.)

17

Rowland had first met appellant during a discussion and support group on the Internet. (21 RT 2634.) He first visited appellant's house in 2001 and brought his two daughters. (21 RT 2636.) Appellant was there with his daughter, "M." (21 RT 2636.) Appellant had laid out a blue plastic tarp in the living room so the girls could play with body paints. (21 RT 2636.) The three girls removed their clothes and painted one another. (21 RT 2637; People's Exhibit 111.) Appellant photographed them in the process. (21 RT 2641.) The girls showered after taking the photos. (21 RT 2646.) Rowland and appellant were also naked at the time. (21 RT 2647.) The girls did not dress right away after showering, but instead began jumping on the bed. (21 RT 2647.)

Detective Guerra played several videos for the jury, each depicting appellant and M, including: "Bond0108," "butt_fuck," "finger_butt," "suck1," and "suck2." (21 RT 2685 - 2699.) Out of the presence of the jury, she graphically described, for the record, what each video depicted. (24 RT 2929-2935, 3060-3067.)

### The Defense Case

Dr. Marilyn Kaufhold, a physician at Children's Hospital, conducted a child sexual abuse examination of M. on January 28, 2002. (21 RT 2548, 2557.) The examination and subsequent lab results revealed nothing abnormal as to M.'s vagina and anus. (21 RT 2560.) A lack of physical findings does not rule

18

out that sexual abuse may have occurred because many molest activities do not produce injuries. (21 RT 2562.)

The prosecution and defense stipulated to facts the defense considered exculpatory, e.g., that when the series of photographs were taken involving naked young girls playing with finger paints, one of the Rowland girls stated that while appellant was present, co-defendant Rowland took all the photographs, and that while all three girls showered with appellant and Rowland, there was no "bad behavior" in the shower. (26 RT 3210.) Also, in her initial interview by a staff member from Child Protective Services, appellant's daughter reported no history of abuse by appellant. (26 RT 3211.) There were stipulations involving inconsistencies in some of the other girls' prior statements to authorities. (26 RT 3213-3214.)

////

////

////

////

////

////

////

////

19

## Argument

### I

**Appellant was denied his Sixth Amendment right to confront
and cross-examine the witnesses against him where the trial
court permitted the prosecution to read a 91, page transcript
of an alleged "ICQ chat" between appellant and the Jensens,
after finding the Jensens were beyond the reach of the court's
subpoena power, because the prosecutor failed to establish
that they were truly "unavailable."**

### *Background*

Over defense objection, the prosecution was permitted to read to the jury,

a 91 page written transcript of several "chats"[8] between appellant and the

Jensens. The transcript was introduced as People's Exhibit 85. (11 RT 991; 12

RT 1003.) The prosecutor was permitted to introduce hearsay statements from

Eggert Jensen to lay a foundation to authenticate this evidence. (8 RT 521.) [9]

The ICQ chats were not encrypted, and therefore any person with access to this

folder could edit it at will. (8 RT 610.) The court found that the chat log was

"self-authenticating" and included statements against interest. (8 RT 680.)

In an exchange dated July 10, 2001, appellant allegedly wrote about

---

[8] "ICQ" is shorthand for "I seek you," a program which allows users to utilize an
instant messaging type program to "chat" using text messaging on their home computer.
(10 RT 877.)

[9] The court ruled that the Confrontation Clause, as addressed in *Crawford*, did not
apply because the testimony was not being presented to a jury. (8 RT 544.)

20

sending Jensen a video of himself having sex with his daughter for the first time without a condom. (Ex. 85, p. 1.) He also stated that she had just recently "let me cum in her butt." (Ex. 85, p. 2.) On August 10, 2001, appellant wrote that his daughter liked to watch "BJ videos" with him. (Ex. 85, p.4.)

From the exchange which allegedly took place on July 10, 2001:

Whitmore asks if Jensen had received a video of him having sex with his daughter without a condom for the first time. (Ex. 85, p.1.)

Appellant asks if Jensen's daughter "has seen you cum." (Ex. 85, p. 2.)

Jensen replied that she has not because Bente, Jensen's wife, "warned her about it." (Ex. 85, p. 2.)

From the exchange dated August 10, 2001:

Whitmore tells Jensen that his daughter "is in the living room, I can see her from here, on the carpet masturbating." (Ex. 85, p. 4.)

Whitmore brags to Jensen that the mother of one of the girls he is molesting, "is totally clueless. I've pulled [her] pants down in front of Mom before and she told me next time to do her panties too!" (Ex. 85, p.5.)

Whitmore tells Jensen that a younger girl "is just so naive, no idea why I like seeing her naked." Her older sister "knows why I like her body, and likes it too." (Ex. 85, p. 5.)

Whitmore states that his wife is also "clueless– I'd have been in jail years

21

ago otherwise." (Ex. 85, p. 6.)

Jensen and Whitmore discuss how they believe their daughters and other young girls they are molesting have "the most perfect butts in the world," however their own daughters look the best in bondage scenes. (Ex. 85, p. 8.)

Whitmore and Jensen discuss the potential of creating personal pornographic Web sites for some of their young victims once they turn 18 years-old. (Ex. 85, p. 8.)

The two discuss using various girls in "domination" scenes. (Ex 85, p. 9.)

From October 10, 2001:

Whitmore tells Jensen that his daughter likes seeing pictures of Jensen's daughter and likes the fact that Jensen's wife "helps" her daughter pose for pornographic pictures. (Ex. 85, p. 11.)

Whitmore and Jensen discuss photos of Jensen's wife and daughter together. (Ex. 85, p.12.)

From October 12, 2001:

Whitmore and Jensen discuss using cotton versus nylon ropes to tie-up their daughters in bondage scenes. (Ex. 85, 15.)

Similar graphic and sometimes shocking exchanges continued through November 15, 2001.

22

The prosecutor quoted extensively from this exhibit in his closing argument:

> "Exhibit 85 is probably one of your best sources of information, because it is 91 pages, where defendant chatted with a buddy of his over in Denmark, Mr. Jensen, and told you what he really thought about things. 'I like to trade because I like to see naked little girls with their legs spread wide.' Look for that. That's on Page 19. That's what he said. That's what he wants."

(26 RT 3290)

The prosecutor repeatedly featured Exhibit 85 in arguing the various aspects of virtually every count in the information. (See, e.g., 26 RT 3295, 3330, 3341, 3343, and 3451-3454.)

### Applicable Law

The Sixth Amendment to the United States Constitution guarantees a criminal defendant the right to confront and cross-examine his accusers. (*Pointer v. Texas* (1965) 380 U.S. 400; *Michigan v. Lucas* ( 1991) 500 U.S. 145.) Our state constitution contains a similar guarantee. (California Constitution, art. I, section 15; *People v. Louis* (1986) 42 Cal.3d 969, 982. And see Penal Code section 686(3).)

This right has two aspects: it ensures that the defendant may personally examine or cross-examine the witnesses, and it compels the witness to stand before the jury so that the jurors have an adequate opportunity to assess his or

23

her credibility. (*People v. Louis, supra,* 42 Cal.3d 969, 982.)

The right may be restricted only in narrowly defined circumstances, such as the unavailability of a previously testifying witness. (See e.g., *Ohio v. Roberts* (1980) 448 U.S. 56; Evidence Code sections 240, 1291; *People v. Lepe* (1997) 57 Cal.App.4th 977, 982.)

In order to invoke the "unavailable witness' exception to the hearsay rule, the proponent of the evidence must establish the declarant's unavailability under the standards set forth in Evidence Code section 240.[10]

---

[10] Evidence Code section 240 holds:

"a) Except as otherwise provided in subdivision (b), "unavailable as a witness" means that the declarant is any of the following:

"(1) Exempted or precluded on the ground of privilege from testifying concerning the matter to which his or her statement is relevant.

"(2) Disqualified from testifying to the matter.

"(3) Dead or unable to attend or to testify at the hearing because of then existing physical or mental illness or infirmity.

"(4) Absent from the hearing and the court is unable to compel his or her attendance by its process.

"(5) Absent from the hearing and the proponent of his or her statement has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process.

"(b) A declarant is not unavailable as a witness if the exemption, preclusion, disqualification, death, inability, or absence of the declarant was brought about by the procurement or wrongdoing of the proponent of his or her statement for the purpose of preventing the declarant from attending or testifying.

## *Legal Analysis*

The present issue involves two claims. First, the prosecution failed to

adequately establish that the Jensens were "unavailable" as witnesses, and was

improperly permitted to utilize inadmissable hearsay in its efforts. Next,

permitting the prosecutor to introduce hearsay statements of persons he knew

were beyond the reach of the court's process denied appellant due process and

the Sixth Amendment right to confront and cross-examine adverse witnesses.

In this case, as the trial court emphasized when ruling on defense

counsel's foundational and hearsay objections, the prosecutor produced several

law enforcement witnesses from Scandinavia. (8 RT 527.) Yet, he claimed he

was unable to subpoena the key witness as to Exhibit 85, Eggert Jensen,

because "He is outside the service of process of this court." (8 RT 527.) When

asked what specific efforts he had made to produce Jensen, the prosecutor

---

"(c) Expert testimony which establishes that physical or mental trauma resulting from an
alleged crime has caused harm to a witness of sufficient severity that the witness is
physically unable to testify or is unable to testify without suffering substantial trauma may
constitute a sufficient showing of unavailability pursuant to paragraph (3) of subdivision
(a). As used in this section, the term "expert" means a physician and surgeon, including a
psychiatrist, or any person described by subdivision (b), (c), or (e) of Section 1010.

"The introduction of evidence to establish the unavailability of a witness under this
subdivision shall not be deemed procurement of unavailability, in absence of proof to the contrary."

25

replied, "He is outside the service of process. I don't have service of process that goes outside of this state." (8 RT 527.) This statement is incorrect. Penal Code section 1334 *et seq.*, specifically provides a process for obtaining the attendance of witnesses from outside the state.

The court questioned the prosecutor as to whether he had attempted to work through the United States government or, perhaps, the Danish government, to obtain the attendance of Mr. Jensen. (8 RT 528.) The prosecutor conceded that "I would imagine that it could be done," however he made no such efforts. (8 RT 528.) The court referenced a prior case over which it had presided, where a person was produced from Cambodia. (8 RT 529.)

The prosecutor then insisted he had no means under international law to bring Mr. Jensen to California. (8 RT 530.) He provided no legal authority. In fact, ordinarily, the United States has no authority to enforce a subpoena in a foreign country against a non-resident, non-citizen of the United States. (*D'Aquino v. United States* (9th Cir. 1951) 192 F.2d 338, 376;[11] *United States v. Gordon* (1st Cir. 1980) 634 F.2d 639, 645; and, *cf. Blackmer v. United States* (1932) 284 U.S. 421.)

However, the prosecutor apparently never even requested that the Jensens

---

[11] The decision in this case is the appeal of the treason conviction of the infamous "Tokyo Rose."

26

*voluntarily* travel to California and testify. At the time of trial, Mr. Jensen was in custody. (8 RT 531.) He had previously cooperated with authorities by providing passwords to his encrypted computer folders. (10 RT 842.) Danish Investigator Underbjerg testified that Jensen had pled guilty to all 49 counts charged against him, and had been very cooperative: "He actually helped the police investigating in the case in some part [sic], and I never caught him in a lie." (8 RT 639.) Nonetheless, the prosecutor failed to approach Danish authorities, who had worked closely with United States Customs and the lead investigator in this case, to perhaps offer some incentive for Mr. Jensen to agree to come to the United States to testify. The record shows that Jensen's cooperation resulted in a sentence of less than two years, some of which was suspended. (8 RT 639.) That is certainly less than the hundreds of years appellant received and no doubt less than he would have faced if he refused to cooperate. Had a request been made for his presence at this trial as part of his own sentence arrangement, there can be little doubt that he would have cooperated.

The situation here is very similar to that found in *People v. Sandoval* (2001) 87 Cal.App.4th 1425. There, a critical witness was located in his native country, Mexico. The prosecution claimed the witness was unavailable because he was beyond the court's jurisdiction, and convinced the trial court to admit his

27

prior testimony. It was shown, however, that the witness was willing to come to the United States and testify, if given minimal assistance to do so. (*Id.* at p. 1444.)

> As noted above, the trial court found [the witness] unavailable simply because he was in Mexico and was a Mexican citizen. While this test may have properly determined unavailability under Evidence Code section 240, the test violates the confrontation clause under the circumstances of this case. [The witness] was statutorily unavailable because the trial court could not utilize its own process to compel [the witness'] attendance at trial. The Supreme Court has made clear, however, that to satisfy the confrontation clause, the prosecution must make a reasonable, good faith effort to obtain the witness's presence at the trial. (See *Ohio v. Roberts* (1980) 448 U.S. 56, 74.)

(*Ibid.*)

That Denmark may well have helped to produce the Jensens is made likely by the fact that both the United States and the Kingdom of Denmark are signatories of the Convention on Cybercrime, held at the 109th Session of the Council of Europe, at Budapest on November 23, 2001. That agreement, ratified by Denmark and effective Jan 10, 2005, was also ratified by the United States Senate. Title 3, Article 9, of that agreement consists of an extensive section on the measures to be taken in combating child pornography. While there is no express provision agreeing to mutual production of witnesses in criminal prosecutions, requesting that Denmark make one or both of the Jensens available for appellant's trial would certainly have been consistent with spirit of

28

that agreement. And there also exists a Treaty on Extradition with Denmark

since 1974 (Treaty 93-21), and a Bi-Lateral Mutual Agreement for Legal

Assistance since June 23, 2005 (Treaty 109-13.) Treaties are the supreme law

of the land, surpassing even the Constitution:

> This Constitution, and the Laws of the United States which
> shall be made in Pursuance thereof; and all Treaties made, or which
> shall be made, under authority of the United States, Shall be the supreme
> Law of the Land; and the Judges of every State shall be bound thereby,
> any Thing in the Constitution or Laws of any state to the contrary
> notwithstanding.

(United States Constitution, Art. VI, second clause.)

State authorities are thus bound to comply with a treaty, and, conversely,

may accrue its benefits. (See *Clark v. Allen* (1947) 331 U.S. 205.) The terms of

such treaties prevail over any conflicting California law. (*Hopkirk v. Bell* (1806)

7 U.S. 454, 458; *Ware v. Hylton* (1796) 3 Dall. 199, 3 U.S. 199.) California

courts have recognized the supremacy of treaties over inconsistent state laws.

(See *Pierburg GMBH & Co. KG. v. Superior Court* (1982) 137 Cal.App.3d

238, 246; and, *Volkswagenwerk Aktiengesellschaft v. Superior Court* (1981) 123

Cal.App.3d 840.)

In referring to the mutual legal assistance treaty with Mexico, the

*Sandoval* court stated:

> The Treaty also gave the prosecution means by which it may have

29

obtained [the witness'] testimony at trial. The cooperation of Mexican
authorities could have been invoked under article 9 to facilitate [the
witness'] attendance, both by inviting him and by communicating to
him the extent to which his expenses would be paid. While this article
does not provide that the Mexican authorities will compel attendance
of the witness, it allows cooperation.

(*Id.* at p. 1442.)

The prosecution never attempted to utilize, or even research the applicable

provisions of international law. In practical terms, there would have been little

difficulty in having Jensen escorted to trial by the Danish investigators who

appeared and testier.

Moreover, sections of the treaties also provide for video-taped

depositions. (See e.g., Art. (3), section (6) of the 1974 treaty.)    The procedure

for deposing a willing witness in Denmark is described in the United States

Department of State Web site,   http://travel.state.gov/law/info/judicial/

judicial_698.html.  Video-taped depositions of witnesses in foreign countries,

when conducted with due process safeguards in place, have been held in

numerous criminal cases to satisfy the requirements of the Confrontation Clause.

(Eg., *United States v. Marchese* (U.S. Dist. Colo. 1994) 842 F.Supp. 1307;

*United States v. Gifford* (ED Penn. 1988) 684 F.Supp. 125; and, *United States*

*v. Johnpoll* (2nd Cir. 1984) 739 F.2d 702.) However, before invoking the use of

a deposition in a criminal case, the prosecution must establish that it has

30

exhausted all reasonable, good faith efforts to produce the witness at trial. (*People v. Sandoval, supra,* 87 Cal.App.4th, at pp. 1443-1444.)

The prosecutor presented no evidence that he had sought assistance under these agreements by contacting the United States Department of Justice or the Kingdom of Denmark Ministry of Justice. In short, *no effort* was made to obtain the attendance of either of the Jensens using any of the means readily available to the prosecutor.

The prosecutor attempted to invoke hearsay exceptions, such as the spontaneous statement exception under Evidence Code section 1240, and statements by a co-conspirator. He made no showing that either would apply to Jensen under Danish law, and could not offer a feasible scenario as to the statement by a co-conspirator. (8 RT 532.) The court subsequently rejected the statement by a co-conspirator theory. (8 RT 547.)

When the court inquired how the prosecutor would "get around" *Crawford,*[12] he simply replied that *Crawford* did not apply. (8 RT 532.) It is unclear whether the court was referring here to the Confrontation Clause violation in admitting the transcripts or the *independent Crawford* violation based upon Jensen's statements used by the Danish police to authenticate the transcripts. (8 RT 521.)

---

[12] *Crawford v. Washington* (2004) 541 U.S. 36.

31

A witness is not unavailable for purposes of the right of confrontation unless the prosecutorial authorities have made a good-faith effort, exerting due diligence, to obtain the witness's presence at trial. (*People v. Cromer* (2001) 24 Cal.4th 889, 904.) "We have said that the term 'due diligence' is 'incapable of a mechanical definition,' but it 'connotes *persevering* application, *untiring efforts in good earnest, efforts of a substantial character'.*" (*Id.* at p. 905 [internal citations omitted, emphasis added].) On review, the appellate court exercises its independent judgment to determine whether the prosecution's efforts to obtain the presence of the missing witness were, in fact, persevering and tireless in conformance with the applicable standard. (*People v. Louis, supra,* 42 Cal.4th 969, 984.) As stated by the United States Supreme Court, "[t]he lengths to which the prosecution must go to produce a witness before it may offer evidence of an extra-judicial declaration is a question of reasonableness." (*Green v. California* (1970) 399 U.S. 149, 189 fn. 2.)

The prosecutor failed to establish the unavailability of the Jensens and no oral or written statements by them should have been admitted.   Appellant submits that, on this basis, there was an insufficient showing of "unavailability," and therefore the admission of the statements was an unauthorized departure from the guarantees of the Confrontation Clause. (*Barber v. Page* (1968) 390 U.S. 719, 722-725.)

32

Moreover, in a case such as this, even if the unavailability of the Jensens had been established, and there were no applicable treaties, a prosecutor cannot be permitted to produce evidence from a foreign national, a person he knows cannot be involuntarily produced, thereby avoiding the Confrontation Clause, without running afoul of the due process guarantees of the Fourteenth Amendment. (See *Lilly v. Virginia* (1999) 527 U.S. 116 [introduction of statements by non-testifying accomplice that inculpated accused violated the Confrontation Clause].)

The states are under a duty to ensure that material witnesses are not, by state action, made unavailable to the defense. (*United States v. Valenzuela-Bernal* (1980) 458 U.S. 858, 864; *Washington v. Texas* (1967) 388 U.S. 14, 16.)

An analogy may be made to the due process prohibition of a prosecutor suppressing evidence favorable to the defense (*Brady v. Maryland* (1963) 373 U.S. 83), including the situation where the state allows an informer to leave the jurisdiction so as to become "unavailable." (*People v. Kiihoa* (1960) 53 Cal.2d 748, 752.) Suppression of such evidence need not be intentional or in bad faith if it results in an unfair trial. (*People v. Westmoreland* (1976) 58 Cal.App.3d 32, 46.) And these obligations apply not only to the prosecutor's office, but to the entire "prosecution team." (*In re Brown* (1998) 17 Cal.4th 873, 879.)

33

In this case, the prosecutor used as his evidentiary centerpiece a highly

incriminating and highly inflammatory document, knowing that it would not be

subject to cross-examination of two of the alleged participants, since he would be

able to hide them behind a veil of "unavailability." He was also aware that it was

highly unlikely appellant would testify to contradict its content.

In *Crawford v. Washington, supra,* 541 U.S. 36, the High Court reversed

a long-standing approach as to when the hearsay statements of an unavailable

witness may be introduced in a criminal trial. The court rejected the concept of

"reliability" and found that it was not a justification for admitting out of court

statements which otherwise violated a defendant's right to confrontation and

cross-examination. The same may be said of the concept of "unavailability"

under the present circumstances. Each case involving an allegedly unavailable

witness must be judged under its own circumstances. (*People v. Winson* (1981)

29 Cal.3d 711, 719.) The prosecution's case here was *designed* to exploit this

so-called unavailability. In this respect, sections of the Evidence Code such as

240 are unconstitutional as applied as they cannot be used to trump appellant's

constitutional rights to confront and cross-examine his accusers as guaranteed by

the Sixth Amendment, and his right to a fair trial as guaranteed by the Due

Process Clause of the Fourteenth Amendment. (See, *Chambers v. Mississippi*

(1973) 410 U.S. 284, where the court invalidated the state's hearsay rule on the

34

ground that it abridged the defendant's Sixth Amendment right to present evidence. See similarly, *Rock v. Arkansas* (1987) 483 U.S. 44, 56.)

### *The error was prejudicial*

Exhibit 85 was the centerpiece of the state's case and involved highly inflammatory statements allegedly made by appellant to the Jensens describing vile sexual acts and desires involving his daughter and other young girls. The prosecutor quoted extensively from the exhibit and it served as the primary link to dozens of the counts charged.

Yet the devastating evidence was presented without any opportunity to confront or cross-examine the Jensens as the Sixth Amendment requires. Because the error is of constitutional magnitude it must be reviewed under the standard set forth in *Chapman v. California* (1967) 386 U.S. 18, 22.

The admission of the highly prejudicial evidence infected the entire trial with an incredible level of unfairness. The state will not be able to show the error was harmless beyond a reasonable doubt. Reversal of the entire judgment is required.

////

////

////

35

## II

**The trial court erred in admitting evidence for which the prosecution failed to establish a sufficient foundation, thereby violating appellant's statutory rights under the Evidence Code and further deprived him of a fair trial guaranteed by the Due Process Clause of the Fourteenth Amendment.**

### *Background*

Throughout the trial, many items of proffered evidence, including photographs, videos, documents and testimony were admitted over appellant's objection that the prosecution had failed to establish the necessary foundation and/or authentication for the admission of this evidence, which was allegedly taken from Jensen's computer in Denmark. Much of it was compiled on a compact disk marked as People's Exhibit 1.

### *Applicable Law*

The term "evidence" includes "testimony, writings, material objects or other things presented to the senses . . ." (Evidence Code section 140.) Only legally competent evidence may be admitted. (*People v. Hamilton* (1963) 60 Cal.2d 105, 128.)

Documentary evidence includes that transmitted or produced by electronic means, such as a computer. (Evidence Code section 250, as amended by Stats. 2002, c. 945 (A.B. 1962) §1.) Prior to its admission, the proponent of any documentary evidence must establish foundational facts such as authenticity and

36

chain of custody. (Evidence Code sections 403, 1401(a).) The decision as to

whether a preliminary fact has been established is within the discretion of the

trial court. (*People v. Pizarro* (2003) 110 Cal.App.4th 530, 543.) However, the

court must determine that such foundational facts have been proven by a

preponderance of the evidence. (*People v. Herrera* (2000) 83 Cal.App.4th 46,

61.) Only evidence that is relevant and material is admissible, and the court has

no discretion to admit irrelevant evidence. (Evidence Code section 350; *People*

*v. Lucas* (1995) 12 Cal.4th 415, 466.)

The proponent must also establish chain of custody.

> The rules for establishing chain of custody are as follows: The
> burden on the party offering the evidence is to show to the
> satisfaction of the trial court that, taking all the circumstances into
> account, including the ease or difficulty with which the particular
> evidence could have been altered, it is reasonably certain that there
> was no alteration. The requirement of reasonable certainty is not
> met when some vital link in the chain of possession is not
> accounted for, because then it is as likely as not that the evidence
> analyzed was not the evidence originally received. Left to such
> speculation the court must exclude the evidence. [Citations.]
> Conversely, when it is the barest speculation that there was
> tampering, it is proper to admit the evidence and let what doubt
> remains go to its weight.

(*People v. Lucas, supra,* 12 Cal.4th 415, 444 [internal citations omitted].)

Authenticity must be established before an item of evidence or secondary

evidence of its content may be introduced. (Evidence Code section 1401 subds.

(a) and (b).) Various methods of authentication are described in sections 1410

37

through 1441.  However, these are not exclusive and other means, such as

circumstantial evidence, content and location are also valid.  (Evidence Code

section 1410; *People v. Gibson* (2001) 90 Cal.App.4th 371, 383.)

*Legal Analysis*

The trial court overruled many foundational objections lodged by

appellant as to the documentary and photographic evidence proffered by the

prosecution.

When Danish police officers searched the Tarm residence of Eggert

Jensen, his computer was seized and several photos and logs were allegedly

copied, as were other papers and envelopes obtained by police.  Many of these

were introduced over defense objection.

The first item was a compact disk compiled by Investigator Underbjerg,

marked as Exhibit 1. The images on the disk were allegedly taken from Jensen's

computer.  This CD contained most of the videos which were introduced in this

case. (21 RT 2683.) The next items were photos allegedly copied from Jensen's

computer, marked as Exhibit 44 (Jensen girl in bondage with Jensen standing beside

her), Exhibit 47 (computer log printout depicting file system used on Jensen

computer), Exhibit 48 (photo of young girl ("M") engaged in oral copulation with

adult male), Exhibit 49 (photo copy of envelopes with appellant's return address

found in Jensen home),  and,  Exhibit 85, a 91 page print-out, allegedly a transcript

38

of ICQ "chat" between appellant and Jensen, which was read to the jury. (See

argument I; 11 RT 994; 12 RT 1003, 1007; 13 RT 1104, 1114.)

The compilation of photographs and videos found on the Exhibit 1 CD were

not authenticated. This issue was discussed by the court and the parties at a pretrial

conference. The court indicated the imagery evidence had to be authenticated

before it could be admitted. (4 RT 275.) Appellant argued that, because the hard

drive from Jensen's computer had been destroyed, the images which were

supposedly copied from that hard drive prior to its destruction did not qualify as

secondary evidence under Evidence Code section 1553. (4 RT 273.) That statute

provides a rebuttable presumption of accuracy for computer print-outs. If the

opposing party introduces evidence that calls into question the accuracy of the

information, the proponent must then prove, by a preponderance of the evidence,

that the information it seeks to introduce is an accurate representation of the images

it purports to represent.

At the *in limine* hearing, the court ruled that, based upon the testimony of the

prosecution's forensic expert, the prosecution had established the authenticity of the

video images. (7 RT 491.) However, the expert's testimony dealt only with the

limited issue of whether the video images were "composites," or "straight shot"

videos. (7 RT 491.) The prosecution must also establish that the computer from

which the information was obtained was operating properly at the time. (*People v.*

39

*Hawkins* (2002) 98 Cal.App.4th 1428, 1447.) Because the hard drive to this computer had been destroyed, and the computer itself was never made available, the prosecution failed to carry its burden under Evidence Code sections 1552 and 1553. The defense was likewise deprived of any means to challenge the presumption of correctness. The prosecution's failure to carry its burden in this regard applies to every item of evidence obtained from Jensen's computer and erroneously introduced at trial.

The court further ruled that "chain of custody and foundation goes to – well, chain of custody goes to weight, not admissibility." (7 RT 491.) The court's ruling was incorrect. As stated in *People v. Lucas, supra,* 12 Cal.4th 415 at 444, it must be established that "it is reasonably certain that there was no alteration. The requirement of reasonable certainty is not met when some vital link in the chain of possession is not accounted for, because then it is as likely as not that the evidence analyzed was not the evidence originally received. Left to such speculation the court must exclude the evidence."

Jensen's computer was seized by Danish police officer Arne Palleson on November 16, 2001. (10 RT 805, 810.) He transported the computer to the local police station in Ringkoebing. (10 RT 810.) There, it was placed in an "empty office." (10 RT 821.) Several days later, Arne Palleson observed Frank Rosenstroem, from the Danish National Police, "working on" the computer. (10 RT

40

821.)

Detective Inspector Rosenstroem examined the Jensen computer, along with two detached hard drives, a "Zip drive," and other detachable memory storage devices. (10 RT 826.) He emphasized the importance of maintaining the hard drives in their original condition, and therefore followed forensic protocol by making a copy of each for examination. (10 RT 827.) He later delivered the data obtained from these storage devices to Detective Inspector Lars Underbjerg. (10 RT 845, 855.) There was no definitive evidence presented that established the continuous chain of custody from Rosenstroem to Underbjerg, and from Underbjerg to law enforcement officials in San Diego.

The break in the chain of custody of this computer began with its placement – at least overnight, perhaps longer – in what was apparently an unlocked, empty office. Detective Rosenstroem thereafter obtained the hard drives and other storage media and moved them to his office for examination. Subsequently, the actual equipment was destroyed.

Prior to the hard drives and other storage media being examined and copied, at least one "vital link in the chain of possession not accounted for," and therefore, "the court must exclude the evidence." (*People v. Lucas, supra,* 12 Cal.4th 415, at p. 444.) The court refused to do so.

The evidence from Jensen's computer included shocking images of Jensen's

41

daughter, sexual images of appellant and his own daughter, including videos of sexual conduct, and a "chat log" containing extensive and highly inculpatory discussions between appellant and the Jensens. The "chat log" presents foundational problems in addition to those addressed above and in the previous argument.

The court permitted Detective Guerra to read to the jury the material attributed to appellant, and Inspector Underbjerg read those parts attributed to Eggert Jensen. (11 RT 993.) Defense counsel objected under Evidence Code section 352, which was overruled. (11 RT 993.) The trial court also denied defense counsel's request to have the reading transcribed. (11 RT 939-940, 993; 12 RT 1003.)

Under the Due Process Clause of the Fourteenth Amendment, the record of the trial proceedings must be sufficient to permit adequate and effective appellate review. (*Griffin v. Illinois* (1956) 351 U.S. 12, 20; *Hardy v. United States* (1964) 375 U.S. 277, 279-282; *People v. Howard* (1992) 1132, 1192.) Penal Code section 1181(9), holds that a defendant is entitled to a new trial if a full transcript is not available for appellate review and the reporter's notes have been lost or destroyed in whole or in substantial part. (*People v. Apalatiequi* (1978) 82 Cal.App.3d 970, 983.) In this case, the court arbitrarily relieved the reporter from her duty to transcribe this critical part of the prosecution's case-in-chief, not only without a stipulation from appellant, but over defense counsel's express objection. Appellant

42

is aware of *no authority* by which a court may refuse to transcribe the presentation of evidence to the jury.

This omission is prejudicial on appeal. The court and the prosecutor seemed to suggest that *only* the actual reading was omitted. (See 11 RT 992, 994.) However, there is nothing in the reported record which informed the jurors what it was they were about to hear, other than a reference to "Exhibit 85," which had been discussed earlier during the testimony of Inspector Underbjerg. (10 RT 869.)

The prosecutor received permission from the court to publish Exhibit 85 to the jury. (11 RT 991.) The prosecutor then indicated that Inspector Underbjerg would be "the voice of Mr. Jensen, while Detective Guerra would be the voice of Paul Whitmore." (11 RT 992.) There was nothing further offered when the reading was completed. (12 RT 1007.) There is no present way to determine what other matters or aspects of this evidence were discussed, or to identify any omissions or misstatements.

The court ultimately found that this document was "self-authenticating." Evidence Code section 1421 holds that, "A writing may be authenticated by evidence that it refers to or states matters that are unlikely to be known to anyone other than the person who the proponent of the evidence claims is the author of the writing." (See *Chaplin v. Sullivan* (1945) 67 Cal.App.2d 728, 734; and, *McAllister v. George* (1977) 73 Cal.App.3d 258, 263.) That was not the case here.

43

The dialogue contained in this printout consisted of matters regarding the molestation of children who were  known to many members of this informal group, who exchanged child pornography over the Internet. The Jensen computer appeared to be the primary "clearinghouse" facilitating these exchanges.

Nowhere in the printout is  Paul Whitmore's name mentioned, although it does refer to  "Mat," which a forensic "expert" testified he "believed" to be appellant's pseudonym.  The writer claimed to have been on his college fencing team, but, again, this too appears to apply to someone other than appellant. (Exhibit 85, p. 2.) Similarly, the writer claimed to have been in the Army, 101st Airborne Division (Ex. 85, p. 60), yet there was no evidence that appellant was ever in the military. (8 RT 633.)

Additionally, this printout was not presented in court in its original condition. Rather, the Danish forensic expert "cut and pasted" sections from an unencrypted folder containing numerous chat logs, including what he believed were discussions between  appellant and the Jensens,  and so he *created* this amalgamation which he transferred to U.S. authorities. (8 RT 623; 10 RT 904.)

Computer printouts have the presumption of accuracy. (Evidence Code section 1552.)  Given that this document was a creation of a forensic computer examiner, such a presumption does not apply and the prosecution bore the "burden of proving, by a preponderance of the evidence, that the printed representation [was]

44

an accurate representation of the existence and content of the computer information or computer program that it purports to represent." (Evidence Code section 1552; *Aguimatang v. California State Lottery* (1991) 234 Cal.App.3d 769, 797.)

The prosecution's forensic expert admitted that he had "altered" the original data, by searching the computer folder and including only that data which he believed reflected text messages between appellant and the Jensens. (10 RT 904.) Under Evidence Code section 1402, a document which has been materially altered is inadmissible unless the proponent can show that (1) "it was made by another, without his concurrence"; (2) that it was altered "with the consent of the parties effected by it"; (3) that the alteration "was otherwise properly or innocently made"; or, (4) that the alteration "did not change the meaning or language of the instrument." (Evidence Code section 1402; *Consolidated Loan Co. v. Harman* (1957) 150 Cal.App.2d 488, 491; *cf. People v. Morris* (1991) 53 Cal.3d 152, 205.)

The present alterations were not "properly or innocently made," but rather created for use as evidence against the alleged writers. The law does not authorize a party to create a writing for the specific purpose of using it as evidence in court.

This evidence was further inadmissible under Evidence Code section 1522(a), in that, in a criminal action, the court must exclude secondary evidence when it determines that the original was in the proponent's possession, and the proponent failed to make it available to the defendant for inspection. Here, authorities

45

intentionally destroyed the "original" which was contained in the hard drive of Jensen's computer.

The individual images obtained from Jensen's computer were used to prove the "produced for a commercial purpose" element of the Penal Code section 311.4(b) counts. The videos compiled on the CD marked as People's Exhibit 1 served as the basis for counts 1 through 8, 36, and 45. The chat log was used to bolster virtually all 55 counts in establishing appellant's intent to produce lascivious images, and to molest his daughter and the other alleged minor victims.

The erroneous admission of copies of images, both "still shots"and videos, and data allegedly obtained from Jensen's computer so infected the proceedings as to deny appellant his rights under the Sixth and Fourteenth Amendments to a fair trial. (*Estelle v. McGuire* (1991) 502 U.S. 62; *Cupp v. Naughten* (1973) 414 U.S. 141.) The illegal admission of this evidence was highly prejudicial. In fact, without it, much of this case would have collapsed for lack of evidence. Even under the lesser "miscarriage of justice" standard of *People v. Watson* (1956) 46 Cal.2d 818, the error requires reversal of the entire judgment.

///

///

///

///

46

## III

**There was insufficient evidence to sustain the convictions in counts 7, 13, 20, 21, 22, 25, 31 32, 41, and 55 for violating Penal Code section 311.4(b), posing a minor for photos involving sexual conduct for commercial purposes.**

### *Background*

Appellant was convicted of 19 counts of violating Penal Code section 311.4(b), producing child pornography for commercial purposes. The evidence was insufficient to sustain the convictions as to 10 of those counts.

Count seven was based upon a video which depicts M., sitting on a toilet, nude. A "screen shot" of this video was marked as Exhibit 68.

Count 13 displayed a series of photographs depicting M. and "Katie" in a bathtub together. This series of nine photographs was marked as Exhibit 75.

Counts 20, 21 and 22 involved a series of 73 photographs showing M., Janelle and Kimberly nude, playing with finger paints and rubbing the paint over each other. The photos were marked, collectively, as Exhibit 75. A separate count was alleged as to each girl.

Count 25 was based on a series of 11 photographs showing Tabatha wearing only a blue jacket, and otherwise nude, while sitting in a chair in front of a blue screen. The series was marked as Exhibit 92.

Counts 31 and 32 were based on a series of 10 photos showing M. and Tabatha in a bathtub together. The series was marked as Exhibit 101. One count

47

was charged for each of the two girls.

Count 40 was based on a series of 12 photographs of appellant's son nude, in the bathroom. These images were marked as Exhibit 148.

Count 41 shows three nude photographs of M., at different ages, standing in a room, standing in a bathtub and lying on a bed. They were marked as Exhibit 120.

Count 55 was based on a series of 43 photos of M. in various poses, covered in a thin white veil. They were marked as Exhibit 125.

Appellant was convicted of each count.

### Applicable Law

When a criminal defendant claims that there is insufficient evidence to sustain a conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Jackson v. Virginia* (1979) 443 U.S. 307, 319; *People v. Johnson* (1980) 26 Cal.3d 557, 576.)

> The test on appeal is whether substantial evidence supports the conclusion of the trier of fact, not the whether the evidence proves guilt beyond a reasonable doubt. [Citation omitted.] The appellate court must determine whether a reasonable trier of fact could have found the prosecution sustained its burden of proving the defendant guilty beyond a reasonable doubt.

(*People v. Reilly* (1970) 3 Cal.3d 421, 425, quoted in *People v. Johnson, supra,* 26 Cal.3d 557, 576.)

48

"Evidence," to be "substantial" must be "of ponderable legal significance . . . reasonable in nature, credible, and of solid value." (*Ibid.*)

To obtain a conviction of producing child pornography as prohibited by Penal Code section 311.4(c), the state must prove beyond a reasonable doubt that the accused promoted, induced or persuaded a minor under the age of 18 years to engage in posing or modeling for the purpose of producing a photograph depicting sexual conduct by the minor. "Sexual conduct" is defined as any exhibition of the genitals or pubic or rectal area for the purpose of sexual stimulation of the viewer, any lewd or lascivious sexual act as defined in section 288. (Penal Code section 311.4(d).)

## *Legal Analysis*

In order to constitute child pornography, a photograph must depict a minor engaging in sexual conduct.

The law is very clear that a photograph depicting the nude body of a minor child who is posing in a sexually neutral or non-suggestive manner does not constitute child pornography.

> The words "exhibition of the genitals, pubic or rectal area" and "for the purpose of sexual stimulation of the viewer" are part of the same phrase, the latter language serving to modify the former. *Together, they speak to the content of the material targeted by the statute rather than the photographer's intent* and describe what is meant in part by the term "sexual conduct." *It is because the language is meant to be read together that simple, straightforward nude photographs of children without more*

49

> *would not fall within the purview of the statute.* Such photographs, even
> if they should depict the pubic or rectal areas of children, would not be
> taken for the apparent purpose of the sexual stimulation of the viewer.

(*People v. Cantrell* (1992) 7 Cal.App.4th 523, 542-543 [emphasis added].)

In 1997, the Legislature expressly approved and adopted the holding in

*People v. Cantrell, supra,* as the definition of what "matter constitutes a person

under the age of 18 years personally engaging in or personally simulating 'sexual

conduct' is limited to visual works that depict that conduct." (Penal Code section

311 subd.(h).)

Noting that numerous federal courts have adopted a list of six factors for a

trier of fact to consider when determining what constitutes child pornography, state

courts have employed the same standard. Thus, the factors for a fact-finder to

consider when determining whether there has been a prohibited exhibition of a

minor child's genitals, pubic or rectal area are:

> 1) Whether the focal point is on the child's genitalia or pubic area;
>
> 2) Whether the setting is sexually suggestive, i.e., in a place or
> pose generally associated with sexual activity;
>
> 3) Whether the child is in an unnatural pose, or inappropriate
> attire, considering the age of the child;
>
> 4) Whether the child is fully or partially clothed, or nude;
>
> 5) Whether the child's conduct suggests sexual coyness or a

50

willingness to engage in sexual activity; and,

6) Whether the conduct is intended or designed to elicit a sexual
response in the viewer.

With the exception of factor number six, which is a required element
of a Penal Code section 311.4 violation, a trier of fact need not find that all
of the first five factors are present to conclude that there was a prohibited
exhibition of the genitals or pubic or rectal area: the determination must be
made based on the overall content of the visual depiction and the context
of the child's conduct, taking into account the child's age.

(*People v. Kongs* (1994) 30 Cal.App.4th 1741, 1754-1755.)

Other courts have expressly held that a photograph of a minor child depicting
simple nudity *does not* violate the statute. (See e.g., *People v. Spurlock* (2003) 114
Cal.App.4th 1122, 1129; and, *In re Ulysses D.* (2004) 121 Cal.App.4th 1092,
1096.)

That such photographs were  taken by a convicted child molester and shared
with another convicted molester for the purpose of sexual gratification has no legal
effect.  The court in *People v. Cantrell, supra,* 7 Cal.App.4th 523, at 542,
emphasized that in determining whether a photograph depicts child pornography,  it
is "the content of the material targeted by the statute rather than the intent of the
photographer" on which a court must focus. (And see similarly,  *People v. Kongs,*

51

*supra,* 30 Cal.App.4th 1741, 1755.) In dealing with a nearly identical federal

statute, the United States Court of Appeals noted, "The crime punished by the

statutes against the sexual exploitation of children, however, does not consist in the

cravings of the person posing the child or in the cravings of his audience. Private

fantasies are not within the statute's ambit." (*United States v. Wiegand* (9th Cir.

1987) 812 F.2d 1239, 1244-1245.)

Another federal appellate court, in reviewing a case in which the photograph

forming the basis of the prosecution had been lost, observed:

> In this case the surveillance tape of [defendant] Villard and
> [informant] Feltman discussing the photograph while viewing it certainly
> could indicate to a reasonable fact-finder that the picture in fact elicited
> a sexual response in the viewers. Although it is tempting to judge the
> *actual* effect of the photograph on the viewer, we must focus instead on
> the *intended* effect on the viewer. We agree with the view expressed by
> the district court in this case:
>
> "Child pornography is not created when the pedophile derives
> sexual enjoyment from an otherwise innocent photograph . . . When a
> picture does not constitute child pornography, even though it portrays
> nudity, it does not become child pornography because it is placed in the
> hands of a pedophile, or in a forum where pedophiles might enjoy it.
> [Citation omitted.]"
>
> We must, therefore, look at the photograph, rather than the viewer.
> If we were to conclude that the photographs were lascivious merely
> because Villard found them sexually arousing, we would be engaging
> in conclusionary boot-strapping rather than the task at hand . . .

(*United States v. Villard* (3rd Cir. 1989) 885 F.2d 117, 124-125, affirming the

judgment of dismissal in *United States v. Villard* (D. NJ 1988) 700 F.Supp. 803.)

Applying these standards to the images depicting M. sitting on a toilet (Exhibit 75), the basis for count seven, it is clear that, this material does not, *as a matter of law,* come within the scope of Penal Code section 311.4. In fact, M. testified that appellant never asked that she "pee" when photographing her. (19 RT 2067.)

Count 13 shows the series of photographs of M. and Katie in a bathtub (Exhibit 75), while Counts 31 and 32 are based on photographs of M. and Tabatha in a tub (Exhibit 101). Count 41 relies on three photos of M., at different ages, standing with a towel, in a bathtub and lying on a bed. (Exhibit 120.) Each of these images depict simple nudity which does not qualify under the child pornography statute.

The same can be said of the photos in Count 25 (Exhibit 92), which show Tabatha in various innocuous poses, wearing only a jacket.

The series of 75 photographs (Exhibit 75) depicting M., Janelle and Kimberly nude, playing with finger paints, similarly shows nothing more than children playing together.

The 12 photographs of appellant's son (Exhibit 148), which form the basis of Count 40, are similar to those previously described. In two of the photographs he is seen bending forward, pulling his underwear down to expose his buttocks. However, most of these photos are part of a series taken on the same occasion, and

53

the two photos mentioned are similar to the others, which show the boy leaving the shower and running around the house in a playful manner.

Finally, Count 55 depicts M., nude, in various poses with a thin white veil. (Exhibit 125.)  There is nothing in this series which would bring it within the purview of section 311.4.

As noted above:

> Child pornography is not created when the pedophile derives sexual enjoyment from an otherwise innocent photograph . . . When a picture does not constitute child pornography, even though it portrays nudity, it does not become child pornography because it is placed in the hands of a pedophile, or in a forum where pedophiles might enjoy it.

(*United States v. Villard, supra*, 885 F.2d 117, 124-125.)

The pictures challenged here are similar to those commonly taken by many families who photograph their small children in the bathtub, or without clothes during some playful activity.  They must be viewed as such.  Under that standard, the convictions as to counts 13, 20, 21, 22, 25, 31, 32, 40, 41 and 55 are not supported by the evidence. Those convictions must be reversed and a not guilty verdict entered as to each.

////

////

////

## IV

**Appellant was denied due process of law and his right to a unanimous verdict where the prosecutor was permitted to submit multiple images as the basis for most of the child pornography and child molest counts.**

### *Background*

Appellant was convicted of numerous counts of producing child pornography and committing a lewd act with a child where the prosecutor was permitted to submit multiple images as the basis for a single count of sexual misconduct.

Count eight, charging a violation of Penal Code section 311.4(b), was based on three images. (Exhibits 69, 70, and 71.)

Count nine, charging a violation of Penal Code section 288(a), was based on a series of 11 images, marked collectively as Exhibit 72.

Count 10, charging a violation of Penal Code section 288(a), showed nine images, marked as Exhibit 73.

Count 11, alleging a violation of Penal Code section 288(a), displayed 27 images, marked as Exhibit 74.

Count 13, charging a violation of Penal Code section 311.4(b), was based on the nine images marked as Exhibit 75.

Count 14, charging a violation of Penal Code section 288(a), showed 40 images marked as Exhibit 76, and one image marked as Exhibit 77.

Count 15, charging a violation of Penal Code section 288(a), was also based

on the single image marked as Exhibit 77, and 14 images marked as Exhibit 80.

Count 16 charged a violation of Penal Code section 288(a), based on two images marked as Exhibit 78.

Count 18, charging a violation of Penal Code section 288(a), was based on the 14 images marked as Exhibit 80, and the single image marked as Exhibit 81.

Count 19 charged a violation of Penal Code section 288(a), and was based upon the 14 images marked as Exhibit 80, and the single image marked as Exhibit 82.

Counts 20, 21 and 22, were all based on the of 77 images depicting three young girls, marked as Exhibit 83.

Count 23, charging a violation of Penal Code section 311.4(b), was based on a series of 19 images marked as Exhibit 90.

Count 24 charged a violation of Penal Code section 288(a), and was based on nine images marked as Exhibit 91.

Count 25, charging a violation of Penal Code section 311.4(b), showed 11 images marked as Exhibit 92.

Count 26 alleged a violation of Penal Code section 311.4(b) and was based on 18 images marked as Exhibit 95.

Counts 27 and 28 alleged a violation of Penal Code sections 311.4(b) and 269, and were based on a series of 11 images marked as Exhibit 96.

56

Count 29 charged a violation of Penal Code section 288(a) based on a series of 22 images marked as Exhibit 97.

Count 30 alleged a violation of Penal Code section 311.4(b), using 62 images marked as Exhibit 100.

Counts 31 and 32, charged two violations of Penal Code section 311.4(b), based on 10 images depicting two young girls, which were marked as Exhibit 101.

Count 37, charged a violation of Penal Code section 311.4(b), based 17 images, marked as Exhibit 109.

Count 38 alleged a violation of Penal Code section 288(a), using a series of 17 images marked as Exhibit 113.

Count 40, charged a violation of Penal Code section 311.4(b), showing 12 images marked as Exhibit 116, and 12 images marked as Exhibit 148.

Count 41 charged a violation of Penal Code section 311.4(b), using four images marked as Exhibit 120.

Count 55 charged a violation of Penal Code section 311.4(b), using 43 images marked as Exhibit 125.

### Applicable Law

California Constitution, article I, section 16, guarantees that a criminal defendant receive a unanimous verdict by the jury as to each count charged. (*People v. Collins* (1976) 17 Cal.3d 687, 693.)

57

The evidence presented by the prosecution must be sufficient to establish, beyond a reasonable doubt, that the defendant committed the act charged. (*Jackson v. Virginia, supra,* 443 U.S. 307, 319; *People v. Johnson, supra,* 26 Cal.3d 557, 576.)

## Legal Analysis

Two serious constitutional problems were created by permitting the prosecution to admit several images as evidence of a single count of producing child pornography or committing a lewd act against a child. The first is that there is no way of knowing *which* photograph(s) the jury determined violated sections 311.4(b) and 288(a). The jury was therefore free to merely determine that, *as a group,* these photos cumulatively constituted child pornography, even though many them were not even arguably within the scope of section 311.4(b), and that others, together, depicted a violation of section 288(a). As noted, many of these photos carried no sexual connotations, but merely depicted nudity. Had the prosecution properly charged this case, there would have been separate counts of violating sections 311.4(b) and 288(a) for each of the images submitted, ensuring that *each image* received individual consideration by the jury.

The second problem is that there is no way of knowing whether the jury was unanimous as to which photograph(s) constituted a violation of sections 311.4(b) or 288(a). It is entirely possible that the jurors disagreed as to which items fell within

58

the parameter of those statutes, but merely agreed, with varying numbers, that one or more different photos were prohibited by section 311.4(b), or depicted an act of lewd behavior. This would violate appellant's right to a unanimous verdict. (Calif. Const., art. I, §16; *People v. Collins, supra,* 17 Cal.3d 687, 693.)

The primary purpose of the unanimity requirement is to prevent a jury from combining evidence of multiple acts, none of which has been proven beyond a reasonable doubt. (*People v. Deletto* (1983) 147 Cal.App.3d 458, 472.) The jury must unanimously agree that the defendant is guilty of a *specific* crime. For example, in *People v. Diedrich* (1982) 31 Cal.3d 263, 280-283, the defendant was convicted of a single count of bribery, yet the evidence showed two discrete bribes. The conviction was reversed as the court could not be certain that some of the jurors may have believed defendant guilty of one of the acts, while other jurors believed him guilty of the other, resulting in no unanimous verdict as to a particular act. (*Ibid.*)

Accordingly, case law has long held that where the evidence suggests more than one discrete act, either the prosecution must elect among the acts, or the court must issue an instruction requiring the jury to agree on the same criminal act. (*People v. Castro* (1901) 133 Cal. 11, 13; and, *People v. Williams* (1901) 133 Cal. 165, 168, both cited with approval in *People v. Russo* (2001) 25 Cal.4th 1124, 1132.) The only alternative is for the prosecution to plead separate counts. Here,

the prosecutor was permitted to submit numerous items of alleged child pornography as to each specified count, leaving the jury to decide which photos fell within the scope of Penal Code sections 311.4(a) and 288(a), with no requirement of unanimity.

The prosecution in this case inundated the jury with as many as 75 images as the basis for a single count.  It is virtually impossible to determine which images(s) the jury used as a basis for its verdicts, and whether such verdicts were unanimous as to at least one image on each count.

For each of these reasons, the convictions on the specified counts must be reversed.

**V**

**The trial court erred in presenting a defective verdict form as to the special allegations under Penal Code section 667.61, subds. (e)(5)-(6), and therefore the jury's findings as to these allegations on counts 1, 9, 10, 11, 14, 15, 16, 17, 18, 24, 29, 33, 36, 37, 38, 43, 44, 46, 48, 49, and 50 must be set aside as having deprived appellant of his statutory and constitutional rights.**

*Background*

In the final days of trial, the trial court and counsel discussed the verdict forms and jury instructions. (25 RT 3158.)  The prosecutor submitted a proposed verdict form for use as to the special allegations.  Appellant objected, challenging the language asking the jury whether appellant "did/did not" commit the special

allegations, rather than whether the allegations were "true or not true." (25 RT 3186.) Appellant called the court's attention to the verdict forms set forth in Penal Code sections 1158 and 1158a, which use the "true/not true" language. (25 RT 3186.) Defense counsel suggested the proposed forms would constitute *Apprendi*[13] error, to which the court replied:

> Counsel, I'll tell you what. If the verdict forms go in this way, that's another appellate issue. Maybe appellate counsel can get that thrown out if that is an issue.

\* \* \* \*

> Well, don't you want *Apprendi* error in this case, Mr. Roberts, and that way with *Apprendi* error it will get thrown out in the appellate courts.

(25 RT 3187.)

The verdict forms were submitted to the jury with the "did/did not" language. (5 CT 827-873.)

### Applicable Law

Penal Code section 667.61 subd.(e)(5) provides an increased penalty of 25 years to-life if the "defendant has been convicted in the present case or cases of

---

[13] *Apprendi v. New Jersey* (2000) 530 U.S. 466.

61

committing an offense specified in subdivision (c)[14] against more than one victim."
Subdivision (e)(6) imposes such punishment if the "defendant engaged in the tying
or binding of the victim in the commission of the present offense . . ."

Subdivision (i) of section 667.61 holds "The penalties provided in this section
shall apply only if the existence of any circumstance specified in subdivision (d) or
(e) is alleged in the accusatory pleading pursuant to this section and either admitted
by the defendant in open court or found to be true by the trier of fact."

## *Legal Analysis*

The language used in the verdict forms did not comply with subdivision (i),
and deprived appellant of his right to have these facts found by a jury as "true" or
"not true." Trial counsel drew an analogy between the present situation and the
verdict form language suggested in Penal Code sections 1158 and 1158a, dealing
with allegations of a prior conviction. Those sections use the "true/not true"
language. The appellate court has held such language to be mandatory.

"The requirement of Penal Code section 1158 on such an issue, is that the
jury shall find that the charge of former conviction is 'true,' or that it is 'not true.'
The form of these verdicts should have provided a direct answer to that question."
(*In re Hall* (1927) 88 Cal.App. 212, 214.)

---

[14] As pertinent here, the listed offenses include sections 288(a) (lewd and
lascivious acts upon a minor), 289 (sexual penetration), and 288a (oral copulation).

62

In this case, the language of section 667.61, subdivision (i), likewise specifies that the allegation must have been "found to be true by the trier of fact."

The trier of fact in this case, the jury, did not make a true finding as to any of the "one strike" allegations related to any of the 21 referenced counts. By accepting the unauthorized "did" language contained in the verdict form, the court deprived appellant of his right to have these matters tried by a jury, as guaranteed by the Sixth Amendment. (*Cunningham v. California* (2007)___ U.S. ___, 127 S.Ct. 856; *Blakely v. Washington* (2004) 542 U.S. 296; *Apprendi v. New Jersey, supra,* 530 U.S. 466, 490.) The decisions cited above in *In re Hall, supra,* make clear that this is not a matter of putting form over substance, but that a defendant is entitled to have a jury provide a *direct answer* to the question of whether the allegation is "true" or "not true," and this same language is set forth in Penal Code section 667.61 subdivision (i).

The trial court appeared to marginalize defense counsel's objections, and the prosecutor noted that "that's they way we do it down here." The error was again raised by way of a motion for new trial, which was denied. (5 CT 896.)

It may also be argued here that since the jury received these special allegations and thereafter failed to make a "true" finding, appellant is entitled to a "not true" finding, rather than having the matter submitted to a new jury for retrial. (*People v. Eppinger* (1895) 109 Cal. 294, 298, disapproved on another point in

63

*People v. Terrell* (1901) 133 Cal. 120, 124, cited with approval in *People v. Paul* (1998) 18 Cal.4th 698, 709, and *People v. Mitchell* (2000) 81 Cal.App.4th 321, 155.)

Defense counsel registered a specific objection which the court and the prosecution summarily dismissed. The issue was raised again in a motion for a new trial which was also denied. The error is substantial and prejudicial. It is a statutory and constitutional violation. Each of the 21 section 667.61 subd.s (e)(5) and (6) allegations should be set aside and a "not true" finding entered.

## VI

**The multiple life counts imposed as to the counts involving M., must · be run concurrently under Penal Code section 667.61, because the procedure used by the jury in finding that appellant "did" commit the multiple victims allegations was hopelessly flawed.**

### *Background*

Counts 1, 9, 10, 11, 14, 15, 16, 17, 18, 24, 33, 36, 37, 38, 43, 44, 46, 48, 49, and 50 each charged a violation of Penal Code section 288(a), committing a lewd act upon a child under 14 years of age. In addition, each of these counts alleged that appellant had committed the offense described against more than one victim within the meaning of Penal Code section 667.61(b)(c)(e.).

Appellant was found guilty of each of these counts and it was further found that he "did" commit the alleged multiple victim allegation. The verdict form used

64

in each count set forth the substantive offense in the first paragraph, followed by a paragraph which stated:

"And, it is further alleged that said defendant, __Did/Did Not__ commit an offense described in Section 667.61(c), against more than one victim, within the meaning of Penal Code Section 667.61(b)(c)(e)." (10 RT 827 *et seq.*)

## *Applicable Law*

Penal Code section 667.61 reads:

(b) Except as provided in subdivision (a), any person who is convicted of an offense specified in subdivision (c) under one of the circumstances specified in subdivision (e) shall be punished by imprisonment in the state prison for 15 years to life .

(c) This section shall apply to any of the following offenses:

(1) Rape, in violation of paragraph (2) or (6) of subdivision (a) of Section 261.

(2) Spousal rape, in violation of paragraph (1) or (4) of subdivision (a) of Section 262.

(3) Rape, spousal rape, or sexual penetration, in concert, in violation of Section 264.1.

(4) Lewd or lascivious act, in violation of subdivision (b) of Section 288.

(5) Sexual penetration, in violation of subdivision (a) of Section 289.

(6) Sodomy, in violation of paragraph (2) or (3) of subdivision (c), or subdivision (d), of Section 286.

(7) Oral copulation, in violation of paragraph (2) or (3) of subdivision (c), or subdivision (d), of Section 288a.

65

(8) Lewd or lascivious act, in violation of subdivision (a) of Section 288.

(9) Continuous sexual abuse of a child, in violation of Section 288.5.

\* \* \*

(e) The following circumstances shall apply to the offenses specified in subdivision (c):

(1) Except as provided in paragraph (2) of subdivision (d), the defendant kidnapped the victim of the present offense in violation of Section 207, 209, or 209.5.

(2) Except as provided in paragraph (4) of subdivision (d), the defendant committed the present offense during the commission of a burglary in violation of Section 459.

(3) The defendant personally inflicted great bodily injury on the victim or another person in the commission of the present offense in violation of Section 12022.53, 12022.7, or 12022.8.

(4) The defendant personally used a dangerous or deadly weapon or a firearm in the commission of the present offense in violation of Section 12022, 12022.3, 12022.5, or 12022.53.

(5) The defendant has been convicted in the present case or cases of committing an offense specified in subdivision (c) against more than one victim.

(6) The defendant engaged in the tying or binding of the victim or another person in the commission of the present offense.

(7) The defendant administered a controlled substance to the victim in the commission of the present offense in violation of Section 12022.75.

(8) The defendant committed the present offense in violation of Section 264.1, subdivision (d) of Section 286, or subdivision (d) of Section 288a, and, in the commission of that offense, any person committed any act

66

described in paragraph (1), (2), (3), (4), (6), or (7) of this subdivision.

A defendant is entitled to a unanimous jury verdict as to both substantive charges and sentence enhancement allegations such as alleged here. (Calif. Const. art.I section 16;  *People v. Collins, supra,* 17 Cal.3d 687, 693; Penal Code section 667.61(i) and (j).)

### *Legal Analysis*

In order to render a true finding as to the multiple victim sentence enhancement set forth in Penal Code section 667.61, the jury must find that  "The defendant has been convicted in the present case or cases of committing an offense specified in subdivision (c) against more than one victim." (Penal Code section 667.61(e)(5); *People v. DeSimone* (1998) 62 Cal.App.4th 693, 697.)

The procedure used by the jury in this case was fatally flawed, even though it may represent a common practice.

A verdict form was submitted to the jury for each of the 20 indicated counts of Penal Code section 288(a).  Each form contained not only a section for the jury to indicate its verdict as to the substantive offense, but also for a finding as to the "multiple victim" allegation. Thus, the jury was required to reach a finding as to this allegation at the same time it reached a verdict on the criminal offenses. The jury did so, in each case finding that appellant had been convicted in the present case of committing an offense specified in subdivision (c) against more than one

67

victim. This is directly contrary to the requirement in Penal Code section 667.61 subd. (e)(5). As noted, that section requires a finding that a defendant had been *convicted.* Yet, the jury's finding was based on its own previous indication(s) on a verdict form that it believed appellant "did" suffer the prior conviction involving more than one victim. Completing an unrecorded verdict form does not constitute a "conviction" under California law.

> The term "conviction" has no fixed definition and has been interpreted by the courts of this state to have various meanings, depending upon the context in which the word is used. *(People v. Williams* (1996) 49 Cal.App.4th 1632, 1637.) "Convicted" "sometimes refers to a verdict or guilty plea and other times it means a verdict or guilty plea and the judgment pronounced on the verdict or plea. For purposes of imposing a sentencing enhancement, "conviction" means only the ascertainment of guilt." *(People v. Mendoza* (2003) 106 Cal.App.4th 1030, 1033.)

*(People v. Medina* (2005) 132 Cal.App.4th 149, 155.)

While there is some disagreement as to what constitutes a "conviction," depending upon the context in which the term is used, all courts have required, at a minimum, a verdict or plea of guilt.

In this case, the jury based its multiple victim findings on its own prior findings as indicated on the verdict form. However, these findings were not "verdicts" at the time they were rendered.

A jury's finding becomes a verdict once it is read in open court, the jury polled and the verdict ordered recorded by the court. Based upon Penal Code

68

section 1164, the courts have held that a jury's "guilty" finding only becomes a "verdict" when it has been presented to the trial court, the clerk reads the verdict to the jury, the jury declares it to be its verdict, and then, by order of the court, the clerk records the verdict in the minutes and reads it to the jury as it appears in the record. (*People v. Holman* (1945) 72 Cal.App.2d 75, 101; *People v. Hendricks* (1987) 43 Cal.3d 584, 597; *People v. Bento* (1998) 65 Cal.App.4th 179, 188.)

Neither submission of the written verdict forms nor the clerk's reading of the forms constitutes the return of a verdict in a criminal trial. Although it has been said that the oral declaration of the jurors constitutes the return of the verdict, because the defendant has a constitutional right to a unanimous jury, there is no verdict absent a unanimous oral declaration. (*People v. Kirk* (2006) 141 Cal.App.4th 715, 724.)   In such circumstances, no verdict has been returned. (*People v. Green* (1995) 31 Cal.App.4th 1001, 1009 (habeas corpus relief granted on other grounds in *Green v. White* (9th Cir. 2000) 232 F.3d 671.)

Under the procedure employed here, and in most courts throughout California, the jury found that appellant had been "convicted" based upon a bare finding made by the same jury in a previous count. That finding had not been read in open court, the jury had not been polled and the verdict had not been ordered recorded. As a matter of law, a jury cannot make a finding that a defendant had been "convicted" of a similar offense in the same proceeding, prior to the verdict as

69

to the other count having been declared in open court, read and ordered recorded by the court. (*Ibid.*)

Appellant wishes to emphasize that it is not the underlying statutes which are fatally flawed, but rather the procedures commonly used to invoke those statutes in a jury trial. The obvious solution here is for a jury to first reach a verdict on the substantive offense(s), and then, in a bifurcated proceeding, return to deliberate and reach its special findings as to any multiple victim allegation(s), having in hand the recorded verdicts as to the offenses relied upon for that finding.

Absent such a bifurcated proceeding, the "multiple victim" findings as to counts 1, 9, 10, 11, 14, 15, 16, 17, 18, 24, 33, 36, 37, 38, 43, 44, 46, 48, 49, and 50, are each null and void. They must be set aside by this court, unless it is prepared to redefine the legal term "conviction."[15]

////

////

////

////

---

[15] The finding of multiple victims is additionally troubling as to count one, where the jury had, presumably, not reached a "verdict" as to any other count on which to base its finding. The prosecutor pointed this out in his closing argument, indicating to the jury that it could not make such a finding. (25 RT 3292 ["You can't do it on the very first count because he hasn't been convicted of anything."]) Yet, the verdict form as to count one contained such an allegation and the jury found that appellant "did" suffer such a "conviction." (5 CT 827.)

70

## VII

**There was insufficient evidence to support the allegations that appellant engaged in "tying or binding" the victim M., and the trial court failed to properly instruct the jury as to this enhancement under Penal Code section 667.61 subd. (e)(6), which was alleged in counts 1, 9, 10, 33, and 37, thereby depriving appellant of due process of law.**

### *Background*

Counts 1, 9, 10, 33 and 37, each charged appellant with committing a lewd act against his daughter, M., as prohibited by Penal Code section 288(a). In each count it was further alleged that appellant had engaged in "tying and binding" his victim as set forth Penal Code section 667.61 subd.(e)(6).

M. testified that on some occasions her dad would place a rope around her arms before photographing her. (18 RT 2047, 2048, 2049, 2053, 2054.) When asked whether she could untie the ropes by herself, she stated that sometimes she could, while other times she did not think so. (18 RT 2048.) M. stated occasionally the ropes hurt, and that she did not "usually" like being tied up. (18 RT 2058.) She could not recall whether appellant ever tied her up again after she told him that the rope hurt her. (18 RT 2061.) She recalled that he would always untie her immediately after she told him about the discomfort caused by the ropes. (18 RT 2069, 2129.) She did not consider the practice to be punishment, but rather a simulation for the photographs and appellant always untied her as soon as he

71

finished. (18 RT 2129.)

As to photographs depicting M. in handcuffs, she indicated that they were "trick handcuffs," on which she could push a release button and they would unlock. (18 RT 2128.)

The only instruction given in relation to the tying and binding allegation was that contained in a modified version of CALJIC 17.24.1, stating that the jury must decide whether appellant "[e]ngaged in the tying or binding of the victim in the commission of the present offense." (4 CT 814; 26 RT 3264.)

The court denied defense counsel's request for further instructions based upon this court's decision in *People v. Campbell* (2000) 82 Cal.App.4th 71. (25 RT 3154, 3202.)

*Applicable Law*

Whenever a defendant claims there is insufficient evidence to sustain a conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Jackson v. Virginia, supra,* 443 U.S. 307, 319; *People v. Johnson, supra,* 26 Cal.3d 557, 576.)

> The test on appeal is whether substantial evidence supports the conclusion of the trier of fact, not the whether the evidence proves guilt beyond a reasonable doubt. [Citation omitted.] The appellate court must determine whether a reasonable trier of fact could have found the prosecution sustained its burden of proving the defendant guilty beyond a reasonable

72

doubt.

(*People v. Reilly, supra,* 3 Cal.3d 421, 425, quoted in *People v. Johnson, supra,* 26 Cal.3d 557, 576.)

"Evidence," to be "substantial" must be "of ponderable legal significance . . . reasonable in nature, credible, and of solid value." (*Ibid.*)

It is settled that in criminal cases, even in the absence of a request, a trial court must instruct on general principles of law relevant to the issues raised by the evidence. (*People v. Daniels* (1991) 52 Cal.3d 815, 885.)  The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case. (*People v. St. Martin* (1970) 1 Cal.3d 524, 531.)

The failure of a state court to instruct correctly on the state law elements of the offense violate a defendant's Sixth Amendment right to a jury trial, by depriving him of a jury determination of an element of the offense. (*United States v. Caldwell* (9th Cir. 1993.)  989 F.2d 1056, 1060-1061.)  It also violates a defendant's right to due process of law because no finding of a crucial element is made beyond a reasonable doubt. (*People v. Figueroa* (1986) 41 Cal.3d 714, 725; *Carella v. California* (1989) 491 U.S. 263, 265-266.)

That both of these rights are implicated when a state court misinstructs in a way which allows a jury to convict without properly finding an element of the

73

offense was confirmed in *Neder v. United States* (1999) 527 U.S. 1, which involved

the failure to instruct on an element of a crime. *Neder* held that omission of an

element of an offense is constitutional error subject to a harmless error review under

*Chapman v. California, supra,* 386 U.S. 18, 24.

The defective instructions may be reviewed on appeal even absent an

objection by appellant at trial. *(People v. Flood* (1998) 18 Cal.4th 470, 482, fn. 12,

citing Penal Code section 1259.)

## *Legal Analysis*

This court has held that the terms "tying and binding" as used in Penal Code

section 667.61 subd.(e)(6), are to be given their "plain or literal meaning." *(People*

*v. Campbell, supra,* 82 Cal.App.4th 71, 77.)[16] In defining these terms, the court

held that such tying or binding is accomplished when the perpetrator applies rope,

tape, etc. on the victim in a manner which increases the victim's vulnerability. *(Id.*

at p. 79.) The court held that tying or binding a victim of sexual assault:

> [N]ecessarily has to do with the Legislature's recognition that such acts
> render the victim of a sexual assault particularly vulnerable, in that they
> facilitate the offense while further disabling the victim. [Citation.] This
> amplification of distress, in an already terrifying and degrading situation,
> by tying or binding the victim is the epitome of what we have termed a
> "cheap shot" [citation], thereby making more culpable an already serious
> and violent sexual offense.

---

[16] The *Campbell* decision is the only published California case on this point.

74

(*Ibid.*)

Applying this standard, the *Campbell* court concluded that wrapping tape around a sexual assault victim's head in order to cover her eyes, qualified as tying and binding within the scope of Penal Code section 667.61 subd.(e)(6). (*Ibid.*)

The evidence in this case was undisputed that the tying or binding was not intended to, nor did it make M. "more vulnerable." She stated that she would sometimes untie the ropes by herself, that appellant immediately removed the ropes whenever she complained that they hurt her and she was unable to do so herself, that she was able to release the "trick handcuffs" without assistance, and that the sole purpose of the ropes was to simulate "bondage" situations in the photographs. Clearly, this is *not* the type of situation the Legislature contemplated when it enacted the tying and binding allegation.

By refusing the requested instruction defining tying and binding as set forth in the *Campbell* decision, the trial court further deprived appellant of his right to have this element tried by the jury using the beyond a reasonable doubt standard of proof. Under the holding in *Blakely v. Washington, supra,* 542 U.S. 296, and *Cunningham v. California, supra,* ___ U.S. ___, 127 S.Ct. 856, this refusal by the court violated appellant's Sixth Amendment right to a jury trial.

The evidence in this case does *not* support the findings as to the Penal Code section 667.61 subd.(e)(6) tying and binding allegations in counts 1, 9, 10, 33 and

37. Such findings must be set aside, a "not true" finding entered as to each of the

Penal Code section 288(a) counts involving M., and appellant's sentence adjusted

accordingly.

## VIII

### The trial court's use of verdict "worksheets" denied appellant's right to due process of law and to a trial by jury under the Sixth and Fourteenth Amendments.

*Background*

Over defense objection, the trial court indicated that it had prepared "verdict

worksheets" which it intended to provide jurors to assist in deliberations.

> The Court: Counsel, I will give you brand-new copies of the verdict
> worksheets, because I had entered two LIOs we discussed this morning.
> I'm also going to give you another worksheet which is simply called
> "Worksheet." And that's also going to the jurors to assist them in this
> matter, because if you will realize, we have 91 separate verdicts going
> to the jurors, and I am providing them with a verdict worksheet which
> is about a 21 or 22 page document. What I've done is I have taken out
> only the language from the verdicts themselves and placed them into a
> chart so that the jurors can keep track of their own verdicts in this matter.
> I have no doubt, Counsel, that if there is any guilty verdict, the jurors
> are going to be polled at the request of defense counsel. Absolutely no
> doubt. So I want to ensure that the jurors are well aware of how they
> have voted on each of these verdicts, and to ensure that if there is a
> verdict, all 12 jurors have unanimously agreed on that verdict.
>
> So, basically, if you'll compare the verdict worksheet and the
> language in the worksheet with the language on the verdict, you'll
> find them identical.
>
> The second -- and this will be marked, the, as Court's exhibit

76

next in order:

> The next exhibit or item that I'm going to send into the jury deliberation room is entitled "worksheet." This, again, sets out all 91 possible verdicts. This is on 14 pages. Basically, it just sets out the count, charge, description, victim or the LIO under the specific count and leaves them room to write in any notes they might want, to help them to organize any notes that they might have. They do not have to use either of these worksheets. But I will specifically request that they try to keep track of their verdicts and that the verdict worksheet might assist them in remembering their verdicts.

(26I RT 3351-3352.)

The worksheets were marked as Court's Exhibits 11 and 12. (26 RT 3352-3353.) Defense counsel noted that the worksheets looked very similar to one in which the court had sustained an earlier defense objection. (26 RT 3353.) The court replied that it had actually amended the worksheet, and counsel renewed his objection. (26 RT 3353.)

*Applicable Law*

While there is no statutory requirement that a verdict be written, it has long been the practice for the judge or court to furnish written forms of the possible verdicts. (*People v. Mack* (1931) 115 Cal.App. 588, 592; *People v. Sandoval* (1992) 4 Cal.4th 155, 197.)

There presently exists no legal authority allowing a trial court to furnish to

the jury, over defense counsel's objection, verdict "worksheets" to use in reaching its decisions. Here, the worksheets invaded the fact-finding province of the jury and became a virtual checklist for convicting appellant of virtually all 55 counts. (*Apprendi v. New Jersey, supra,* 530 U.S. 466, 490; *Duncan v. Louisiana* (1968) 391 U.S. 145.)

### Legal Analysis

Perhaps the closest authority is *People v. Clark* (1943) 59 Cal.App.2d 760, 762, where the conviction was reversed after the trial judge inadvertently signed a guilty form, and then crossed it out.

*Clark* is similar to the present case in that the judge, in drafting these worksheets, did not merely repeat the language found in the verdict forms as she said she had. This is most apparent where the court included the name of a victim, even where the verdict form did not do so. For example, counts 2, 3, 4, 5, 6, 34, 39, and 45, each charged a violation of Penal Code section 269. The verdict forms did not contain the name of the alleged victims. Yet, in the worksheet (Court Exhibit 12), the court indicated the name of the person it believed was the victim in each count.

Similarly, although some counts charging a violation of Penal Code section 311.4(b) provided the name of a victim, others did not. (See verdict forms for counts 7, 8, 23, 25, 26, 27, 35, 41, 42 and 5 CT 827, *et. seq.*) The court provided

78

the names of the persons it believed were the victims in these counts.

Count 54 charged a violation of Penal Code section 136.1 and did not name a victim, but the court indicated a name for the jury in its worksheet.[17]

The influence on the jurors of these names on the court's worksheet cannot be discounted. As the court stated in *People v. Clark, supra:*

> No one can tell what influence the notation on the verdict had on the jury, and to what extent it influenced the jury in arriving at its verdict . . . Jurors pay a great deal of attention to what the trial court says or does in the trial of a case, and any action or remarks by the court which indicates the feeling of the court is observed by the jurors and often the jury will go beyond the evidence and consider the action and remarks of the court.

*(People v. Clark, supra,* 59 Cal.App.2d 760, 762 [internal citations omitted].)

In this case, the record establishes that the jurors relied heavily upon these worksheets.   When the jury sent out Note #2 to the court requesting to view certain videos, it was also asked "Can we bring in worksheet?" (5 CT 825.)  When the jury returned their verdicts, the court stated on the record that all jurors had the worksheets with them, asked if any of the jurors had *not* used the worksheets, and

---

[17] While likely not intentional, Exhibit 12 presented another problem. It placed the name of the "victim" on the same line as the charged crime, but omitted it on the lines of the lesser included offenses. This could only work to appellant's disadvantage and, in fact, the jury did not select a single LIO, but rather found appellant guilty of each charged offense, with but a single exception.

79

received no negative response. (26 RT 3512.)

The trial court also denied the present argument when raised in appellant's motion for a new trial. (4 CT 940.)

In order to find appellant guilty of the counts indicated above, the jury was required to find that there was a victim, a crime, and whether appellant committed that crime. By providing the jury with the name of a victim where none appeared in the verdict form, the court took the matter away from the jury and, in effect, negated the necessity of a finding on that element of the referenced counts.

It is fundamental that a defendant is entitled to have a jury decide each element of a charged offense. (Sixth and Fourteenth Amendments; *Apprendi v. New Jersey, supra,* 530 U.S. 466, 490; *Duncan v. Louisiana, supra,* 391 U.S. 145.) And it is error of constitutional magnitude to indicate to a jury that an essential element of a crime has been established, however clear the evidence on point. (*People v. Figueroa, supra,* 41 Cal.3d 714, 723; *People v. Godinez* (1992) 2 Cal.App.4th 492, 502.) While these cases involved an erroneous instruction, the court, in the present case, actually supplied the name of the persons it believed were victims in the indicated counts.

Moreover, this error reduced the prosecution's burden, thereby violating the due process clause of the Fourteenth Amendment. (*In re Winship* (1970) 397 U.S. 358, 363.)

And this error is not limited to the referenced counts themselves, but also any related enhancements. (*Cunningham v. California, supra,* ___ U.S. ___, 127 S.Ct. 856; *Apprendi v. New Jersey, supra,* 530 U.S. 466.)

The trial here lasted nearly five weeks. There were over two hundred exhibits, consisting of hundreds of pages. The fact that the jury reached verdicts in all 55 counts with only five hours of deliberation, supports the suspicion that the court's self-styled worksheet "assisted" the jury by serving as a checklist for conviction.

For the reasons stated, the verdicts in the referenced counts and all related sentence enhancement allegations must be reversed as having been obtained in violation of the Sixth and Fourteenth Amendments, and article I, section 16 of the California Constitution. (*People v. Holmes* (1960) 54 Cal.2d 442. See also, 6 Calif. Crim. Law (3rd) Reversible Error, §23 [denial of right to jury trial is reversible error, *per se*].)

////

////

////

////

////

81

## IX.

**There was insufficient evidence to sustain the charge of aggravated sexual assault of a child pled in count two,  based solely on the images contained in a video.**

### *Background*

Appellant was charged in count two with violating Penal Code section 269, aggravated sexual assault of a child (sodomy; to wit: bondage – sodomy video entitled "butt-fuck.") (5 CT 828.) The video was contained, with other material, on the CD compiled from material allegedly copied from Jensen's computer, marked as People's Exhibit 1.  A "screen shot" from the video was marked as People's Exhibit 63.

The alleged victim, M. testified on some occasions appellant penetrated her anus with his finger. (18 RT 2065.)  She also indicated that he had placed a black-colored phallic object in her anus. (18 RT 2067.)  She had no memory of taking any movies or videos. (18 RT 2069.)  She never was asked, nor did she state that appellant had ever penetrated her rectum with his penis.

The video, "butt fuck,"was shown to the jury by Detective Guerra. (21 RT 2685.) Out of the presence of the jury, the detective indicated that the video was 29 seconds in length, and showed a female minor, identified as M., tied with white rope, with her legs beneath her. (21 RT 2695.)  An adult male, presumably appellant, is behind the girl, "moving back and forth in a rocking motion." (21 RT 2695.)  At one point, the male's penis is exposed and ejaculate is seen. (21 RT 2696.)

82

*Applicable Law*

As previously noted, when a defendant claims there is insufficient evidence to sustain a conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Jackson v. Virginia, supra,* 443 U.S. 307, 319; *People v. Johnson, supra,* 26 Cal.3d 557, 576.)

Aggravated sexual assault upon a child includes an act of sodomy, as alleged in count two, when "committed by force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person." (Penal Code section 269 subd. (3).)

"Sodomy is sexual conduct consisting of contact between the penis of one person and the anus of another person. Any sexual penetration, however slight, is sufficient to complete the crime of sodomy." (Penal Code section 286 subd. (a).)

*Legal Analysis*

Mere contact between one person's penis and another's anus is insufficient to establish the crime of sodomy. (*People v. McElrath* (1985) 175 Cal.App.3d 178, 185.) Penetration of the victim's rectum by the perpetrator's penis, however slight, is required. (*Ibid.*; Penal Code section 286 subd. (a).) Such penetration may even occur through clothing, such as the victim's underwear. (*People v. Ribera* (2005) 133 Cal.App.4th 81, 85.)

83

The record here is void of *any* evidence of penetration.  M. was never asked nor did she state that appellant had ever sodomized her.  The video on which the prosecution based this charge shows M. naked and tied with rope, with appellant behind her, making a "rocking back and forth motion." There is nothing in the video showing appellant had penetrated her rectum with his penis. Penetration, like most other elements of an offense, may be established by circumstantial evidence. (*People v. Adams* (1993) 19 Cal.App.4th 412, 429; *People v. Morales* (1989) 48 Cal.3d 527, 553.)  In *Adams,* the victim was found to have semen in her rectum, with injuries to her anal sphincter muscle.  There was no such evidence here.  And while penetration may be proven by circumstantial evidence, it must also be proven beyond a reasonable doubt.  (*People v. Martinez* (1986) 188 Cal.App.3d 19, 24.)

The evidence was completely lacking as to proving any penetration as alleged in count two.  That conviction must be reversed and a not guilty verdict entered.

*////*

*////*

*////*

*////*

*////*

*////*

*////*

*////*

84

# X

**Denial of appellant's motion to sever the child pornography counts from the other offenses was an abuse of discretion which denied appellant due process of law.**

## Background

In a pretrial motion appellant moved the court to sever the "life counts," i.e., those in which the people were seeking a sentence of 15 years to life, or 25 years to life, either from each other, or in "lesser groupings." (6 CT 1192.) Appellant further moved to try the offenses charged under Penal Code section 311.4 separately from the life counts. The motion was denied and appellant received a single trial for all 55 counts charged. (6 CT 1193.)[18]

## Applicable Law

Severance and joinder of different counts is controlled by Penal Code section 954. That provision holds:

> An accusatory pleading may charge two or more different offenses connected together in their commission, or different statements of the same offense or two or more different offenses of the same class of crimes or offenses, under separate counts, and if two or more accusatory pleadings are filed in such cases in the same court, the court may order them to be

---

[18] In drafting this argument, appellate counsel initially utilized the file provided by trial counsel. In searching for the moving papers in the Clerk's Transcript, it was discovered that both the motion and the People's opposition had been omitted. Under separate cover, appellant has filed a motion that the court take judicial notice of the file-stamped copy of appellant's moving papers in the trial court or, alternatively, that the court augment the record to include this document.

consolidated. The prosecution is not required to elect between the different offenses or counts set forth in the accusatory pleading, but the defendant may be convicted of any number of the offenses charged, and each offense of which the defendant is convicted must be stated in the verdict or the finding of the court; provided, that the court in which a case is triable, in the interests of justice and for good cause, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately or divided into two or more groups and each of said groups tried separately. An acquittal of one or more counts shall not be deemed an acquittal of any other count.

Even if a charge meets the criteria for permissible joinder under section 954, "Severance may nevertheless be *constitutionally* required if joinder of the offenses would be so prejudicial that it would deny defendant a fair trial." (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1243-1244 (emphasis in orig.) Entitlement to a severance is demonstrated by a defendant showing that he would otherwise suffer prejudice. (*People v. Marquez* (1992) 1 Cal.4th 553, 572.)

Penal Code section 954.1 was added with the passage of Proposition 115. That statute provides that where crimes of the same class are charged, evidence concerning one offense need not be admissible as to the other offense(s) in order to try them together. "Cross-admissibility" of evidence remains a factor though, in evaluating whether prejudice is demonstrated. In other words, if the evidence concerning the joined offense would have been admitted as to the other charges even had a severance been granted, no prejudice can be shown by the defendant. (*People v. Catlin* (2001) 26 Cal.4th 81, 110; *People v. Balderas* (1985) 41 Cal.3d 144, 171-172.) However, if evidence as to the severed charge would not have been admitted,

86

prejudice *may* then be demonstrated.

> "Refusal to sever may be an abuse of discretion where: (1) evidence
> on the crimes to be jointly tried would not be cross-admissible in
> separate trials; (2) certain of the charges are unusually likely to inflame
> the jury against the defendant; (3) a 'weak' case has been joined with a
> 'strong' case, or with another 'weak' case, so that the 'spillover' effect
> of aggregate evidence on several charges might well alter the outcome
> of some or all of the charges; and (4) any one of the charges carries the
> death penalty or joinder of them turns the matter into a capital case."

(*People v. Caitlin, supra,* 26 Cal.4th at 110, quoting *People v. Bradford* (1997) 15
Cal.4th 1229, 1315.)

## *Legal Analysis*

The most compelling reason to grant a severance in this case was the shear
number of counts and the shocking allegations underlying those counts. Judge
Kaneshiro stated this was the worst case she had seen in 28 years and appellant was
the most despicable person to appear in her court. She was not the only judge to
make such an observation. At the close of the preliminary examination, Judge
Bernard Revak, sitting as the magistrate, stated: "Let me just add for the record as a
footnote that this is the most disgusting case I've ever been associated with in almost
39 years in the criminal justice system. And I pity the trier of fact that has to deal
with this case."  (10 RT 869.)

Defense counsel for co-defendant Brooke Rowland wrote in a motion to sever
his client's case from that of appellant:

87

Whitmore's alleged actions are so numerous, grotesque, and revolting as to transcend even tolerable conceptions of the realm of demonic and monstrous. Were there seven levels of Hell reserved solely for child molesters, a person found guilty of Rowland's conduct might reasonably anticipate eternal condemnation to perhaps the second level. Yet, for his vile deeds, a person of Whitmore's caliber should expect no less than to spend eternity in the inner [sanctum] of Satan's lair at the molten-filled core of the seventh level.

(See fn. 18.)

The first step a court takes in assessing a motion to sever concerns the "cross-admissibility" of the evidence pertaining to the offenses. (*Williams v. Superior Court* (1984) 36 Cal.3d 441, 448.) It is certainly true that some of the evidence in this case would be "cross-admissible." However, because of the number of counts and the extreme inflammatory nature of the allegations, the court should have engaged in a careful examination, balancing the benefits of joinder against its prejudicial effect. (*Id.* at p. 453.)

A charge that a man molested his own child is "highly inflammatory." Here, the allegations of incestuous child molestation were beyond the pale. There can be little doubt that, when considered together, the evidence so inflamed the passions of the jurors that they issued guilty verdicts on a wholesale basis. After a five week trial, the jury returned over 50 guilty verdicts in less than five hours. It is virtually *impossible* for this jury to have given reasoned, individual consideration to each of the counts in this amount of time.

Instead, it is likely the jury saw each separate charge as one continuous crime

and viewed the mountain of evidence as one vague mass of evil.  Consciously or subconsciously, it appears the jury ignored the instruction to consider each count separately, a painful process for even the most objective and disciplined person.

Finally, the joinder of all  counts made it virtually impossible for appellant to testify on his own behalf as to some of the counts, or limited aspects of the case, e.g., the "chat log" transcript attributed to him and for which he was deprived of any means to cross-examine Jensen.

The  joinder of these counts·was improper under Penal Code section 954, and that error must be assessed under *People v. Watson, supra,* 46 Cal.2d 243.  The misjoinder of counts also served to deny appellant due process of law and a fair trial.  (*Williams v. Superior Court, supra,*  36 Cal.3d 441, 448 [joinder laws cannot be used to deny a defendant his right to due process and a fair trial]; *Pointer v. United States* (1894) 151 U.S. 396, 403-404; *United States v. Lane* (1986) 474 U.S. 438, 446 n.8; *Bean v. Calderon* (9th Cir. 1998) 163 F.3d 1073, 1084.)  For these reasons, the convictions must be reversed and a severance granted at any retrial.

////

////

////

////

////

////

89

## XI

**The cumulative prejudice of the multiple errors requires reversal
of the entire judgment of conviction.**

Even if the errors previously described do not individually require reversal,

the cumulative effect of these errors served to deny appellant a fair trial. (*People v.*

*Buffum* (1953) 40 Cal.2d 709, 726; *People v. Hill* (1998) 17 Cal.4th 800, 847.)

The most damaging piece of evidence was the ICQ chat transcript. As set

forth in Arguments I and II, this evidence should have been excluded as lacking in

foundation and based upon hearsay. Appellant's rights to confront and cross-

examine the witnesses against him and to due process were denied by the admission

of this evidence. The witnesses in Denmark were available and most likely willing

to help but the prosecutor made no attempt to contact them since they were outside

the country. The evidence was lacking in reliability, not challenged through cross-

examination, and described the most inflammatory acts and depraved desires

imaginable.

The videos, still images and written data obtained from Jensen's computer by

Danish authorities were likewise inadmissible as the prosecution failed to properly

authenticate the evidence, and establish an unbroken chain of custody.

The evidence was insufficient to sustain the conviction for producing child

pornography in the ten counts set forth in Argument III. The controlling statute and

the courts – both California and federal – are unanimous in finding that nudity

alone does not constitute pornography. The evidence was completely lacking as to

90

the required penetration element to sustain the sodomy charge in count two. The evidence was also insufficient to establish the "tying and binding" allegations. And by permitting the prosecution to inundate the jury with as many as 75 separate images as to a single count of producing child pornography, appellant was denied his right to a unanimous jury verdict.

All of the special allegations resulting in an enhanced indeterminate life term were invalidated by the court's insistence on using the "did/not" rather than "true/not true" terminology, and the trial judge and prosecutor showed disdain for the appropriate law and procedure suggesting the unauthorized methods she and the prosecutor proposed could be addressed by this court on appeal. The jury's findings on the multiple victim allegations were additionally undermined by the procedure employed to reach those findings, even though the court followed a common practice in doing so. This, coupled with the verdict "worksheets" contrived by the court and used by the jury further deprived appellant his right to a trial by jury and due process of law.

Most of these errors created prejudice that would require a reversal of the affected counts. However, the cumulative prejudicial impact requires reversal of the entire judgment.

The test for cumulative error is whether the appellant received due process of law and a fair trial. Reversal is required where there was a reasonable probability the jury would have reached a more favorable verdict but for the errors. (*People v. Cuccia* (2002) 97 Cal.App.4th 785, 795. See *People v. Hernandez* (2003) 30

Cal.4th 835, 877 [errors at penalty phase of capital case were numerous and serious, leading to reasonable possibility that, considered together, they affected the jury's penalty determination, requiring reversal of judgment of death].)

There is more than a "reasonable probability" the jury here would have reached a verdict more favorable to appellant, but for the numerous and serious errors which occurred in the trial court.

### Conclusion

Once in a while, a case presents such shocking and disturbing evidence that the legal process is challenged in performing its function of guaranteeing a fair trial. In the present case, Judge Kaneshiro and Judge Revak stated that in their collective experience which spanned nearly seven decades, they had never confronted such a disturbing case. There can be little doubt here that the emotional evidence, the volume of which was unnecessary and unmanageable, led the court to take shortcuts and violations of the most basic provisions of the constitutions and Evidence Code. The result was an absurd sentence of almost 500 years-to-life in state prison.

The shortcuts taken by the trial court and the prosecutor virtually ensured a conviction of all charged counts, and the jurors who no doubt had less experience in such emotional areas than the court and counsel, were ill-equipped to perform their function in an objective manner. The worksheets submitted by the court spared the jury of conducting the required analysis. Instead, the "conviction train" rolled past, and all the jurors had to do was count the cars with the help of the worksheet checklist.

The judgment must be reversed and proper steps taken to ensure fairness.

The credibility of our system of "blind justice" is at stake.

Dated: 4/20/7

Respectfully submitted,

*Patrick Morgan Ford*

PATRICK MORGAN FORD,
Attorney for Appellant
PAUL GORDON WHITMORE



Attachment B

IN THE COURT OF APPEAL - STATE OF CALIFORNIA
FOURTH APPELLATE DISTRICT
DIVISION ONE

PEOPLE OF THE STATE OF CALIFORNIA,)
                                   )
               Plaintiff and Respondent,  )        Court of Appeal
                                   )               No. D048294
                                   )
v.                                 )
                                   )               Superior Court
PAUL GORDON WHITMORE,              )               No. SCD165314
                                   )
               Defendant and Appellant.  )

APPEAL FROM JUDGMENT OF THE
SAN DIEGO COUNTY SUPERIOR COURT,
THE HONORABLE GALE E. KANESHIRO, JUDGE

APPELLANT'S REPLY BRIEF

**Argument**

**I**

**Appellant was denied his Sixth Amendment right to confront and cross-examine the witnesses against him where the trial court permitted the prosecution to read a 91 page transcript of an alleged "ICQ chat" between appellant and the Jensens, after finding the Jensens were beyond the reach of the court's subpoena power, because the prosecutor failed to establish that they were truly "unavailable."**

Appellant asserts that this evidence was improperly admitted for two

reasons. First, the prosecution failed to adequately establish that Jensen was

"unavailable" as a witness, and his statements were improperly used to lay a

1

foundation for the admission of hearsay evidence. Next, permitting the prosecutor to introduce hearsay statements of persons he knew were beyond the reach of the court's process denied appellant due process and the Sixth Amendment right to confront and cross-examine adverse witnesses.

Respondent fails to directly address either argument, instead claiming that Jensen's statements were presented not for their truth but merely to add "context" to appellant's statements. (RB 23.) Respondent first argues that appellant's statements contained within the transcript of the "ICQ chat" were admissible as statements against interest, pursuant to Evidence Code section 1230. (*People v. Duarte* (2000) 24 Cal.4th 603, 610-611.) This response does not address the present argument as appellant does not directly challenge his own statements, but rather Jensen's.

Respondent then strains the language of Evidence Code section 356 to claim that Jensen's statements were admissible in order to make appellant's statements understandable. Section 356 provides:

> Where part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into *by an adverse party*; when a letter is read, the answer may be given; and when a detached act, declaration, conversation, or writing is given in evidence, any other act, declaration, conversation, or writing which is necessary to make it understood may also be given in evidence.

Respondent circumvents the clear language of the statute regarding "an

2

adverse party," by engaging in hypertechnical statutory construction, claiming that this language applies only to the first clause of the statute.  (RB 25, citing *People v. Corey* (1978) 21 Cal.3d 738, 742.)

*Corey* made no such holding.  Rather, it dealt with the construction of a penal statute and, even in that context, appears to support appellant's interpretation that the phrase "by an adverse party" is an exception to the general rule on which respondent relies.  (*Id.* at p. 742, citing *Wholesale T. Dealers v. National etc. Co.* (1938) 11 Cal.2d 634, 659 ["when several words are followed by a clause which is applicable as much to the first and other words as to the last, the natural construction of the language demands that the clause be applicable to all.])  Cases are not authority for issues not decided and *Corey* is not helpful here.  (*Interinsurance Exchange of the Auto Club v. Superior Court* (1989) 209 Cal.3d 177, 182 fn 2, citing *McDowell & Craig v. City of Sante Fe Springs* (1960) 54 Cal.2d 33, 38.)

Instead, the California Supreme Court has dealt with this  issue in at least three decisions, each applying *only* to another part of a recorded conversation where the *adverse party* introduced additional statements in order to bolster its interpretation of the meaning of the statements.  (See *People v. Pride* (1992) 3 Cal.4th 195; *People v. Zapien* (1993) 4 Cal.4th 929; and, *People v. Arias* (1996) 13 Cal.4th 92.)

3

The prosecution was improperly permitted to introduce Jensen's statements, without which appellant's statements become meaningless and irrelevant, and therefore inadmissible.  (Evidence Code section 350.)

Respondent fails to address the core of appellant's argument that the prosecution failed to establish Jensen was legally "unavailable" as a witness, or that the prosecutor in this case "designed" his case-in-chief to include Jensen's statements, believing that he could prevent appellant's cross-examination of Jensen behind a veil of "unavailability," thereby denying appellant a fair trial and due process of law.  (AOB pp. 33-35.)

Regarding prejudice, appellant notes in his opening brief that this transcript was in fact, the centerpiece of the prosecution's case.  While, as respondent observes, the videos and photographs were highly inculpatory, a transcript of shocking, depraved statements attributed to appellant had the affect of a recorded confession which affected virtually every count charged.  Respondent has not and cannot demonstrate that its improper admission into evidence was harmless beyond a reasonable doubt.  (*Chapman v. California* (1967) 386 U. S. 18, 22.)

////

////

////

4

## II

**The trial court erred in admitting evidence for which the prosecution failed to establish a sufficient foundation, thereby violating appellant's statutory rights under the Evidence Code and further depriving him of a fair trial guaranteed by the Due Process Clause of the Fourteenth Amendment.**

Appellant challenges the admission of evidence allegedly seized from Jensen's home computer in Denmark, featuring photographs, videos and documents, including the 91 page transcript challenged separately in Argument I. The prosecution failed to establish the necessary foundation for the admission of this evidence.

Appellant first argues that the evidence was inadmissible as the prosecution was not able to demonstrate an unbroken chain of custody in the collection, examination and preservation of the computer-generated evidence. Respondent acknowledges this legal principle and argument, but merely asserts "appellant's chain of custody claim utterly fails." (RB 20.) Respondent fails to specifically address breaks in the chain of custody such as Jensen's computer being left for an undetermined number of days in an unlocked office at the Ringkoebing police station. (AOB 40.) Rather than "utterly failing" as to this argument, appellant has established that the evidence should have been excluded. (*People v. Lucas* (1995) 12 Cal.4th 415, 444.)

As to the authenticity argument, respondent fails to address the fact that

5

the evidence supplied to U.S. authorities by the Danish police was *not* an exact copy of the hard drive of Jensen's computer, but rather material "cherry picked" from the computer by the foreign police, and copied onto a compact disk. This is especially true as to the "ICQ chat log." (AOB 43-45.) The hard drive was destroyed, preventing appellant from examining critical evidence.

Whether reviewed under *Chapman v. California, supra,* 386 U. S. 18, 22, as a denial of due process resulting in an unfair trial, or *People v. Watson* (1956) 46 Cal.2d 818, due to the numerous violations of the Evidence Code — many of which respondent fails to even address — the convictions must be reversed.

### III

**There was insufficient evidence to sustain the convictions in counts 7, 13, 20, 21, 22, 25, 31, 41 and 55 for violating Penal Code section 311.4(b), posing a minor for photos involving sexual conduct for commercial purposes.**

Appellant challenges the sufficiency of the evidence as to nine counts of producing child pornography, asserting that the material on which these counts are based does not meet the legal definition of pornography involving children as set forth in the lead case of *People v. Cantrell* (1992) 7 Cal.App.4th 523. Even though this decision was specifically adopted by the Legislature as correctly stating the standard by which the courts should determine whether material

6

constitutes child pornography (Penal Code section 311, subd.(h)), it is cited nowhere in Respondent's Brief.

Respondent contends that the image of M. sitting on a toilet, the basis of count 7, comes within the scope of section 311.4 subd.(d), because it depicts an "excretory function," and because M. was "evidently posed so that she would hold her hands up in a rather unnatural manner while sitting naked on the toilet." (RB 31.) This image does *not* fall within the scope of section 311.4 subd.(d) as it does not depict any excretory function, and M. expressly testified that appellant never asked her to "pee". (19 RT 2067.)

Count 13 was based on a series of nine photographs depicting two young girls in a bathtub, in which three of the girls are eating popsicles. (Exhibit 75.) Respondent asserts these are pornographic because (in respondent's mind) the popsicles represent "phalli," and because an overhead camera angle was used in six of the pictures so that the girls' nude bodies can be seen. (RB 31.) Respondent's argument regarding the depiction of child nudity is contrary to the language of *People v. Cantrell, supra,* 7 Cal.App.4th 523, 542-543. (See also, *People v. Spurlock* (2003) 114 Cal.App.4th 1122, 1129; and, *In re Ulyssess D.* (2004) 121 Cal.App.4th 1092, 1096, where the courts emphasized that simple child nudity does not equate to pornography.) Respondent's claim that he believes the girls sucking on popsicles was intended by appellant to represent

7

"phalli," even if true, is not legally significant.  This is because it is "the content

of the material targeted by the statute rather than the intent of the photographer"

on which a court must focus.  (*People v. Cantrell, supra,* 7 Cal.App.4th 523,

542.  And see similarly, *People v. Kongs* (1994) 30 Cal.App.4th 1741, 1755;

*United States v. Wiegand* (9th Cir. 1987) 812 F.2d 1239, 1244; and, *United*

*States v. Villard* (3rd Cir. 1989) 885 F.2d 117, 124, cited and discussed in AOB

at pp. 51-52.)

Counts 20, 21 and 22 were based on a series of 85 photographs depicting

three nude young girls playing with fingerpaints.  (Exhibit 83.)  Respondent

argues that some of the images focused on the girls' buttocks or genitals,

therefore "were nothing short of pornographic . . .  and it is absurd for

appellant to urge otherwise."  (RB 32.)  Again, respondent ignores controlling

case law on the subject of child nudity, relying instead on his personal feelings

and subjective interpretations.  The present analysis requires adherence to the

case law which shows that these images are outside the scope of section 311.4

subd.(d).

Count 25 is based on 11 images of a young girl naked or wearing only a

jacket.  (Exhibit 92.)  Respondent contends this constitutes child pornography

because the child is in "suggestive poses," and in some images her genitals or

buttocks are visible.  (RB 32.)  Respondent repeats the argument equating nudity

8

with pornography. That argument (repeated several times) must be rejected.

Counts 31 and 32 consist of 10 images depicting two young girls in a bathtub, very similar to count 13. (Exhibit 101.) Here, respondent believes his argument finds additional support in the fact that one of the girls was approaching puberty, therefore "had developed pubic hair and started breast development." (RB 32.) "That appellant would dare to suggest these pictures do not constitute pornography defies reason in light of his 'focus' upon [the girl's] developing pubic and breast areas." (RB 33.) Appellant not only "dares" to suggest, but unequivocally asserts these images do not constitute child pornography based upon the state of the law, rather than a misplaced emotional reaction to the shocking nature of this case.

Count 40 (Exhibit 123), is based on three images of appellant's young son "romping around the house naked and two pictures of appellant and B. wrestling while fully clothed." (RB 33.) Respondent contends these images are pornographic because they are "focused" on the boy's buttocks, and because he was "not a cute two-year-old who had just gotten out of the bathtub to run around naked; rather he was substantially older, albeit pre-pubescent." (RB 33.) Respondent again ignores controlling law, and applies a subjective standard of what constitutes child pornography.

Count 41 consists of four images showing appellant's naked daughter

9

from ages five through eight, in a bathtub and lying on a bed.  (Exhibit 120.)
According to respondent, these images, when taken together, are pornographic
because they demonstrate "appellant's continuous indoctrination of his young
daughter that it was acceptable to be photographed nude."  (RB 34.)  Respondent
again focuses on the intent of the photographer rather than an objective viewing
of  the images themselves.  The argument demonstrates that respondent has
abandoned any review of the applicable law.

Count 55 is based on 45 images depicting appellant's naked daughter in
various poses covered by a thin translucent white veil.  (Exhibit 125.)
Respondent argues that each of these images constitutes pornography because
each showed M. in a "provocatively suggestive pose — utterly inappropriate for
a girl M.'s age."  Appellant denies the images were so "provocatively
suggestive" as to constitute pornography.  And while perhaps "inappropriate or
disturbing," this does not amount to pornography.

By undertaking the extremely unpleasant and difficult task of objectively
applying the controlling standard of review to the individual images detailed
above, this court will find that the evidence is insufficient, as a matter of law, to
support the convictions in counts 7, 13, 20, 21, 22, 25, 31, 32, 41 and 55, each
of which must be reversed.

////

10

**IV**

**Appellant was denied due process of law and his right to a unanimous verdict where the prosecutor was permitted to submit multiple images as the basis for most of the child pornography and child molest counts.**

Appellant challenges the convictions for violating Penal Code section 288 subd. (a) in counts 9, 10, 11, 14, 15, 16, 18, 24, 29 and 38, and for violating section 311.4 subd.(d) in counts 8, 13, 20, 21, 22, 23, 25, 26, 27, 28, 30, 31, 32, 37, 40, 41 and 55. These convictions must be reversed because each was based not on a single image or act, but rather upon several images, some consisting of as many as 85 separate images.

By permitting the prosecutor to prove his case in this manner, the trial court deprived appellant of his right to a unanimous verdict as to which individual act or image the jury relied upon to sustain each count. It further permitted the jury to determine that as a group, the numerous images in each count may have constituted sufficient evidence as to that count.

Respondent recognizes that a jury must unanimously agree a defendant is criminally responsible for "one discrete act." When the evidence shows more than one such act, the prosecution must either select the specific act it relies on to sustain each count, or the jury must be instructed that it must unanimously agree beyond a reasonable doubt that the defendant committed the same specific

11

act.  (RB 39-40, citing *People v. Thompson* (1995) 36 Cal.App.4th 843, 850.) Neither option was exercised in this case.

Respondent attempts to cure the error by invoking the exception to the unanimity requirement found in cases such as this court's decision in *People v. Gear* (1993) 19 Cal.App.4th 86, 92, involving a prosecution for continuous sexual abuse of a child.  Respondent also cites *People v. Jones* (1991) 51 Cal.3d 294.  Respondent attempts to draw an analogy to the present case, by claiming that the individual images represented a continuous course of conduct by appellant, thereby negating the unanimity requirement.  Respondent cites no authority for this creative application of the unanimity exception, and neither is the claim logical.

In continuous sexual abuse of a child cases, the unanimity requirement does not apply to a specific instance of abuse, as long as the evidence shows that specific acts of sexual abuse took place during the time period pled.  In *People v. Jones, supra,* 51 Cal.3d 294, the court held that the jury need not agree on a specific act as to time and place, as long as it unanimously agreed that the act took place within the alleged time period.

Here, the prosecution relied almost exclusively on the multiple images, both photographic and video, in order to prove that the specific acts  took place. It inundated the jury with as many as 85 individual images as to a single count

12

and allowed each juror to decide, without a unanimity instruction, which image that juror believed proved the charge. And this is especially troubling as to the multiple image child pornography counts, where numerous images were not within the scope of the statute.

Respondent bases his argument largely on the unsupported assertion that it was irrelevant whether any image alone represented pornography, but rather whether appellant engaged in the proscribed conduct of posing a child to produce the image. (RB 41.) Here, respondent would simply eliminate the element of the charge that the image actually portray prohibited conduct. Respondent cites no authority for this dramatic assertion because none exists.

Respondent further finds it "curious" that appellant did not challenge count seven, producing child pornography, which was based upon a single video. The question answers itself. Respondent reasons that since a video consists of "hundreds of still images played in rapid succession," under appellant's argument, the jury would have to be instructed which of these images depicts the prohibited conduct. (RB 41.) Respondent is wrong.[1]

Appellant relies upon a longstanding, fundamental rule regarding the necessity of a unanimity requirement. Respondent's attempt to cure this error by

---

[1] Moreover, unlike film, video tape and digital video are not a series of still images played in rapid succession. Rather, they consist of one unbroken continuous image which captures the movement of the subject(s).

13

rewriting the law must be rejected. The convictions for the counts specified above must be reversed.

## V

**The trial court erred in presenting a defective verdict form as to the special allegations under Penal Code section 667.61, subds. (e)(5)-(6), and therefore the jury's findings as to these allegations on counts 1, 9, 10, 11, 14, 15, 16, 17, 18, 24, 29, 33, 36, 37, 38, 43, 44, 46, 48, 49, and 50 must be set aside as having deprived appellant of his statutory and constitutional rights.**

Appellant objected to the court's use of verdict forms which used the terminology that the defendant "did/did not" commit the special allegations, rather than such allegations were either "true" or "not true." The court overruled, and in fact, derided counsel's objections. (25 RT 3187.) The jury returned its findings using the improper verdict forms.

Citing *In re Hall* (1927) 88 Cal.App. 212, 214, and the cases it mentioned, appellant argues this was erroneous and requires reversal in that he was entitled to a "direct answer" as to whether the allegations were found to be true. *People v. Blackburn* (1968) 261 Cal.App.2d 554, 559 fn. 6, contains a similar holding regarding a jury's finding as to an allegation that the defendant was armed with a firearm.

Extreme care must be exercised in drafting verdict forms so that they comply with all statutory requirements. Any defect must be resolved in the

14

defendant's favor. (See *In re Birdwell* (1996) 50 Cal.App.4th 926, 928.)

Respondent makes a strained argument citing Penal Code sections 1158 and 1158a. These sections contain the exact language regarding the necessity for a jury finding as to whether a special allegation is "true" or "not true." Respondent asserts that appellant's argument would render these sections superfluous, and that such statutory interpretations are to be avoided. (*People v. Loeun* (1997) 17 Cal.4th 1, 9.) Appellant disagrees that his argument would have any such affect.

Respondent further asserts that even if the language was improper, the error was harmless as appellant cannot establish prejudice. However, a jury's failure to make a special finding in the language prescribed by statute may be regarded as a finding in the defendant's favor. (*In re Hall, supra,* 88 Cal.App. 212, 214; *People v. Garcia* (1970) 4 Cal.App.3d 904, 907.)

Appellant further asserts that the jury's failure to find that the special allegations were "true" or "not true," deprived him of his Sixth Amendment right to have these matters decided by a jury, a process which requires a direct answer to the question. (*Cunningham v. California* (2007) ___ U. S. ___ 127 S.Ct. 856.) Moreover, by failing to render a "verdict" on the special allegations in the form required by statute, the findings are a legal nullity. Each of the indicated "tying and binding" and "multiple victim" allegations must be set

15

aside.

## VI

### The multiple life counts imposed as to the counts involving M., must be run concurrently under Penal Code section 667.61, because the procedure used by the jury in finding that appellant "did" commit the multiple victims allegations was hopelessly flawed.

Appellant challenges the common procedure utilized in this case whereby the jury found that appellant had been "convicted" of committing the same or similar offense against two or more victims, relying upon the same jury's findings prior to such findings of guilt being announced and recorded as convictions.  This is directly contrary to the language of Penal Code section 667.61 subd.(e)(5).

To properly make such findings, a court should bifurcate the trial to allow a jury to first render its verdicts on the substantive offenses, record those convictions, then deliberate as to any allegations attached to the convictions.

Respondent notes that "appellant may be correct in a hyper-technical sense," impliedly agreeing that no legal convictions existed at the time the jury found they did.  (RB 46.)  However, he claims that any error was harmless. (RB 46.)

For the reasons discussed in Argument V, the error is not harmless in that the findings were based upon "convictions" which, as matter of law, did not and

16

could not exist at the time they were used by the jury.  Accordingly, the findings are defective and a legal nullity.  The findings must be set aside.

## VII

**There was insufficient evidence to support the allegations that appellant engaged in "tying or binding" the victim M., and the trial court failed to properly instruct the jury as to this enhancement under Penal Code section 667.61 subd. (e)(6), which was alleged in counts 1, 9, 10, 33, and 37.**

Counts 1, 9, 10, 33 and 37, each charged appellant with committing a lewd act against his daughter, and contained a special allegation that appellant engaged in "tying and binding" the victim as set forth in Penal Code section 667.61 subd.(e)(6).

There was insufficient evidence to support this allegation in that the victim testified that whenever her father placed a rope around her, he would immediately remove it when she requested if she was unable to do so herself, and that the handcuffs used were a "trick type" with a release button she could activate herself.  The victim testified that she did not consider these practices as any type of punishment or act against her, but rather a simulation for appellant's photographs.

The court would only instruct the jury with CALJIC No. 17.24.1, and refused the defense request for an instruction based on *People v. Campbell*

17

(2000) 82 Cal.App.4th 71, which describes the increased vulnerability of the victim.

Respondent argues that *Campbell* requires only an instruction following the statutory language of section 667.61 subd.(e)(6), and, that in any case, appellant's actions increased his daughter's "vulnerability both psychologically and physically." (RB 36.)

In light of this court's observation in *Campbell* that the terms "tying and binding" are to be given their literal and plain meaning, appellant was entitled to an expanded instruction regarding increased victim vulnerability. The evidence in this case did not support that element and the court's refusal to include this language in its instruction constitutes reversible error as to the tying and binding life term enhancements on counts 1, 9, 10, 33 and 37.

## VIII

### The trial court's use of verdict "worksheets" denied appellant's right to due process of law and to a trial by jury under the Sixth and Fourteenth Amendments.

Over defense objection, the trial court provided the jury with its self-styled "verdict worksheets" for use in their deliberations. The form of the worksheets and defense counsel's objections are set forth in the opening brief. (AOB 76-77.)

The worksheets improperly invaded the fact-finding province of the jury

18

and became a virtual checklist to summarily convict appellant of 55 counts of sexual misconduct, and the numerous enhancement allegations.

Respondent contends that the worksheet was a proper method for the court to "assist" the jury in its deliberation process.  (RB 48-50.)

Appellant reiterates the contentions set forth in the opening brief (AOB 78-81) which respondent has failed to adequately address.  The court's inclusion of the victim's names as to each count improperly influenced the jury and reduced the prosecution's burden.  That the court did this only as to the charged offenses and not the lesser included offenses enhanced the improper influence exerted by the court.

The trial lasted almost five weeks.  There were over two hundred exhibits consisting of hundreds of pages.  Yet, the jury returned 55 guilty verdicts and dozens of findings as to enhancement allegations in less than five hours of deliberation.  It is virtually *impossible* for a jury to have considered this volume of evidence and given individual consideration to each of the substantive charges and allegations in this time period.  There is  more than a reasonable probability that the jury used the court's "worksheet" as a checklist to convict appellant of the charges and allegations without the deliberation to which he was entitled.  All convictions must be reversed.

////

19

## IX

### There was insufficient evidence to sustain the charge of aggravated sexual assault of a child charged in count two, based solely on the images contained in the 30 second video.

Appellant was charged in count two with violating Penal Code section 269, aggravated sexual assault of a child (sodomy; to wit bondage — sodomy video entitled "butt fuck.") The video was among the material allegedly copied from Jensen's computer and copied to a compact disk. A "screen shot" was marked as People's Exhibit 63.

Appellant's daughter was never asked nor did she state that appellant ever penetrated her rectum with his penis. The video shows an unidentified male rocking back and forth against appellant's daughter's buttocks. There is no penetration depicted.

Mere contact between one person's penis and another's anus is insufficient to establish sodomy. (*People v. McElrath* (1985) 175 Cal.App.3d 178, 185.) Penetration of the victim's body, however slight, is required. (*Ibid.*) While such penetration may be established by circumstantial evidence, it must be proven beyond a reasonable doubt. (*People v. Martinez* (1986) 188 Cal.App. 3d 19, 24.)

Relying on the same evidence recited here, including appellant's

statements contained in the ICQ chat log, respondent argues that the evidence sustaining this charge was "overwhelming." (RB 37.)

This is simply not so. That the prosecutor failed to even ask appellant's daughter whether this penetration occurred is certainly significant. There was obviously a reason that he did not ask the critical question. No reasonable jury could find beyond a reasonable doubt that appellant committed sodomy within the meaning of section 269. Count 2 must be reversed and dismissed.

## X

### Denial of appellant's motion to sever the child pornography counts from the other offenses was an abuse of discretion which denied appellant due process of law.

The court denied appellant's motion to sever the "life counts" from each other, or into "lesser groupings." Appellant did not believe a jury could render the required individualized consideration of each count, due to the number of charges and the volume of evidence to be presented by the prosecution. It is appellant's contention that a single trial as to all counts, even in compliance with Penal Code sections 954 and 954.1, would nonetheless deny him a fair trial, and therefore severance was constitutionally compelled. (*Williams v. Superior Court* (1984) 36 Cal.3d 441, 448; *Bean v. Calderon* (9th Cir. 1998) 163 F.3rd 1073, 1084.)

Respondent focuses on Penal Code sections 954 and 954.1, and the cases

21

interpreting those statutes.  (RB 51-53.)

Respondent rejects appellant's claim "that the jury was 'overwhelmed by a mountain of evil,'" and fails to address the constitutional aspect of appellant's argument.  Compelling circumstantial proof that the jury was simply overwhelmed is found in the fact, referenced above, that after a five week trial with hundreds of exhibits, the jury took only five hours to return 55 verdicts of guilty, and dozens of "did" findings as to the sentence enhancement allegations.

Trying all these counts and allegations  in a single trial deprived appellant of due process of law and denied him the fair trial to which he was entitled.

## Conclusion

This is a case that challenged even veteran judges in maintaining their judicial temperament and objectivity.  The magistrate presiding at the preliminary hearing and the trial judge expressed personal outrage at the level of depravity of appellant's conduct as found true by the jury.  Counsel for appellant's co-defendant Rowland described the level of hatred attached to the present charges.

> Whitmore's alleged actions are so numerous, grotesque, and revolting as to transcend even tolerable conceptions of the realm demonic and monstrous.  Were there seven levels of Hell reserved solely for child molesters, a person found guilty of [co-defendant] Rowland's conduct might reasonably anticipate eternal condemnation to perhaps the second level.  Yet, for his vile deeds, a person of Whitmore's caliber should expect no less than to spend eternity in the

22

inner sanctum of Satan's lair at the molten-filled core of the seventh level.

Yet, even a person accused of such shocking and vile conduct is guaranteed a fair trial by our Constitution.  That did not occur in this case.  Most of the errors described in the briefing compel reversal when viewed individually.  The cumulative impact of these errors compels reversal of the entire judgment.

Dated:  8/14/07

Respectfully submitted,

*Patrick Morgan Ford*

PATRICK MORGAN FORD,
Attorney for Appellant
PAUL GORDON WHITMORE

## Certificate of Compliance

I, Patrick Morgan Ford, hereby certify that the within brief consists of 5792 words, as determined by the word count feature of the word processing program utilized in this case.

Dated:  8/14/07

*Patrick Morgan Ford*

PATRICK MORGAN FORD

23