# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PAUL GORDON WHITMORE,<br><br>                                  Petitioner,<br><br>                    vs.<br><br>MATTHEW CATE, Secretary,<br><br>                                  Respondent. | Civil No.    09cv1324-MMA (MDD)<br><br><br>**REPORT AND RECOMMENDATION<br>OF UNITED STATES MAGISTRATE<br>JUDGE RE DENIAL OF PETITION<br>FOR WRIT OF HABEAS CORPUS** |

        This Report and Recommendation is submitted to United States District Judge Michael M. Anello pursuant to 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2 of the United States District Court for the Southern District of California.

## I.

## FEDERAL PROCEEDINGS

        Paul Gordon Whitmore (hereinafter "Petitioner"), is a state prisoner proceeding pro se and in forma pauperis with a Petition for a Writ of Habeas Corpus by a Person in State Custody pursuant to 28 U.S.C. § 2254.  (ECF No. 1.)  Petitioner was convicted by a San Diego County Superior Court jury on November 30, 2005, of twenty-one counts of committing a lewd act on a child, eighteen counts of posing a minor for the purpose of producing pornography, nine counts of aggravated sexual assault of a child, and one count each of exhibiting harmful material to a

minor, annoying or molesting a child, and attempting to dissuade a witness from reporting a crime.  (Pet. at 1[1]; Lodgment No. 1, Clerk's Tr. ["CT"] at 827-77.)  He was sentenced to 467 years and 8 months-to-life in state prison; the sentence was enhanced as a result of findings by the jury that there were multiple victims and that a victim was tied or bound.  (CT 1104-11.) Petitioner alleges here that his rights under the Sixth and Fourteenth Amendments to the United States Constitution were violated because: (1) he was unable to confront and cross-examine a witness when evidence was admitted at trial of an internet chat he had with a Danish national who did not testify; (2) evidence seized from the Danish national's computer was admitted without a proper foundation; (3) insufficient evidence was presented at trial to support eleven of the eighteen counts of posing a minor for the purpose of producing pornography; (4) the jury verdict may not have been unanimous as to over half of the counts; (5) the jury failed to properly find the enhancement allegations true; (6) the enhancement allegation verdict forms were defective; (7) insufficient evidence was presented to support the findings that he tied or bound a victim; (8) the trial court invaded the jury's deliberative efforts by providing verdict worksheets; (9) insufficient evidence was presented to support the guilty verdict of aggravated sexual assault in count two; (10) the trial court abused its discretion in failing to sever the child pornography counts from the more serious offenses; and (11) the cumulative effect of the trial errors was prejudicial.  (Pet. at 4-5, 10-17, 53-150.)

Petitioner voluntarily dismissed Claims 5 and 6 because they had not been presented to the state supreme court and were therefore unexhausted.  (ECF No. 32.)  He later presented those claims to the state supreme court in a habeas petition, but this Court denied his subsequent motion to reinstate them into his federal Petition after finding they are barred by the one-year statute of limitations set forth in 28 U.S.C. § 2244(d)(1).  (See Order filed 8/4/11 [ECF No. 53] at 3-4.)  Thus, Claims 5 and 6 are not before the Court.

Respondent has filed an Answer to the Petition, along with an incorporated Memorandum of Points and Authorities in support, and has lodged portions of the state court record.  (ECF

---

[1] When citing to documents filed with the Court's Electronic Case Filing ("ECF") system, such as the Petition, Answer and Traverse, the Court will refer to the pages assigned by that system.

Nos. 20, 56.)  Respondent contends that federal habeas relief is unavailable because Claims 2 and 4 fail to state a federal question, Claims 5 and 6 have been dismissed, Claim 11 is without merit, and the state court's adjudication of the remaining claims was neither contrary to, nor involved an unreasonable application of, clearly established federal law, and did not involve an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  (Ans. at 14-34.)  Petitioner has filed a Traverse.  (ECF No. 59.)

## II.

## STATE PROCEEDINGS

In a 64-count second amended information filed in the San Diego County Superior Court on October 5, 2005, Petitioner was charged with twenty-three counts of committing a lewd act on a child in violation of California Penal Code section 288(a); nine counts of aggravated sexual assault of a child in violation of Penal Code section 269; nineteen counts of posing a minor for pictures involving sexual content in violation of Penal Code section 311.4(b); one count of child molestation in violation of Penal Code section 647.6(a); one count of child abuse in violation of Penal Code section 273a(a); one count of sending harmful matter to a minor via electronic means in violation of Penal Code section 288.2(b); and one count of attempting to dissuade a witness from reporting a crime in violation of Penal Code section 136.1(b)(1).  (CT 703-26.) Petitioner's co-defendant Brooke Rowland was charged along with Petitioner in six of the lewd act on a child counts and four of the posing a minor for pictures involving sexual content counts, and Rowland was separately charged with nine additional counts of committing a lewd act on a child.  (Id.) The second amended information also contained sentence enhancement allegations which provided for terms of 15 years-to-life and 25 years-to-life alleging that, in violation of Penal Code section 667.61(a)(c)(e), Petitioner engaged in tying or binding the victim as to five of the lewd act on a child counts and that multiple victims were involved as to all twenty-three of the lewd act on a child counts.[2]  (Id.)

---

[2]  Rowland pleaded guilty to two counts of lewd acts on a child prior to Petitioner's trial, admitted the truth of the allegation that more than one victim was involved, stipulated to a sentence of 15 years-to-life in state prison, and testified at Petitioner's trial.  (Lodgment No. 2, Reporter's Tr. ["RT"] at 354-68, 2630-81.)  Petitioner rejected a plea offer of 25 years-to-life.  (RT 371.)

On November 30, 2005, following a jury trial, Petitioner was found not guilty on count 19, the trial court dismissed counts 12, 47 and 53, and the jury found Petitioner guilty as to the remaining 51 counts alleged against him in the second amended information. (CT 827-77.) The jury found all the enhancement allegations true. (CT 827, 835-37, 839-44, 849, 853, 857, 860-62, 867-68, 870-73.) On February 9, 2006, Petitioner was sentenced to 467 years and 8 months-to life in state prison. (RT 3583-3636.)

On April 4, 2007, Petitioner appealed his conviction, raising the same claims presented in his federal Petition here. (Lodgment No. 3.) The appellate court affirmed in an unpublished opinion in which it denied the claims on the merits. (Lodgment No. 6, People v. Whitmore, No. D048294 (Cal. App.Ct. May 8, 2008).) On June 9, 2008, Petitioner filed a petition for review in the state supreme court raising the same claims presented in the appellate court and here, with the exception of Claims 5 and 6. (Lodgment No. 7.) On August 18, 2008, the state supreme court summarily denied the petition for review without comment or citation of authority. (Lodgment No. 8.) Petitioner filed a habeas petition raising Claims 5 and 6 in the state supreme court on February 16, 2010, over a year after his conviction had become final and about nine months after he had initiated this action, which the state supreme court summarily denied on August 11, 2010. Petitioner's subsequent motion in this Court to reinstate Claims 5 and 6 was denied on the basis that the claims are untimely under the one-year statute of limitations set forth in 28 U.S.C. § 2244(d)(1). (See Order filed 8/4/11 [ECF No. 53] at 3-4.)

### III.

### EVIDENCE ADDUCED AT TRIAL[3]

Per-Erik Åström testified that he is the operating manager of the Save the Children hotline in Stockhlom, Sweden, a non-governmental organization founded in 1917, working domestically and internationally to protect the rights of children as stated in the United Nations Convention on the Rights of the Child; the hotline is focused in particular on stopping child pornography on the internet. (RT 785-87.) He testified that on November 15, 2001, he received an anonymous

---

[3]   A detailed review of the evidence presented at trial is necessary due to the nature of Petitioner's claims, in particular the claims relating to sufficiency of the evidence.

tip via e-mail in Swedish on the hotline's website, which identified an internet news group (a collection of e-mail addresses which groups of people use to share information), where Åström was able to view about 15 photographs, one of which he identified at trial as depicting a Scandinavian girl in a sadistic setting with an adult male.  (RT 787-91.)  Åström was able to identify the logo of a Danish company on the shirt worn by the adult male in that photograph, and turned the photographs over to the police.  (Id.)

Arne Pallesen, a police detective from Ringkoebing, Denmark, testified that on November 16, 2001, he received information about a case which originated in Sweden regarding the photograph identified at trial by Åström.  (RT 800-02.)  Based on an interview with the president of the company whose logo was seen on the shirt of the man in the photograph, Pallesen went to a house in Tarm, Denmark, and encountered three people, Eggert Jensen, the man in the photograph, his wife Bente Jensen, and the girl in the photograph, Bente's biological daughter.  (RT 803-04; CT 365.)  Pallesen arrested Eggert and Bente, and transferred the girl, who was nine years old, to social professionals.  (RT 806.)  The Jensen home, the interior of which could be seen in the photograph forwarded by Åström, was searched, and a rope, a digital camera, a computer, and several empty envelopes with addresses in the United States, including one addressed to Petitioner and one sent from Petitioner to Eggert, were seized.  (RT 806-15, 3030-34; CT 370.)

Frank Rosenstroem, a Detective Inspector with the National Danish Police, testified that he is a computer forensic specialist and that he examined the computer and digital camera seized from the Jensen home.  (RT 823-30.)  Some of the data on the computer was password protected; after being provided the password from Eggert Jensen, Rosenstroem copied photographs from the computer files and turned them over to other investigative agencies.  (RT 841-45.)

Lars Underbjerg, a Detective Inspector with the Danish National Police, testified that he received evidence seized from the Jensen home from Detective Rosenstroem.  (RT 850-57.)  Underbjerg said he did not receive the original computer hard drive, but was provided with an exact copy created by a forensic program called EnCase, in order to permit him to examine the evidence without tampering with the original computer hard drive, which was later destroyed.

(RT 855-56.)  Photographs of Bente Jensen's daughter were found on the Jensen computer, as were folders containing information regarding other abused children, the people who abused them, and the people who exchanged photographs of the children, resulting in about 30 or 40 individuals in seven countries becoming suspects.  (RT 857-59.)  Underbjerg said that Eggert Jensen had arranged his computer files so that each individual with whom he communicated and shared photographs had his own file, which made it a simple matter to match the internet chat logs between Jensen and each suspect with the photographs they had shared.  (RT 862-63.)

Detective Underbjerg identified four suspects in California, Petitioner, Petitioner's co-defendant Brooke Rowland, Lloyd Emerson from Clovis, California, and Sean Bradley.  (RT 1099-1100.)  Petitioner's name and address were found on a text document in the Jensen computer, and chat logs referred to Petitioner's daughter.  (RT 864, 875.)  Detective Underbjerg found a transfer log showing that a video folder containing a video with the name "Bond0108" (which formed the basis of count 1 of the second amended information-lewd act on a child),  had been sent by Petitioner to the Jensen computer; it showed Petitioner's minor daughter M.W. handcuffed to a chair in Petitioner's home being tickled by Petitioner with a close-up of a male hand massaging her genitals.  (873-75, 894-96, 910, 983, 2685-88, 2695.) The chat log indicated that additional videos were sent by Petitioner to the Jensen computer named "butt_fuck" (count 2-aggravated sexual assault of a child), depicting Petitioner on top of M.W., who is bound with ropes and ejaculated upon after appearing to have her anus penetrated by Petitioner's penis; "finger_butt" (count 3-aggravated sexual assault of a child), depicting Petitioner digitally penetrating the anus of M.W., who is bound with white ropes inside Petitioner's house; "Suck1," "Suck2" and "PA06006c2" (counts 4-6-aggravated sexual assault of a child), each depicting oral copulation of Petitioner by M.W. at Petitioner's house; "Potty" (count 7-posing a minor for pictures involving sexual conduct), depicting M.W. sitting naked on a toilet appearing to urinate and speaking to an unseen person whom she calls "daddy"; and "PA220159," "PA220160" and "PA220161" (count 8-posing a minor for pictures involving sexual conduct), depicting M.W. on Petitioner's bed spreading her legs to expose her vagina and inserting a vibrator into her vagina while saying "Hi April."  (RT 896-909, 921-22, 2695-99.)

Detective Underbjerg testified that the chat logs from the Jensen computer show that folders containing photographs were also sent by Petitioner to the Jensen computer, including folders named "M tied" (counts 9 and 10-lewd act on a child) containing a series of photographs showing M.W. in bondage being digitally penetrated by a male hand; "M nude," containing a series of photographs depicting Petitioner touching M.W. and Petitioner's 12 year-old son B.W. (counts 11 and 12-lewd act on a child) in their living room; and "M and friends," a series of photographs depicting M.W. and Katie, a young girl who lived across the street from Petitioner, in a bathtub eating popsicles with the camera focused on their genitals (count 13-posing a minor for pictures involving sexual conduct), showing Petitioner's co-defendant Rowland wrestling naked on a bed with M.W. and with Rowland's two minor daughters J.R. and K.R., who are all naked (counts 14-16-lewd act on a child), showing Rowland with J.R. on a bed naked and masturbating (count 17-lewd act on a child), two photographs of K.R. naked with a male's hand touching her (counts 18-19-lewd act on a child), and a series of photographs showing M.W., J.R. and K.R. playing naked with paints (counts 20-22-posing a minor for pictures involving sexual conduct). (RT 873-75, 894-909, 920-22, 1042-44, 2685-92, 3305-19; CT 708-14.)

Detective Underbjerg said there was a reference to ropes in the chat logs, as well as certain ways to tie people up. (RT 919.) Messages written by Petitioner were found in the chat logs on the Jensen computer providing instructions on how to encrypt and protect information, how to add backgrounds and sound effects to videos, and requesting the information not be shared. (RT 881-84.) Additional information about Petitioner was discovered in the chat logs, and Underbjerg provided all the information to the United States authorities. (RT 877.)

Stephanie Guerra, a Detective with the San Diego Sheriff's Department, testified that she is a specialist in internet crimes against children, and was assigned to investigate Petitioner's case. (RT 941-50.) Detective Guerra spoke to Detective Underbjerg about how the case had developed in Denmark, and determined that Petitioner had a nine-year old daughter named M.W. who might be the subject of ongoing molestation. (RT 952-55; CT 371-72.) Detective Guerra quickly obtained a warrant to search Petitioner's home, coordinated with other law enforcement and child protection agencies, including those in Clovis, California, where another suspect lived,

and served the warrant on Petitioner at his home in the Allied Gardens area of San Diego.  (RT 957-66.)  Petitioner, his wife Lisa, and their two children, B.W. and M.W., were home when the warrant was served; Detective Guerra recognized Petitioner, M.W., and furniture in the home from the videos and photographs provided by Detective Underbjerg.  (RT 697-71.)

Items seized from Petitioner's house included a padded envelope addressed to Lloyd Emerson in Clovis, California, six computers, computer disks, compact disks, two digital cameras, a camera tripod, numerous photographs, ropes, leather straps, handcuffs, vibrators, dildos, butt plugs, flavored condoms, flavored lubricants, and a book by Peter Althaus titled "Nymphs of Nature," consisting of photographs of naked prepubescent girls accompanied by poetry, which had a handwritten notation on the back cover stating: "Hi. Paul.  Just an Idea. Nothing definite yet.  Pete."  (RT 975-88, 1008-19, 1037.)  Detective Guerra testified that she interviewed M.W. and asked her why she had allowed the videos and photographs to be taken; M.W. told Guerra that she did not want to participate in the photography and often told Petitioner "no," but said she could not refuse him because he was her father.  (RT 3049-51.)  A 91-page transcript of a five-week internet chat between Petitioner and the Jensens was read to the jury, with Detective Guerra reading Petitioner's part and Detective Underbjerg reading the Jensens' parts.  (RT 992-94, 1003-07, 1208.)

John Weaver, a police officer employed by the City of Clovis, California, specializing in sex crimes, testified that he was contacted by a United States Customs Agent who provided information that a Clovis resident, Lloyd Emerson, had been identified as a suspect in a sex abuse case by the Denmark National police.  (RT 1149-52, 1183.)  Weaver searched Emerson's house where he lived with his wife and four children, pursuant to a warrant, and seized several computers and numerous boxes of compact disks and computer disks.  (RT 1153-54.)  There were over 400 compact disks seized, containing about 800,000 files, which required eight months of "painstaking" review, and which resulted in finding photographs and videos relevant to Detective Guerra's investigation of Petitioner, as well as 75 to 100 other suspects worldwide, including about 30 in the United States.  (RT 1157-60, 1224, 1232-33.)

/ / /

Videos seized from the Emerson house in Clovis included "Tie 1," Tie 2" and "Tie 3," which were filmed in Petitioner's living room and depict Petitioner's daughter M.W. tied up in a chair naked and having a butt plug inserted into her anus by Petitioner while photographic flashes are seen (count 34-aggravated sexual assault on a child; count 35-posing a minor for pictures involving sexual conduct; and counts 36-38-lewd act on a child); a series of three movies which show M.W. wearing headphones while lying on Petitioner's bed holding a peach-colored dildo and following instructions when placing it in her mouth and vagina while asking "Daddy, would the police arrest you for doing this?" (count 39-aggravated sexual assault of a child); and a video titled "first cum" (count 45-aggravated sexual assault of a child), showing M.W. orally copulating an adult male in Petitioner's living room and asking the man to "Tell me when it comes."  (RT 1266, 1493, 2931-33, 2987, 3048-51, 3061-67, 3326-32.)

In addition to those videos, photographs were found in the materials seized at the Emerson home which depict M.W. with a black dildo (count 23-posing a minor for pictures involving sexual conduct); M.W. and T.S., the twelve-year-old daughter of Petitioner's wife's cousin, naked in bed touching each other (count 24-lewd act on a child); T.S. naked in Petitioner's living room (count 25-posing a child for pictures involving sexual conduct); M.W. tied up with colored ropes (count 26-posing a child for pictures involving sexual conduct); M.W. tied up and penetrated with an anal plug (count 27-posing a child for pictures involving sexual conduct, and count 28-aggravated sexual assault of a child); T.S.'s little sister C.S. with a male hand touching her and lifting her clothes (count 29-lewd act on a child); M.W. and Emerson's daughter J.E. sitting together with Petitioner with a male hand touching J.E.'s vagina (count 30-posing a minor for pictures involving sexual conduct); M.W. and T.S. in a bathtub together (counts 31-32-posing a child for pictures involving sexual conduct);  M.W. tied to a living room chair with red rope (count 33-lewd act on a child); and a series in which M.W. is nude wearing a veil (count 55-posing a child for pictures involving sexual conduct).  (RT 1160-73, 1496, 3320-26, 3341-42.)  In addition to the videos and photographs, Weaver found correspondence between Petitioner and Emerson, and a reference to "Lolita Art USA," a web site either authored by Petitioner or sent to Emerson by Petitioner, but which was probably not distributed on the

internet.  (RT 1165-73, 1252-53, 1366-71.)  Weaver testified that J.E. told him that Petitioner had taken pictures of her in 2001 when she was going to the bathroom.  (RT 1668.)

Michael Casida, a Clovis Police officer, testified that he found information regarding Petitioner in Emerson's computer files, and found some of the same videos and photographs which Petitioner had sent to Jensen.  (RT 1256-74.)  Casida interviewed Emerson in connection to a federal prosecution in which Emerson incriminated Petitioner and pleaded guilty to federal charges for which he received the maximum possible sentence.  (RT 1362-66.)  A folder on one of the compact disks recovered from Emerson's house named "friends" contained a subfolder named "Paul" which contained photographs depicting Petitioner's children M.W. and B.W. in the bathroom (count 40-posing a minor for pictures involving sexual conduct); M.W. in the shower and naked on the bed (count 41-posing a minor for pictures involving sexual conduct); M.W. with a vibrator (count 42-posing a minor for pictures involving sexual conduct, and count 43-lewd act on a child); and Petitioner touching M.W.'s vagina (count 44-lewd act on a child).  (RT 1264-74, 2521-22, 3332-36.)  Casida testified that based on the information he received in connection to the case, including his interviews with many of the other people involved, it was his opinion that Petitioner was a major player in a worldwide conspiracy to distribute child pornography, that Petitioner was one of the most well-educated and sophisticated leaders of the conspiracy, and that this particular conspiracy was unique because participants such as Petitioner and Emerson, rather than wishing to stay anonymous, actively pursued personal connections with each other in order to get to know each other's children and commit acts of molestation with specific themes.  (RT 1433-35, 1454.)  An expert witness testified that in his opinion the videos introduced into evidence were not composites, that is, they were shot live and accurately depicted the interaction between the people appearing in the videos.  (RT 393-486.)

Lloyd Emerson was called as a witness but refused to answer any questions based on his Fifth Amendment right not to incriminate himself. (RT 1483.) Gina Emerson, Lloyd Emerson's wife, testified that in 2000-2001 she lived in Clovis, California, with her husband and four children, L.E. (who was 14 years old at the time), M.E. (12 years old), J.E. (6 years old) and C.E. (5 years old); she said that Petitioner and her husband were friends and that she was unaware of

her husband's activities.  (RT 1589-91.)  She testified that Petitioner occasionally visited the Emerson home with his daughter M.W., but never with his wife or son, and that they stayed for several days at a time.  (RT 1592, 1595.)  Gina traveled to San Diego on several occasions in 2000-2001, soon after her mother died, in order to deal with the estate; she said that the entire family went to San Diego on one occasion, and that her husband took just the girls on another occasion.  (RT 1592 -94.)

Gina and Lloyd Emerson's daughter J.E., who was twelve years old at the time of the trial, testified that when she was in second grade she knew Petitioner's daughter M.W., and at that time J.E. lived with her mom, dad, an older brother, and her sisters C.E. and M.E.  (RT 1631-34.)  She remembered traveling to San Diego to visit Petitioner with her entire family on one occasion, and remembered one occasion when her dad took just her and C.E. to Petitioner's house.  (RT 1636.)  J.E. testified that she did not remember anything that happened while she was visiting Petitioner, but did remember that Petitioner was there.  (RT 1637-38.)  J.E. refused to look at some of the most graphic photographs of her which were introduced at trial, but she recognized herself, her younger sister C.E., Petitioner, and the Emerson house in photographs which were shown to her at trial depicting Petitioner touching her vagina, which formed the basis of count 30 of the second amended information.  (RT 1638-45; CT 718.)

Peggy Schmitz testified that her cousin Lisa was married to Petitioner; Peggy lived with her husband and two daughters, T.S and C.S., in 2000-2001.  (RT 1647-48.)  Peggy said that T.S., age 12 at the time, and C.S., age 6 at the time, often spent weekend nights at Petitioner's house, which was about a 25 minute drive from their home.  (RT 1648-49, 1658.)  On one occasion when T.S. returned home from spending the night at Petitioner's house, Peggy found condoms in her backpack.  (RT 1650.)  The girls decided themselves to stop going over to Petitioner's house after they returned from a trip there upset, uptight, tense, and scared; when they were told that Petitioner had been arrested, C.S. seemed terrified and T.S. expressed relief.  (RT 1651-56.)

Peggy Schmitz' daughter C.S. testified that Petitioner's children M.W. and B.W. are her cousins, and that she used to spend time at their house.  (RT 1670-74.)  She recalled Petitioner

taking pictures of her with a digital camera at his house when they were alone together, transferring the pictures to his computer, and then using the computer to change the background in the photographs. (RT 1677-80.) She testified that she recognized herself, Petitioner, and Petitioner's house in photographs recovered from compact disks found at the Emerson household which depicted Petitioner touching her, which formed the basis of count 29 of the second amended information. (RT 1250, 1680-84; CT 716.)

Peggy Schmitz' daughter T.S. testified that she often spent weekend nights at Petitioner's house with her sister C.S. (RT 1713-19.) T.S. said she remembered Petitioner showing her videos (count 51-harmful matter sent to a minor via electronic means) of her cousin M.W. tied naked to a chair with a red rope in Petitioner's living room, a video of a naked M.W. touching Petitioner's penis in a bathroom, and a video showing four naked boys kissing and touching each other. (RT 1731-37, 3338.) T.S. testified that Petitioner gave her condoms a couple of times (count 52-child molesting), but said she did not know why, and did not know why Petitioner showed her the videos. (RT 1734, 1737-38, 3339-40.) T.S. said she wanted to be a model and at first Petitioner took "normal" pictures of her wearing clothes, but he also took pictures of her without her clothes, even when she said she did not want him to do so. (RT 1739-42.)

T.S. testified that Petitioner would occasionally pin her down and remove her clothes with his teeth (count 49-lewd act on a child), and then tickle her (count 50-lewd act on a child). (RT 1742-43, 3337-38.) She said that Petitioner locked her in his bedroom and took pictures of her while sitting on her, and on one occasion she woke up with Petitioner sitting on her stomach with his hands on her chest underneath her shirt (count 48-lewd act on a child) asking if she was ready to take pictures. (RT 1752-54, 3337.) T.S. testified that she saw Petitioner take pictures of M.W. naked, and said there was a peach-colored dildo used in some of the pictures Petitioner took of her and M.W. (RT 1758.) T.S. testified that Petitioner was the person who took the photographs introduced at trial which formed the basis of counts 25, 30 and 39 of the second amended information showing her posing naked in front of a blue blanket, her and M.W. on Petitioner's bed using the peach-colored dildo, and her and M.W. in a bathtub together. (RT 1759-63.) T.S. testified that Petitioner had her touch his penis and masturbate him (count 46-

lewd act on a child), but that she refused his request to touch him with her mouth, and said Petitioner touched himself in front of her and put condoms on himself in front of her.  (RT 1769-70, 1775-76.)  She testified that Petitioner touched her vagina when they were in his bedroom, and that he took pictures of her little sister C.S. "down her pants."  (RT 1770-72.)

Lisa Whitmore, Petitioner's ex-wife, testified that she married Petitioner in 1982, and they have two children together, B.W., a son who was 12 years old in 2000, and M.W., a daughter who was 9 years old in 2000.  (RT 1792-94.)  Lisa testified that Petitioner obtained a masters degree in education and psychology from the University of Texas, and that he subsequently obtained a Marriage, Family and Child counselor license in California.  (RT 1799-1800.)  Lisa said that Peggy Schmitz is her first cousin, and that Peggy's daughters T.S. and C.S. often came to their house and spent nights there.  (RT 1810-11.)  Lisa testified that Peggy was not married to T.S.'s father, that her father did not spend time with T.S., and that Petitioner had become a father figure to T.S., who was borderline mentally retarded.  (RT 1814-16, 1966.)  Lisa said that Petitioner spent a large amount of time using their home computer and was very proficient with it; he set up a website for T.S. to help her in her aspiration to become a model, as well as a website called Digital Cherry Blossoms for parents of children with developmental disabilities.  (RT 1808, 1817, 1821, 1825-26.)

Lisa testified that a couple of years before Petitioner was arrested, the police became involved when T.S.'s father complained of pictures Petitioner had posted on the internet showing T.S. playing in the mud in Petitioner's backyard, which made it look as though T.S. was in chains but was actually just playing by a swing.  (RT 1820-23.)  Lisa said she was not concerned at the time because the pictures looked harmless to her, although she resented Petitioner spending so much time with her cousin's family.  (RT 1823.)  She said Petitioner met his co-defendant Brooke Rowland in an internet chat room, that Rowland had dropped his daughters off at their home on several occasions for play dates, and that M.W. went with Petitioner to Clovis to visit Lloyd Emerson a few times.  (RT 1828-3030.)  Lisa was aware of complaints regarding Petitioner taking pictures of a girl named Katie, who lived across the street and was friends with M.W., which showed Katie and M.W. in a bathtub.  (RT 1857-61.)  She spoke with

Katie's mother and Petitioner about the pictures, but was not concerned, although they all agreed that no more pictures like that should be taken, and Katie did not spend as much time at their house afterwards. (RT 1862.) Lisa said she was concerned about a screen saver Petitioner used on his computer showing T.S. and M.W., because M.W. was not wearing a top, but Petitioner took it down when asked. (RT 1868-69.) She also said that she and Petitioner had marital troubles which involved Petitioner having "a different mind-set about sex." (RT 1959.)

Petitioner's daughter M.W. testified that she remembered seeing pictures on her father's computer of herself and the Emerson girls without clothes. (RT 2023-30.) M.W. testified that Petitioner told her he had sent some of those pictures to Lloyd Emerson, Brooke Rowland, and a person named Tracy who lived in Texas. (RT 2032-33, 2059.) She said that Petitioner took pictures of her, her cousins T.S. and C.S., and Rowland's daughters J.R. and K.R., in their living room with a blue sheet for a backdrop. (RT 2034-35.) M.W. recognized photographs shown to her at trial depicting her and her neighbor Katie in a bathtub which she said was taken by Petitioner, photographs showing her, K.R. and J.R. naked playing with paints which were taken by Petitioner and Rowland, and a photograph showing her naked wearing ice skates with Petitioner. (RT 2038-42.) She recognized photographs, which she said were taken by Petitioner, of her and T.S. in a bathtub, her and T.S. in Petitioner's bed naked, herself shirtless, of Petitioner with his mouth on her vagina, of her wearing a veil and tied with ropes with Petitioner touching her bottom and penetrating her anus with his finger, touching his penis to her anus, with his penis in her mouth, and with a ten-inch rubber penis in her anus. (RT 2043-55, 2066-67, 2124-25.) M.W. said that Emerson and Rowland had touched her vagina when Petitioner was present, and that those men did the same things to their daughters. (RT 2068-69, 2125.)

M.W. testified that sometimes she could untie the ropes Petitioner tied her up with by herself and sometimes she could not, that sometimes the ropes were too tight and hurt her, and although she usually did not like to be tied up she did not consider it punishment. (RT 2048. 2058, 2061, 2128-29.) She also said that the handcuffs Petitioner used on her were "trick" handcuffs from which she could release herself. (RT 2128.) Shortly after Petitioner was arrested, M.W. was interviewed at Children's Hospital; she said she lied during that interview

when she said nothing had happened, and that about a year later she began telling the truth after her brother, B.W., who had also been told to lie, began telling the truth; she said she lied at first because Petitioner had told her not to tell anyone (count 54-attempting to dissuade a witness from reporting a crime) because he would be arrested.  (RT 2063-64, 3340.)

Petitioner's son B.W., who was twelve years old in 2000, testified that his cousins T.S. and C.S. often came to his house.  (RT 2199-2212.)  He said that Petitioner occasionally showed him photographs depicting child pornography on the computer and asked if he liked them.  (RT 2218-20.)  B.W. said he told his father they were disgusting and Petitioner stopped showing them to him; Petitioner told him not to tell his mom or Petitioner would get into trouble.  (RT 2220-21, 2229.)  B.W. remembered Petitioner taking pictures of his sister M.W. and his cousin T.S. in front of a blue sheet in the living room, and said that Petitioner used to take M.W. and T.S. into his bedroom for an hour at a time with the door closed when his mom was out of the house, but he did not know what they did in there.  (RT 2225-27.)

Curtis Johnson, a computer forensics examiner with the United States Customs Service, testified that he found more than 900 pictures and over 200 movies of children engaged in sexual conduct in the materials seized from Petitioner's home, as well as images of adult women tied with ropes and subjected to violence.  (RT 2410-11.)  Johnson also found encrypted files on Petitioner's computers he could not access.  (RT 2322-24.)  Laura Weber testified that she lived across the street from Petitioner in 2000, and that her daughter Katie, born in 1993, went to school with M.W. and they played together.  (RT 2577-79.)  Weber did not allow Katie to go over to Petitioner's house after Petitioner took photographs of Katie and M.W. in a bathtub.  (RT 2581-83.)  Katie testified that she played with M.W. and B.W. at their house, and that Petitioner took pictures of them both, including on two occasions in a bathtub.  (RT 2588-93.)

Brooke Rowland, Petitioner's co-defendant, testified that he has two daughters, J.R, who was 7 years old in 2000, and K.R,, who was 2 years old in 2000, and that he was testifying so that his daughters did not have to go through the ordeal of testifying.  (RT 2630-33.)  Rowland said he had pleaded guilty in state court to two counts of lewd and lascivious acts, one with each of his daughters, without a plea agreement but with the understanding that he would be

sentenced to two concurrent sentences of fifteen years-to-life, the remaining fifteen counts against him in the second amended information would be dismissed, he would testify at Petitioner's trial, and he would receive a letter from the District Attorney noting his cooperation. (RT 2632, 2652-53.) Rowland testified that at one point in his life he was going through divorce proceedings and was having trouble obtaining custody of his daughters, so he formed an internet group called Dads and Daughters, which traded information and provided support to men trying to get custody of their daughters. (RT 2633.) He said he met Petitioner in May 2001, through the website, and that Petitioner provided information and support for the website in his capacity as a marriage and family therapist. (RT 2634.)

Rowland testified that he took his two daughters, whom he had custody of every other week at the time, to Petitioner's house after he and Petitioner discussed taking pictures of the children putting paint on themselves, which Rowland said he "didn't see any problem with. So long as they weren't posed or anything was sexually explicit." (RT 2635-36, 2669.) Petitioner and his daughter M.W were the only ones home when Rowland and his daughters arrived at Petitioner's house on that occasion. (RT 2636.) Rowland said that he and Petitioner took photographs of the three girls playing naked and painting themselves which form the basis of counts 20-22 of the second amended information. (RT 2638-44; CT 713-14.) After the girls were through painting, the two men and the three girls showered and went into Petitioner's bedroom naked. (RT 2644-47.) Petitioner took photographs of Rowland wrestling naked on the bed with the three girls, and photographs were taken showing Petitioner touching a naked K.R. (RT 2648-49.) Rowland said it shocked him to discover that those photographs had been found in Denmark. (RT 2650.) Rowland stated that he had also entered a guilty plea to federal charges stemming from his activities and faced a sentence of ten to twenty years in a federal penitentiary. (RT 2656-57.) He said he got divorced and started the Dads and Daughters website after his wife had unfairly accused him of inappropriately touching his daughters. (RT 2655-56.)

The trial court granted a defense motion to dismiss count 12 (child abuse based on B.W.'s presence in the room when Petitioner touched M.W.), because there was insufficient evidence that B.W. suffered the emotional distress necessary to prove that charge, and granted a defense

motion to dismiss count 53 (posing a minor for pictures involving sexual conduct based on a video of B.W. running around the house naked), because there was insufficient evidence that B.W. was posed.  (RT 2803, 2841, 2844.)  The court also granted an unopposed defense motion to dismiss count 47 (lewd act on a child based on a video showing T.S. placing her hand on Petitioner's penis a second time), because it did not prove an offense distinct from count 46, lewd act on a child which was based on that video and on T.S.'s testimony that she touched Petitioner's penis only once.  (RT 2827, 2835-36.)  The People rested.  (RT 3208.)

The only witness called by the defense was a medical doctor from Children's Hospital who testified that she examined Petitioner's daughter M.W. on January 28, 2002, and found no sign of physical sexual abuse.  (RT 2547-63.)  The parties stipulated that Rowland's daughter J.R. had testified at the preliminary hearing that she remembered playing with the paints, but said that her father took the photographs, not Petitioner, and that although the two men and three girls were all naked in the shower together nothing inappropriate happened.  (RT 3209-10.)  The parties stipulated that M.W. was interviewed on January 28, 2002, but reported no history of abuse.  (RT 3211-12.)  The parties stipulated that T.S. was interviewed on January 31, 2002, and February 9, 2002, and that she told the interviewer that Petitioner took nude photographs of himself with her and M.W., that Petitioner made T.S. masturbate him on more than one occasion while wearing a condom which T.S. had placed on Petitioner's penis, that Petitioner did the same thing to M.W., including making M.W. orally copulate him, and that he filmed those acts and showed them to T.S. on the computer.  (RT 3212-14.)  The defense rested and there was no rebuttal by the prosecution.  (RT 3214-15.)

The jury was instructed (RT 3215-68), and counsel presented closing argument.  (RT 3268-3460.)  After deliberating about five hours, the jury found Petitioner not guilty on count 19, and guilty on the 51 counts which remained after counts 12, 47 and 53 were dismissed.  (RT 3465-3528; CT 827-77.)  The jury returned a true finding as to the enhancement allegations that multiple victims were involved and that Petitioner tied or bound his victims.  (Id.)  Petitioner's post-trial motions were denied, he was sentenced to 467 years and 8 months-to-life in prison, and was ordered to pay restitution to his victims.  (RT 3542-3677.)

# IV.

## __PETITIONER'S CLAIMS__

The Petition presents the following claims:

(1)  Petitioner was denied his Sixth Amendment right to confront and cross-examine Eggert and Bente Jensen because the transcript of the 91-page internet chat between Petitioner and the Jensens was introduced into evidence and read to the jury without a determination that the Jensens were unavailable witnesses.  (Pet. at 10, 53-68, 128-31.)

(2) Petitioner was denied his Sixth and Fourteenth Amendment rights to due process and a fair trial by the admission of evidence seized from the Jensen computer because the prosecution failed to establish that a proper chain of custody had been maintained and failed to properly authenticate the evidence, and had therefore failed to establish a sufficient foundation for its admission at trial.  (Pet. at 11, 69-79, 132-33.)

(3) Petitioner was denied his Sixth and Fourteenth Amendment rights to due process and a fair trial because there was insufficient evidence presented at trial to support eleven of the eighteen counts of posing a minor for the purpose of producing pornography, as the images supporting those counts, although depicting nudity, were not sufficiently sexual in nature to satisfy the legal definition of pornography.  (Pet. at 11, 80-88, 133-37.)

(4) Petitioner was denied his Sixth and Fourteenth Amendment rights to due process and a unanimous jury verdict as to twenty-eight counts because the prosecutor was permitted to submit multiple images to support each of those counts, and it is therefore not possible to determine whether the jury was unanimous with respect to which image supported a guilty finding as to each count.  (Pet. at 11-12, 88-93, 138-41.)

(5) Claim 5 has been dismissed.  (_See_ Order filed 8/4/11 [ECF No. 53] at 3-4.)

(6) Claim 6 has been dismissed.  (_Id._)

(7) Petitioner was denied his Sixth and Fourteenth Amendment rights to due process and a fair trial because there was insufficient evidence to support the jury's finding that he tied or bound his victims, and because the jury was improperly instructed as to those enhancements. (Pet. at 14, 104-09, 144-45.)

(8)  Petitioner was denied his Sixth and Fourteenth Amendment rights to due process and a trial by jury because the trial court invaded the jury's deliberative efforts by providing verdict worksheets.  (Pet. at 14-15, 109-14, 145-46.)

(9)  Petitioner was denied his Sixth and Fourteenth Amendment rights to due process and a fair trial because there was insufficient evidence presented at trial to support his conviction for aggravated sexual assault of a child as charged in count two.  (Pet. at 15, 115-17, 147-48.)

(10)  Petitioner was denied his Sixth and Fourteenth Amendment rights to due process because the trial court abused its discretion in failing to sever the child pornography counts from the more severe offenses.  (Pet. at 15-16, 118-22, 148-49.)

(11)  Petitioner was denied his Sixth and Fourteenth Amendment rights to due process and a fair trial by the cumulative effect of the multiple constitutional trial errors identified in the Petition.  (Pet. at 16-17, 123-25, 150.)

## V.

## DISCUSSION

For the following reasons, the Court finds that Petitioner is not entitled to habeas relief. The Court therefore **RECOMMENDS** the Petition be **DENIED**.

**A.**     **Standard of Review**

Title 28, United States Code, § 2254(a), sets forth the following scope of review for federal habeas corpus claims:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in <u>violation of the Constitution or laws or treaties of the United States.</u>

28 U.S.C.A. § 2254(a) (West 2006) (emphasis added).

This action was initiated after enactment of the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214.  Under 28 U.S.C. § 2254(d), as amended by AEDPA:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the

merits in State court proceedings unless the adjudication of the claim—

    (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

    (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254(d) (West 2006).

A state court's decision may be "contrary to" clearly established Supreme Court precedent (1) "if the state court applies a rule that contradicts the governing law set forth in [the Court's] cases" or (2) "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from [the Court's] precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000). A state court decision may involve an "unreasonable application" of clearly established federal law, "if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." Id. at 407. A decision may also involve an unreasonable application "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Id.

"[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. . . . Rather, that application must be objectively unreasonable." Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003) (internal quotation marks and citations omitted). Clearly established federal law "refers to the holdings, as opposed to the dicta, of [the United States Supreme] Court's decisions . . ." Williams, 529 U.S. at 412. In order to satisfy section 2254(d)(2), a federal habeas petitioner must demonstrate that the factual findings upon which the state court's adjudication of his claims rest, assuming it rests upon a determination of the facts, are objectively unreasonable. Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

"As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking

in justification that there was an error well understood and comprehended in existing law beyond

any possibility for fairminded disagreement." <u>Harrington v. Richter</u>, 562 U.S. __, 131 S.Ct. 770,

786-87 (2011).  The Supreme Court has stated that "[i]f this standard is difficult to meet, that is

because it was meant to be . . . [as it] preserves authority to issue the writ in cases where there

is no possibility fairminded jurists could disagree that the state court decision conflicts with this

Court's precedents."  <u>Id.</u> at 786 ("Section 2254(d) reflects the view that habeas corpus is a guard

against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary

error correction through appeal.") (internal quotation marks omitted).

**B.    Claim 1**

Petitioner alleges in his first claim that he was denied his right under the Sixth

Amendment's Confrontation Clause, as that right has been incorporated into the Due Process

Clause of the Fourteenth Amendment, to confront and cross-examine Eggert and Bente Jensen.

(Pet. at 10, 53-68, 128-31.)  He argues that the transcript of the 91-page internet chat between

the Jensens and Petitioner was read to the jury without a proper determination that the Jensens

were unavailable witnesses, and that the prosecutor in fact stated that the Jensens could probably

have been produced at trial.  (<u>Id.</u>)

Although the 91-page transcript of the internet chat was admitted as a trial exhibit and

provided to the jury, the reading performed at trial was not transcribed by the court reporter, and

the 91-page transcript is not in the record before this Court.  Nevertheless, Petitioner identifies

what he contends are prejudicial statements contained in the internet chat: (1) Petitioner writing

about sending Jensen a video of Petitioner having sex with his own daughter without a condom

for the first time and asking Jensen if he had received the video; (2) Petitioner stating that his

daughter recently "let me cum in her butt," and that she likes to watch "BJ videos" with him;

(3) Petitioner asking Jensen if his own daughter "has seen you cum," and Jensen's reply that she

has not because Jensen's wife had "warned her about it."; (4) Petitioner telling Jensen that his

daughter "is in the living room, I can see her from here, on the carpet masturbating.":

(5) Petitioner bragging to Jensen that the mother of one of the girls he is molesting "is totally

clueless.  I've pulled (her) pants down in front of Mom before and she told me next time to do

her panties too!"; (6) Petitioner telling Jensen that a younger girl "is just so naive, no idea why I like seeing her naked," and that her older sister "knows why I like her body, and likes it too."; (7) Petitioner stating that his wife is "clueless-I'd have been in jail years ago otherwise."; (8) Petitioner and Jensen discussing how their victims "have the most perfect butts in the world," stating that their own daughters look the best in the bondage scenes, discussing the potential of creating personal pornographic web sites for some of their victims when they turn 18 years old, and discussing using the girls in "domination" scenes; (9) Petitioner telling Jensen that his daughter likes seeing pictures of Jensen's daughter, that he likes the fact that Jensen's wife "helps" her daughter pose for pornographic pictures, and discussing photographs of Jensen's wife and daughter together; and (10) Petitioner and Jensen discussing using cotton versus nylon ropes to tie their daughters in bondage scenes. (Id. at 53-55.) Petitioner also points to an excerpt from the chat log the prosecutor quoted during closing argument stating that Petitioner likes "to trade because I like to see naked little girls with their legs spread wide." (Id. at 56.)

Respondent argues that Petitioner is not entitled to federal habeas relief because the state court's denial of the claim, on the basis that no Confrontation Clause violation occurred because nothing in the chat could be construed as accusatory or testimonial, was neither contrary to, nor involved an unreasonable application of, clearly established federal law. (Ans. at 14-17.) Respondent also argues that the Jensens' statements were largely immaterial, and that they only provided context to Petitioner's own prurient statements. (Id. at 16.)

Petitioner replies that Respondent's argument is specious, as the statements in the internet chat were referred to in closing argument when the prosecutor invited the jury to use the statements as proof of Petitioner's intent. (Traverse at 4.) Petitioner argues that the transcript was created by the Danish police by cutting and pasting from numerous chats in order to produce a document which is accusatory in nature, and that it was created with the assistance of Eggert Jensen, who was obviously rewarded for his cooperation because he was convicted of the same offenses as Petitioner but sentenced to only two years in prison with time off. (Id. at 4-5.) Petitioner also argues that those same officials then destroyed the Jensen computer hard drive, which eliminated any possibility of verifying the transcript's authenticity. (Id.) He contends

1    that because the state court ignored his argument that the transcript was not properly

2    authenticated, an evidentiary hearing is necessary.  (Id. at 7.)

3         Petitioner presented each of the claims addressed in this Report and Recommendation to

4    the California Supreme Court in his petition for review.  (Lodgment No. 7.)  That court denied

5    the petition for review without a statement of reasons or citation of authority.  (Lodgment No.

6    9.)  This Court therefore applies the following rebuttable presumption: "Where there has been

7    one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that

8    judgment or rejecting the same claim rest upon the same ground."  Ylst v. Nunnemaker, 501 U.S.

9    797, 803-06 (1991).  Because the state appellate court addressed the merits of each of the claims

10   presented here, this Court will apply 28 U.S.C. § 2254(d) to the appellate court opinion.

11        The state appellate court, after reviewing relevant United States Supreme Court precedent

12   holding that the Sixth Amendment Confrontation Clause right does not apply to non-testimonial

13   statements, in particular Crawford v. Washington, 541 U.S. 36 (2004) and Davis v. Washington,

14   547 U.S. 813 (2006), stated:

15            Whitmore notes in his brief that during the computer chats, Eggert Jensen
         stated that his daughter had not seen him ejaculate because his wife, Bente Jensen,
16       had warned her about it.  Whitmore also notes in his brief that during the chats,
         he and Eggert Jensen discussed various topics relating to the manner in which they
17       molested their daughters.  However, Whitmore fails to demonstrate in his opening
         brief how any of the statements the Jensens made in the computer chats were
18       testimonial.  None of the statements to which Whitmore refers in his opening
         brief, such as those mentioned above, are testimonial in nature.  They are not
19       accusatory, were not made in a formal setting, and bear no resemblance to the
         "(v)arious formulations of th(e) core class of 'testimonial' statements," provided
20       in Crawford, supra, 541 U.S. at page 51.  (See id. at pp. 51-52 ("ex parte in-court
         testimony or its functional equivalent-that is, material such as affidavits, custodial
21       examinations, prior testimony that the defendant was unable to cross-examine, or
         similar pretrial statements that declarants would reasonably expect to be used
22       prosecutorially,' (citation); 'extrajudicial statements . . . contained in formalized
         testimonial materials, such as affidavits, depositions, prior testimony, or
23       confessions,' (citation); 'statements that were made under circumstances which
         would lead an objective witness reasonably to believe that the statement would be
24       available for use at a later trial,' (citation))".)  Rather, the Jensens' statements are
         akin to statements that the Davis court deemed "clearly nontestimonial."  (Davis,
25       supra, 547 U.S. at p. 825 (noting that "statements from one prisoner to another"
         were clearly not testimonial).)  Accordingly, we conclude that the trial court did
26       not violate Whitmore's federal constitutional right to confrontation by admitting
         the Jensens' statements.

27

28   (Lodgment No. 6, People v. Whitmore, No. D048294, slip op. at 7-8.)

"The Sixth Amendment's Confrontation Clause provides that, '(i)n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.'  We have held that this bedrock procedural guarantee applies to both federal and state prosecutions." Crawford, 541 U.S. at 42, citing Pointer v. Texas, 380 U.S. 400, 406 (1965). The confrontation clause "guarantees the defendant a face-to-face meeting with witnesses appearing before the trier of fact." Coy v. Iowa, 487 U.S. 1012, 1016 (1988).  The physical confrontation "enhances the accuracy of factfinding by reducing the risk that a witness will wrongfully implicate an innocent person." Maryland v. Craig, 497 U.S. 836, 846 (1990).  The introduction of prior testimonial statements of a witness violates a defendant's confrontation rights unless the person who made the statements is unavailable to testify and there was a prior opportunity for cross-examination. Crawford, 541 U.S. at 68; Davis, 547 U.S. at 823 ("the Confrontation Clause applies only to testimonial hearsay.")

The state appellate court found that the introduction of the chat did not violate Petitioner's Confrontation Clause rights because it did not contain testimonial statements.  That decision was an objectively reasonable application of Crawford because any statements made by the Jensens during the chat were clearly non-testimonial, and Crawford does not recognize non-testimonial statements as implicating the Confrontation Clause.  Crawford, 541 U.S. at 59, 68.

Petitioner contends, however, that even if the original statements were non-testimonial, they were transformed into accusatory, testimonial hearsay by the Danish police when they cut and pasted from the original chat logs on the Jensen computer to create the 91-page transcript read at trial, and because they did so with the cooperation of Eggert Jensen, who received an extraordinarily light sentence for the same crimes for which Petitioner received an unusually harsh sentence.  (Traverse at 4-7.)  Petitioner argues that the internet chat transcript was the cornerstone of the prosecution's case against him, that all the other counts would have failed for lack of evidence without it, and that the Danish team destroyed the Jensen hard drive so there is no way for him to challenge the accuracy of the transcript.  (Id.)  He argues that Davis stands for the proposition that statements used to establish or prove past events that are related to later prosecution are testimonial.  (Id.)

Petitioner misreads <u>Davis</u>, which involved statements made during police interrogation, not, as here, statements made between Petitioner and the Jensens during their internet chats which were later retrieved by police forensic experts from the Jensen computer. <u>Davis</u>, 547 U.S at 822; <u>see</u> <u>United States v. Solorio</u>, 669 F.3d 943, 952 (9th Cir. 2012), <u>pet. for cert. filed</u>, No. 11-9841 (Apr. 13, 2012)  (noting that "statements made out-of-court with a primary purpose other than possible prosecutorial use are nontestimonial."), quoting <u>Davis</u>, 547 U.S. at 822 n.1. The state appellate court here applied the correct United States Supreme Court precedent in an objectively reasonable manner, and its determination was neither contrary to nor involved an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of  the facts in light of the evidence presented in the state court proceedings. <u>Andrade</u>, 538 U.S. at 75-76; <u>Miller-El</u>, 537 U.S. at 340; <u>Williams</u>, 529 U.S. at 412. Petitioner is not entitled to federal habeas relief because he has not demonstrated that the appellate court's ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." <u>Richter</u>, 131 S.Ct. at 786-87.  An evidentiary hearing is therefore neither permitted nor necessary. <u>See</u> <u>Cullen v. Pinholster</u>, 563 U.S. ___, 131 S.Ct. 1388 (2011) (holding that a federal habeas court may only consider evidence presented in the state court in determining whether a petitioner has satisfied 28 U.S.C. § 2254(d)); <u>see also</u> <u>Campbell v. Wood</u>, 18 F.3d 662, 679 (9th Cir. 1994) (holding that an evidentiary hearing is available "where the petitioner's allegations, if proved, would establish the right to relief.").

Moreover, even if Petitioner could show a Confrontation Clause violation arising from the manner in which the internet chat transcript was created or authenticated, or if he could somehow establish that the adjudication of his claim by the state court was objectively unreasonable, he must also demonstrate that any Confrontation Clause error was not harmless. "Confrontation Clause violations are subject to harmless error analysis, because 'the Constitution entitles a criminal defendant to a fair trial, not a perfect one.'" <u>United States v. Nielsen</u>, 371 F.3d 574, 581 (9th Cir. 2004), quoting <u>Delaware v. Van Arsdall</u>, 475 U.S. 673, 680-81 (1986)). "Evidence erroneously admitted in violation of the Confrontation Clause must be shown

harmless beyond a reasonable doubt, with courts considering the importance of the evidence, whether the evidence was cumulative, the presence of corroborating evidence, and the overall strength of the prosecution's case." Id., quoting United States v. Bowman, 215 F.3d 951, 961 (9th Cir. 2000). Habeas relief is not available "unless the error resulted in 'substantial and injurious effect or influence in determining the jury's verdict,' . . . or unless the judge 'is in grave doubt' about the harmlessness of the error." Medina v. Hornung, 386 F.3d 872, 877 (9th Cir. 2004), quoting Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) and O'Neal v. McAninch, 513 U.S. 432, 436 (1995). "The relevant inquiry is whether the [error] actually harmed the appellant." Medina, 386 F.3d at 877; see also Fry v. Pliler, 551 U.S. 112, 119 (2007) (holding that harmless error analysis is still required after a showing that the state court opinion was contrary or involved an unreasonable application of clearly established federal law because 2254(d) "sets forth a precondition to the grant of habeas relief . . ., not an entitlement to it.")

Petitioner contends that the internet chat transcript constituted devastating evidence against him because he is heard describing vile sexual acts and desires involving young girls, including his own daughter, and because it served as a primary link to dozens of the charges. (Pet. at 68.) The admission of the Jensens' statements in the internet chat was clearly harmless, however, as any incriminating value they had was overwhelmed by the evidence presented at trial regarding Eggert Jensen's involvement in a massive worldwide scheme to distribute child pornography. Petitioner argues that the internet chat gave context to, or was used to demonstrate his intent with respect to, the pornographic videos and photographs he created.[4] However, the most devastating evidence against him consisted of the trial testimony of his victims and the photographic record he created of his children, and the children of his friends and relatives, being sexually abused. Assuming Petitioner is correct that the internet chat provided evidence of his intent in creating the images, the specific intent necessary to satisfy the elements of the

---

[4] The jury was instructed that the charge of committing a lewd act on a child requires the specific intent to arouse, appeal to, or gratify the lust, passions, or sexual desires of the person or the child; that aggravated sexual assault requires the specific intent to cause sexual arousal, gratification or abuse; and that posing a minor for pictures involving sexual content where the content involves penetration or excretory functions requires the specific intent to arouse, appeal to, or gratify the sexual desires of either party, or, if the sexual content was based on exhibition of the genitalia, the specific intent that it was done for the purpose of the sexual stimulation of the viewer. (RT 3236-38.)

offenses is obvious from the videos and photographs introduced at trial, and is obvious from the fact that Petitioner was sharing and trading those images with others who were creating and sharing images of their children being abused.  Even if some context was provided by the internet chat regarding Petitioner's intent in creating the images, the more than 200 videos and over 900 pictures of other children engaged in sexual conduct found at his home, and the images of adult women subjected to sexual bondage and violence also found there, along with the testimony of his victims and the nature of the images of those victims introduced at trial, provided a context which overwhelmed any context the internet chat may have provided.

In addition, the statements made during the internet chat were cumulative to evidence presented at trial that Petitioner had extensively photographed and videotaped his daughter in a sexually explicit manner, and had traded that material with Jensen and Emerson, who were doing the same to their daughters.  Even assuming Petitioner could establish that the internet chat transcript is inaccurate or should have been excluded, the evidence it provided that he and Jensen conversed about their "vile desire" to molest children was cumulative to the unmistakable evidence found at their homes that they not only harbored those desires, they had acted on them repeatedly.  That evidence consisted of victim testimony and images showing them posing and molesting their children, and the hundreds of pornographic photographs and videos of other minors found in their homes.  When considered in light of the overwhelming direct evidence admitted at trial, the internet chat transcript constituted a minor part of the evidence against Petitioner, and it was cumulative to and overwhelmed by the other evidence.  In addition, the statements contained in the internet chat corroborated, and were corroborated by, the other trial evidence, lessening any potential impact of the allege failure to properly authenticate the transcript.  In light of the fact that the prosecution's case was very strong, it is clear that any error in this regard did not result in a substantial or injurious effect or influence in determining the jury's verdict.  O'Neal, 513 U.S. at 436; Brecht, 507 U.S. at 637; Medina, 386 F.3d at 877; Bowman, 215 F.3d at 961.  As such, any Confrontation Clause violation was harmless.

Based on the foregoing, the Court finds that the state appellate court applied the correct United States Supreme Court precedent in an objectively reasonable manner, and federal habeas

1   relief is therefore unavailable to Petitioner.  Richter, 131 S.Ct. at 786-87; Andrade, 538 U.S. at

2   75-76; Miller-El, 537 U.S. at 340; Williams, 529 U.S. at 412.  The Court also finds that any

3   possible constitutional violation was harmless.  Fry, 127 S.Ct. at 2327; Brecht, 507 U.S. at 637;

4   Medina, 386 F.3d at 877.  Because this claim can be denied on the basis of the state court record,

5   and because Petitioner's allegations, even if true, do not provide a basis for habeas relief, an

6   evidentiary hearing is unnecessary.  Campbell, 18 F.3d at 679.  The Court therefore recommends

7   that habeas relief be denied as to Claim 1.

8   **C.   Claim 2**

9          Petitioner contends in Claim 2 that he was denied his Sixth and Fourteenth Amendment

10  rights to due process, a fair trial, and meaningful appellate review by the admission of evidence

11  seized from the Jensen computer because the prosecution failed to establish a sufficient

12  foundation for its admission, and because a copy of the 91-page internet chat transcript is not in

13  the appellate record.  (Pet. at 11, 69-79, 132-33.)  He contends that the compact disk onto which

14  Detective Underbjerg download materials from the Jensen computer prior to destroying the

15  computer's hard drive contained most of the videos introduced in the case, as well as the internet

16  chat, but that a proper chain of custody was not maintained.  (Id. at 72-75.)

17         Respondent contends that this claim presents an issue of state law only and therefore fails

18  to state a federal question, and that the internet chat transcript was admitted into evidence at trial

19  and is part of the appellate record.  (Ans. at 17.)  Respondent contends that the appellate court

20  correctly found the evidence was properly admitted under state law, and argues that Petitioner

21  has failed to support his conclusory allegation that its admission violated his federal

22  constitutional rights.  (Id. at 17-18, citing James v. Borg, 24 F.3d 20, 26 (9th Cir. 1994) (holding

23  that conclusory allegations are insufficient to warrant federal habeas relief).)

24         Petitioner replies that the federal Constitution requires states to follow their own laws,

25  and that the failure to do so can rise to the level of a federal constitutional violation.  (Traverse

26  at 8-16, citing Estelle v. McGuire, 502 U.S. 62 (1991).)  He argues that an evidentiary hearing

27  is necessary to fully develop the facts regarding the chain of custody of the evidence taken from

28  the Jensen computer, as well as the creation of the internet chat log.  (Id.)

The Court will look through the silent denial of this claim by the state supreme court and apply 28 U.S.C. § 2254(d) to the appellate court opinion, which stated:

### a. *Evidence Code sections 1552 and 1553*

Whitmore claims that "the prosecution failed to carry its burden under Evidence Code sections 1552 and 1553." However, as is indicated by our quotation of the reporter's transcript above, in the trial court, defense counsel specifically stated that he was not raising an objection under Evidence Code section 1553. [Evidence Code section 1553 provides, "A printed representation of images stored on a video or digital medium is presumed to be an accurate representation of the images it purports to represent. This presumption is a presumption affecting the burden of producing evidence. If a party to an action introduces evidence that a printed representation of images stored on a video or digital medium is inaccurate or unreliable, the party introducing the printed representation into evidence has the burden of proving, by a preponderance of evidence, that the printed representation is an accurate representation of the existence and content of the images that it purports to represent."] Further, Whitmore does not provide any other record citation indicating that he raised an objection under Evidence Code sections 1552 or 1553 at any other time during the proceedings. Accordingly, we conclude that Whitmore has forfeited this contention by failing to raise it in the trial court. (Evid.Code, § 353.)

### b. *Chain of custody*

Whitmore contends that the trial court erred in overruling his claim that the People failed to adequately establish a chain of custody pertaining to the Jensens' computer. We assume for the sake of argument that the trial court implicitly overruled Whitmore's chain of custody objection based on the trial testimony of the Danish police officers regarding their seizure and analysis of the Jensens' computer. [Footnote: In his brief, Whitmore does not indicate when he contends the trial court specifically ruled on his chain of custody claim. However, in making his claim, Whitmore relies on the trial testimony of Pallesen, Rosenstroem, and Underbjerg regarding the circumstances under which Danish police obtained information from the Jensens' computer. We therefore infer that Whitmore is arguing that the trial court implicitly overruled a continuing chain of custody objection made during the trial.]

In *People v. Catlin* (2001) 26 Cal.4th 81, 134, the Supreme Court outlined the law governing chain of custody claims:

"In a chain of custody claim, '"(t)he burden on the party offering the evidence is to show to the satisfaction of the trial court that, taking all the circumstances into account including the ease or difficulty with which the particular evidence could have been altered, it is reasonably certain that there was no alteration. (¶]) The requirement of reasonable certainty is not met when some vital link in the chain of possession is not accounted for, because then it is as likely as not that the evidence analyzed was not the evidence originally received. Left to such speculation the court must exclude the evidence. (Citations.) Conversely, when it is the barest speculation that there was tampering, it is proper to admit the evidence and let what doubt remains go to its weight." (Citations.)' (citation); see also Méndez, Cal. Evidence (1993) § 13.05, p. 237 ('While a perfect chain of custody is desirable, gaps will not result

in the exclusion of the evidence, so long as the links offered connect the evidence with the case and raise no serious questions of tampering').)"

The People presented testimony that Danish police seized the Jensens' computer, maintained the computer at a police station, made a copy of the files that were on the computer, analyzed those files, and compiled the relevant files onto a compact disc that the People ultimately presented as evidence in this case. Whitmore points to no evidence of any tampering with the Jensens' computer or with the files extracted from the computer. Accordingly, we conclude that the trial court did not err in implicitly overruling Whitmore's chain of custody objection.

### c.   *Self-authentication of the computer chats*

Whitmore contends that the People failed to adequately establish a foundation for admission of the computer chats between Whitmore and the Jensens. Specifically, Whitmore claims that the trial court erred in determining that the chats were self-authenticating.

Evidence Code section 1421 provides, "A writing may be authenticated by evidence that the writing refers to or states matters that are unlikely to be known to anyone other than the person who is claimed by the proponent of the evidence to be the author of the writing."

In the computer chats, the writer alleged to be Whitmore referred to matters that were unlikely to be known by persons other than Whitmore, including the numerous ways in which he had molested M.W. [Footnote: Whitmore does not suggest that M.W. was the author of the chats.] The writer also discussed the fact that he had been accused of molesting T.M., and that as a result, he had to destroy his pornographic pictures of T.M. The People provide numerous additional examples of comments made in the computer chats from which the trial court could have reasonably concluded that the document was self-authenticating, including the fright the writer received when Lisa (Whitmore's wife) came home unexpectedly while he was molesting M.W. In the message, the writer wrote, "Lisa came home-we ALMOST got caught . . . whew!!! My pulse is like 125. . ." Accordingly, we conclude the trial court did not abuse its discretion in determining that the computer chats were self-authenticating.

### d.   *Transcribing the reading of exhibit No. 85*

Whitmore claims that the trial court erred in overruling his request to have the court reporter transcribe the reading of exhibit No. 85 to the jury. We are aware of no authority, and Whitmore cites none, that would require that the trial court to order the transcription of the reading of a written document that is admitted in evidence. The California Rules of Court expressly provide that electronic recordings that are admitted in evidence need not be transcribed. (Cal. Rules of Court, rule 2.1040(b) ("Unless otherwise ordered by the trial judge, the court reporter need not take down or transcribe an electronic recording that is admitted into evidence").) We see no basis for concluding that a different rule should apply to written documents.

"In any event, state law entitles a defendant only to an appellate record 'adequate to permit (him or her) to argue' the points raised in the appeal. (Citation.) Federal constitutional requirements are similar. The due process and equal protection clauses of the Fourteenth Amendment require the state to furnish

an indigent defendant with a record sufficient to permit adequate and effective appellate review." (*People v. Rogers* (2006) 39 Cal.4th 826, 857.) Exhibit No. 85 was offered in evidence in the trial court and, as such, is part of the appellate record. (Cal. Rules of Court, rule 8.320(e).) The appellate record is thus sufficient to permit Whitmore to argue any points pertaining to exhibit No. 85 in this appeal.

Having rejected all of Whitmore's contentions, we conclude that the trial court did not err in admitting evidence seized from the Jensens' computer on the ground that the People failed to establish a sufficient foundation for its admission.

(Lodgment No. 6, <u>People v. Whitmore</u>, No. D048294, slip op. at 8-17.)

In <u>Estelle v. McGuire</u>, the case upon which Petitioner relies, the Supreme Court found that an inquiry into whether the evidence was "incorrectly admitted pursuant to California law . . . is no part of a federal court's habeas review of a state conviction." <u>Id.</u>, 502 U.S. at 67. The Court left open the issue as to "whether a state law would violate the Due Process Clause if it permitted" the introduction of evidence for an improper purpose. <u>Id.</u> at 75 n.5. The Ninth Circuit has read <u>McGuire</u> as providing that there are circumstances under which a federal habeas petitioner can establish a federal due process violation by showing that the admission of evidence was so prejudicial that it rendered the trial fundamentally unfair. <u>See</u> <u>Johnson v. Sublett</u>, 63 F.3d 926, 930 (9th Cir. 1995) ("The admission of evidence does not provide a basis for habeas relief unless it rendered the trial fundamentally unfair in violation of due process."), citing <u>McGuire</u>, 502 U.S. at 67-68; <u>Jammal v. Van de Kamp</u>, 926 F.2d 918, 919 (9th Cir. 1991) ("The issue for us, always, is whether the state proceedings satisfied due process; the presence or absence of a state law violation is largely beside the point."); <u>see also</u> <u>Holley v. Yarborough</u>, 568 F.3d 1091, 1101 (9th Cir. 2009) (granting habeas relief under AEDPA based on state court's limitation on cross-examination of child molestation victim and refusal to permit introduction of impeachment evidence, but stating that the Supreme Court "has not yet made a clear ruling that admission of irrelevant or overly prejudicial evidence constitutes a due process violation sufficient to grant the writ.") The Supreme Court has also held there are extreme cases where state procedures can give rise to a federal due process violation, such as where state court actions are "so arbitrary or capricious as to constitute an independent due process" violation. <u>Lewis v. Jeffers</u>, 497 U.S. 764, 780 (1990); <u>Michigan v. Lucas</u>, 500 U.S. 145, 151 (1991) ("Restrictions

1    on a criminal defendant's rights to confront adverse witnesses and to present evidence may not

2    be arbitrary or disproportionate to the purposes they are designed to serve.")

3         This is not a case where the admission of the evidence complained of by Petitioner was

4    arbitrary or capricious, or that it rendered his trial fundamentally unfair.  Rather, the trial court

5    granted a defense motion requiring the evidence to be authenticated before the prosecutor could

6    mention it in his opening statement, and held a lengthy pre-trial evidentiary hearing during

7    which the evidence seized from the Jensen computer was authenticated through the testimony

8    of an expert witness, and through the testimony of the investigating officers Underbjerg, Pallesen

9    and Guerra, who also testified regarding the chain of custody.  (RT 284, 373-502, 516-689.)  As

10   the appellate court found, sufficient testimony was presented at trial to establish the authenticity

11   of the evidence seized from the Jensen computer and to establish a sufficient chain of custody.

12   Although Petitioner correctly argues that his defense counsel "made numerous foundational

13   objections and made them all on-going," (Traverse at 8; RT 837), as quoted above, the appellate

14   court found that the trial court correctly addressed those objections.  Petitioner challenges that

15   holding by arguing that because the Jensen hard drive was destroyed, assumptions had to be

16   made about the authenticity of the evidence.  (Traverse at 9.)  Petitioner has identified nothing

17   fundamentally unfair about the manner in which the evidence was authenticated.

18        Even if Petitioner could demonstrate authentication issues arising from the fact that his

19   activities were first discovered in a foreign country, or were introduced in the form of a "cloned"

20   hard drive rather than the original, an expert witness testified that the videos introduced at trial

21   were  shot live and were not composite, that is, they accurately depicted the interaction between

22   the individuals seen in the videos.  (RT 393-486.)  Additional factors supporting authenticity of

23   the evidence include the fact that Petitioner and his home are seen in many of the videos and

24   photographs introduced at trial, which were found on other computers, were discussed in the

25   computer chats, and had suggestive names which accurately described the content of those files.

26   In addition, several of Petitioner's victims testified at trial that it was Petitioner who videotaped

27   and photographed them, evidence further corroborated by the testimony of Petitioner's co-

28   defendant.  As such, there is no reasonable basis to question the result of the procedures used to

authenticate the evidence seized from the Jensen computer.  In sum, Petitioner has established no error regarding the authentication of the evidence seized from the Jensen computer, and even if he could, no fundamental unfairness arose in this case as a result of an alleged failure of the state court to properly authenticate the materials.

Petitioner's allegation that he was deprived of a meaningful appellate review because the internet chat transcript was not part of the appellate record is also without merit.  The United States Supreme Court has held that when a state provides an appeal as a matter of right, its appellate procedures must comport with the Due Process and Equal Protection Clauses of the Fourteenth Amendment.  Martinez v. Court of Appeal of California, 528 U.S. 152, 161 (2000).  However, Petitioner has not attempted to refute the statement by Respondent and the finding of the appellate court that a copy of trial exhibit 85, the 91-page internet chat transcript, was admitted into evidence at trial and was part of the appellate record.  Even to the extent Petitioner alleges the failure of the court reporter to transcribe the reading of the internet chat obstructed his appellate review, he has failed to show that the appellate court's rejection of this claim involved an objectively unreasonable application of clearly established federal law.

The Court finds that the state court's adjudication of Claim 2 was neither contrary to, nor involved an unreasonable application of, clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  Richter, 131 S.Ct. at 786-87; Andrade, 538 U.S. at 75-76; Miller-El, 537 U.S. at 340; Williams, 529 U.S. at 412; Martinez, 528 U.S. at 161; McGuire, 502 U.S. at 67-68.  Because this claim can be resolved on the basis of the state court record, and because the allegations, even if true, do not provide a basis for relief, an evidentiary hearing is unwarranted.[5]  Campbell, 18 F.3d at 679.  The Court recommends denying habeas relief as to Claim 2.

---

[5]  To the extent Petitioner's request for an evidentiary hearing could be liberally construed as a request to expand the record to include the 91-page transcript of the internet chat, the Court has discretion under Rule 7(b) of the habeas rules to order expansion of the record for good cause shown.  See Rule 7(b), Rules foll. 28 U.S.C. § 2254; but see Cooper-Smith v. Palmateer, 397 F.3d 1236, 1241 (9th Cir. 2005) (holding that the provisions of 28 U.S.C. § 2244(e)(2) which restrict the ability of the Court to hold evidentiary hearings applies to Rule 7).  However, for the same reasons the Court finds that an evidentiary hearing is unnecessary for the resolution of Claim 2, the Court finds it unnecessary to expand the record to include the internet chat transcript.

**D.     Claim 3**

Petitioner contends in Claim 3 that he was denied his Sixth and Fourteenth Amendment rights to due process and a fair trial because there was insufficient evidence presented at trial to support eleven of the eighteen counts charging him with posing a minor for the purpose of producing pornography.  (Pet. at 11, 80-87, 133-37.)  He contends the images used to support those counts involved simple nudity and were not sufficiently sexualized so as to satisfy the state or federal definitions of pornography.  (Id.)  He refers to the images showing his daughter M.W. sitting naked on a toilet apparently urinating (count 7), the series of nine photographs showing M.W. and a neighbor girl naked in a bathtub eating popsicles (count 13), ten images showing M.W. and T.S. naked in a bathtub (counts 31-32), the series of 85 photographs showing M.W., K.R. and J.R. naked playing with finger paints and painting each other (counts 20-22), the 11 images of T.S. naked in Petitioner's living room (count 25), the three images of Petitioner's son romping around the house naked and wrestling with Petitioner (count 40), the four images of M.W. naked from ages five through eight in a bathtub and on a bed (count 41), and the 45 images of M.W. naked in various poses covered by a thin transparent veil (count 55).  (Id.)

Respondent contends that in rejecting this claim the state appellate court applied the correct clearly established United States Supreme Court precedent regarding sufficiency of the evidence, and did so in an objectively reasonable manner.  (Ans. at 18-24.)  Petitioner replies that the jury, the trial court, and the appellate court all found the images to constitute pornography based on an emotional reaction to the totality of the evidence presented at trial, and not because they depict sexual activity or gratuitous genital display.  (Traverse at 16-17.)  He argues that because this claim hinges on a determination of fact, an evidentiary hearing is necessary.  (Id. at 17.)

The Court will look through the silent denial of this claim by the state supreme court and apply 28 U.S.C. § 2254(d) to the appellate court opinion, which stated:

> 1.     *Standard of review*
>
> In determining the sufficiency of the evidence to support a conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential

elements of the crime beyond a reasonable doubt." (*Jackson v. Virginia* (1979) 443 U.S. 307, 319.) "[T]he court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence-that is, evidence which is reasonable, credible, and of solid value-such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.)

### 2. Governing law

Section 311.4 provides in relevant part:

"(b) Every person who, with knowledge that a person is a minor under the age of 18 years, or who, while in possession of any facts on the basis of which he or she should reasonably know that the person is a minor under the age of 18 years, knowingly promotes, employs, uses, persuades, induces, or coerces a minor under the age of 18 years, or any parent or guardian of a minor under the age of 18 years under his or her control who knowingly permits the minor, to engage in or assist others to engage in either posing or modeling alone or with others for purposes of preparing any representation of information, data, or image, including, but not limited to, any film, filmstrip, photograph, negative, slide, photocopy, videotape, video laser disc, computer hardware, computer software, computer floppy disc, data storage media, CD-ROM, or computer-generated equipment or any other computer-generated image that contains or incorporates in any manner, any film, filmstrip, or a live performance involving, sexual conduct by a minor under the age of 18 years alone or with other persons or animals, for commercial purposes, is guilty of a felony and shall be punished by imprisonment in the state prison for three, six, or eight years."

"(d)(1) As used in subdivisions (b) and (c), 'sexual conduct' means any of the following, whether actual or simulated: sexual intercourse, oral copulation, anal intercourse, anal oral copulation, masturbation, bestiality, sexual sadism, sexual masochism, penetration of the vagina or rectum by any object in a lewd or lascivious manner, exhibition of the genitals or pubic or rectal area for the purpose of sexual stimulation of the viewer, any lewd or lascivious sexual act as defined in Section 288, or excretory functions performed in a lewd or lascivious manner, whether or not any of the above conduct is performed alone or between members of the same or opposite sex or between humans and animals. An act is simulated when it gives the appearance of being sexual conduct."

In *People v. Kongs* (1994) 30 Cal.App.4th 1741 (*Kongs*), the court provided a list of factors to consider in determining whether an image is intended to stimulate a viewer by emphasizing a child's genitals, pubic, or rectal area:

"1) whether the focal point is on the child's genitalia or pubic area; (¶) 2) whether the setting is sexually suggestive, i.e ., in a place or pose generally associated with sexual activity; (¶) 3) whether the child is in an unnatural pose, or in inappropriate attire, considering the age of the child; (¶) 4) whether the child is fully or partially clothed, or nude; (¶) 5) whether the child's conduct suggests sexual coyness or a willingness to engage in sexual activity; [¶] 6) whether

the conduct is intended or designed to elicit a sexual response in the viewer." (*Id*. at p. 1755, citing *United States v. Dost* (S.D.Cal. 1986) 636 F.Supp. 828, 832 (*Dost*), affd. *sub nom. U.S. v. Wiegand* (9th Cir. 1987) 812 F.2d 1239.)

The *Kongs* court also noted, "With the exception of factor number six, which is a required element of a Penal Code section 311.4 violation, a trier of fact need not find that all of the first five factors are present to conclude that there was a prohibited exhibition of the genitals or pubic or rectal area: the determination must be made based on the overall content of the visual depiction and the context of the child's conduct, taking into account the child's age." (*Kongs*, *supra*, 30 Cal.App.4th at p. 1755.)

Other courts have also emphasized that "consideration of the specific *Dost* factors is not mandatory under section 311.4," and that in considering a sufficiency challenge in this context, a reviewing court must determine, "'based on the overall content of the visual depiction and the context of the child's conduct, taking into account the child's age' (citation), that the photograph depicts an exhibition of the genitals for the purpose of sexual stimulation of the viewer. (Citation.)" (*People v. Spurlock* (2003) 114 Cal.App.4th 1122, 1133 (*Spurlock* ).) The *Spurlock* court also stated in determining whether particular images constitute evidence of a section 311.4 violation, "[n]udity is not sufficient, but it is also not strictly necessary." (*Spurlock*, *supra*, 114 Cal.App.4th at p. 1129.) "Whether a particular display is an illicit exhibition is a more complicated inquiry than simply asking whether the genitals are exposed.  Photographs showing a partially clad pubic area may well be intended to elicit a sexual response on the part of the viewer." (*Id*. at p. 1129.)

3.     *There is sufficient evidence to support all of the convictions*

With this statutory language and case law in mind, we review the evidence that supports the challenged convictions.

Count 7 is premised on a short video, approximately 13 seconds in length, entitled "Potty," which showed M.W. sitting nude on a toilet with her hands up. [Footnote: The identities of some of the victims depicted in the images is not clear from the images themselves, or from the record citations Whitmore provides in his brief. However, the identities of the victims appear to be undisputed. We therefore identify the victims in the images discussed in this section as the parties have in their briefs.] While M.W. cannot actually be seen to be urinating in the video, the jury could have reasonably inferred that in taking a video of M.W. sitting nude on the toilet, Whitmore produced a video of "excretory functions performed in a lewd or lascivious manner." (§ 311.4, subd. (b).)

Count 13 is premised on a series of nine photographs of M.W. and K.W. naked in a bathtub.  In one of the images, the girls are sucking on popsicles, and in two others each girl is holding a popsicle.  In some of the images the girls have their legs partially spread apart, and the camera angle is focused toward their genitals.  The jury could have reasonably determined that these images depict sexual conduct based on the totally nudity, the use of objects suggestive of phalli, and the focal point of the photographs.

Counts 20, 21, and 22 are based on a series of 85 photographs of M.W., J.R., and K.R. [Footnote:  Each count pertained to a different victim.]  In the images, the girls are naked and rubbing fingerpaint on each other while in various

positions on a blue tarp.  Several of the photographs focus on the victims' genitalia.  In others, the girls have their legs spread open.  The full nudity, sexual poses, and conduct (playing naked in fingerpaints), all support the conclusion that the images constitute sufficient evidence of a violation of section 311.4, subdivision (b).

Count 25 is based on a series of 11 photographs of T.M. either naked, or wearing only an open jacket.  One of the photographs focuses on her buttocks.  In another, she has her arms raised above her head, revealing developing breasts.  Several photographs depict T.M.'s genitalia with her legs spread apart.  The full and partial nudity depicted in the photographs, as well as the victim's poses, support the conclusion that the images constitute sufficient evidence of a violation of section 311.4, subdivision (b).

Counts 31 and 32 are based on a series of 10 photographs of M.W. and T.M. naked in the bathtub.  [Footnote: Count 31 pertained to M.W. and count 32 pertained to T.M.]  In several of the photographs, the girls are sucking on candy canes.  In others, the focal point is either the girls' genital area or buttocks.  The jury could have reasonably determined that the images depict sexual conduct based on the totally [sic] nudity, the use of objects suggestive of phalli, and the focal points of the photographs.

Count 40 is based on trial exhibit No. 116, which contains a series of 12 photographs of M.W. and [B].W. in the bathroom.  [Footnote omitted]  In the photographs, M.W. is completely nude and [B].W. is wearing only a t-shirt.  In one of the photographs, M.W. is pulling up [B].W.'s shirt to reveal his genitals, in another she is grabbing his behind with her hand, and in a third M.W. is sticking her buttocks out at the camera.  The jury could have reasonably determined based on the totally and partial nudity as well as M.W.'s poses and conduct, that the images depict sexual conduct.

Count 41 is based on a series of four photographs of M.W.  The photographs depict M.W. either fully or partially nude, at yearly intervals, from ages five through eight.  The first image was taken when M.W. was five years old.  In the photograph, she is nearly nude, with only a towel covering her head and her outstretched arms.  In the second picture, M.W., age six, is standing in the bathtub, with her genitals clearly visible.  In the third picture, M.W., age seven, is naked in the bathtub, looking up at the camera, sitting cross-legged.  In the final picture, M.W. is lying naked on a bed with her hands behind her head, revealing her full torso.  Her genitalia are clearly visible and appear to be the focal point of the image.  The jury could have reasonably, determined based on the totally [sic] nudity and the focal point of at least one of the photographs, that these images depict sexual conduct.

Finally, count 55 is based on 45 images of M.W.  In the photographs, M.W. is naked in various suggestive poses, wrapped partially in a translucent veil or in a fish net.  Several of the photographs reveal either her genitalia or buttocks.  The jury could have reasonably determined, based on the nudity, the suggestive poses, and the use of inappropriate attire, that the photographs depict sexual conduct.

After reviewing the photographs and the video, we conclude that there is sufficient evidence to support each of the convictions.

(Lodgment No. 6, People v. Whitmore, No. D048294, slip op. at 17-23.)

-37-

The clearly established federal law regarding sufficiency of the evidence claims, as correctly identified by the state appellate court, is set forth in Jackson v. Virginia, 443 U.S. 307, 319 (1979). In Jackson, the Court held that the Fourteenth Amendment's Due Process Clause is violated, and an applicant is entitled to federal habeas corpus relief, "if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." Jackson, 443 U.S. at 324; see also In re Winship, 397 U.S. 358, 364 (1970) ("[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.") In applying the Jackson standard, federal habeas courts must respect the province of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts by assuming the jury resolved all conflicts in a manner that supports the verdict. Id. at 319. Once a state court fact finder has found a defendant guilty, federal habeas courts must consider the evidence "in the light most favorable to the prosecution." Id. Federal habeas courts must also analyze Jackson claims "with explicit reference to the substantive elements of the criminal offense as defined by state law." Id. at 324 n.16. Because AEDPA controls here, the Court must "apply the standards of Jackson with an additional layer of deference," and can only grant relief if the state court's decision was objectively unreasonable. Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005). Because the state appellate court here identified and applied the correct standard, this Court "must ask whether the decision of the California Court of Appeal reflected an unreasonable application of Jackson and Winship to the facts of this case." Id. at 1275; Holland v. Jackson, 542 U.S. 649, 652 (2004) (holding that a state court decision involves an "unreasonable application" of clearly established federal law if it "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case.")

Here, the state appellate court explicitly cited and applied the Jackson standard, and did so in an objectively reasonable manner. When each of the images challenged by Petitioner is viewed "with explicit reference to the substantive elements of the criminal defense as defined by state law," which were articulated by the appellate court, and when this Court applies the

deference required by Jackson to resolve any conflicts in favor of the verdict, it is clear that sufficient evidence was presented at trial to meet the elements of each offense challenged by Petitioner. As the appellate court noted, Petitioner's contention that the images are simple nudity is belied by the focus on the children's genitalia and buttocks, as well as the suggestive presence of phallic objects and the implied (if not actual) excretory functions. Considering the broad discretion jurors are given in deciding what inferences to draw from the evidence presented at trial, it is clear that the jury could have drawn the inference that the images satisfied the elements of the offense by depicting sexual conduct or excretory functions performed in a lewd or lascivious manner. Jackson, 443 U.S. at 319; see also Coleman v. Johnson, 566 U.S. ___, 2012 WL 1912196 at *4 (May 29, 2012) ("The jury in this case was convinced, and the only question under Jackson is whether that finding was so insupportable as to fall below the threshold of bare rationality.") Even were the Court to disagree with the appellate court's analysis with respect to any particular count, which it does not, considering the additional layer of deference a federal habeas court is required under AEDPA to give over and above the deference required by Jackson, this Court cannot say that the appellate court's opinion involved an objectively unreasonable application of Jackson and Winship. Juan H., 408 F.3d at 1275; see also Richter, 131 S.Ct. at 786-87 ("If this standard is difficult to meet, that is because it was meant to be . . . [as it] preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court decision conflicts with this Court's precedents. . . . and reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal.")

Accordingly, the Court finds that the state court's adjudication of Claim 3 did not involve an unreasonable application of clearly established federal law. Richter, 131 S.Ct. at 786-87; Andrade, 538 U.S. at 75-76; Williams, 529 U.S. at 412; Jackson, 443 U.S. at 324; Winship, 397 U.S. at 364; Juan H., 408 F.3d at 1274-75. Because this claim can be denied on the merits solely with reference to the state court record, and because Petitioner's allegations, even if true, do not provide a basis for federal habeas relief, an evidentiary hearing is unnecessary. Campbell, 18 F.3d at 679. The Court therefore recommends denying habeas relief as to Claim 3.

**E.      Claim 4**

Petitioner contends in Claim 4 that he was denied his Sixth and Fourteenth Amendment rights to due process, a fair trial, and a unanimous jury verdict because the prosecutor was permitted to submit multiple images to support single counts.  (Pet. at 11-12, 88-93, 138-41.) He argues that with respect to the 28 counts against him which were based on multiple images, there is no way of knowing which image the jury determined constituted a violation of the law as to each count, and therefore no way of knowing whether the jury was unanimous in their determination that any particular count was predicated on any particular image.  (Id.)  He also argues that the failure of the trial court to give a proper unanimity instruction was error.  (Id.)

Respondent contends that this claim does not present a federal question because Petitioner relies only on a state constitutional provision requiring unanimity in jury verdicts.  (Ans. at 24.) Respondent argues that the United States Supreme Court has never held that due process requires jury unanimity in state criminal cases, and argues that Petitioner has not established an arbitrary deprivation of a liberty interest by the state court.  (Id. at 24-26.)

Petitioner replies that in some of the counts over 70 images were used to prove a single charge, and that the flood of imagery may have overwhelmed the jury and guaranteed a conviction even though no one single image constituted a violation.  (Traverse at 19.)  He also contends an evidentiary hearing is necessary to resolve the factual dispute regarding whether it was possible for the jurors to disagree as to which image constituted a violation.  (Id.)

The Court will look through the silent denial of this claim by the state supreme court and apply 28 U.S.C. § 2254(d) to the appellate court opinion, which stated:

> Whitmore claims that the trial court deprived him of his constitutional right to a unanimous jury by allowing the People to present multiple images for most of the counts in which he was charged with posing a minor for the purpose of producing pornography (§ 311.4, subd. (b)) and committing a lewd act upon a child (§ 288, subd. (a)).  Whitmore claims that the error requires reversal of counts 8, 9, 10, 11, 13, 14, 15, 16, 18, 19, 20-32, 37, 38, 40, 41, and 55.  Although it is not entirely clear from his brief, it appears that Whitmore's claim is that the trial court erred by failing to provide the jury with a unanimity instruction as to these counts.  [Footnote: Whitmore suggests in his opening brief, and expressly states in his reply brief, that the trial court did not provide any unanimity instruction in this case.]  We apply the de novo standard of review to this claim.  (*People v. Guiuan* (1998) 18 Cal.4th 558, 569 (determination of whether the trial court has a duty to give a particular jury instruction sua sponte is reviewed de novo).)

1.      *Governing law*

The jury's verdict in a criminal case must be unanimous. (Cal. Const., art. I, § 16; *People v. Russo* (2001) 25 Cal.4th 1124, 1132 (*Russo*).)  From this constitutional principle, courts have derived the general rule that if one criminal act is charged, but the evidence tends to show the commission of more than one such act, "either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act." (*Russo, supra*, 25 Cal.4th at p. 1132.)  "This requirement of unanimity as to the criminal act 'is intended to eliminate the danger that the defendant will be convicted even though there is no single offense which all the jurors agree the defendant committed.'" (*Ibid.*, quoting *People v. Sutherland* (1993) 17 Cal.App.4th 602, 612.)

Notwithstanding this principle, a unanimity instruction is not required where the offenses are so closely connected as to form a single transaction or where the offense itself consists of a continuous course of conduct. (*People v. Diedrich* (1982) 31 Cal.3d 263, 282.)  "'"This exception arises in two contexts. The first is when the acts are so closely connected that they form part of one and the same transaction, and thus one offense. (Citation.)  The second is when . . . the statute contemplates a continuous course of conduct of a series of acts over a period of time. (Citation.)"'" (*People v. Napoles* (2002) 104 Cal.App.4th 108, 115.)

2.      *Whitmore was not deprived of his right to a unanimous jury as to any of the specified counts*

Contrary to Whitmore's suggestion in his briefs, the trial court provided a unanimity instruction as to counts 9, 10, 11, 13, 20-35, 37, 38, 41, and 55.  A defendant's right to a unanimous verdict is preserved by the issuance of a unanimity instruction. (See *Russo, supra*, 25 Cal.4th at p. 1132.)  Thus, as to the counts for which the court in fact issued a unanimity instruction, Whitmore's claim necessarily fails.

With respect to the remaining counts, Whitmore was charged in counts 8 and 40 with posing a minor for the purpose of producing pornography (§ 311.4, subd. (b)).  Count 8 is based on three images taken from a video that depict a girl using a vibrator.  In the first two images, the vibrator is seen, and in the final image, the girl is wearing the same shirt as in the other images.  Count 40 is based on 12 photographs of [M].W. and B.W. in the bathroom.  (See part III.C.3., *ante*.)

Section 311.4, subdivision (b) generally prohibits individuals from having minors "pos[e] . . . for purposes of preparing any . . . image . . . involving . . . sexual conduct . . . ."  Whitmore was not charged with possessing a single, discrete piece of child pornography, but rather, with having committed the offense of posing a minor for the purpose of producing child pornography.  The evidence presented in support of each count constituted evidence of a single episode of posing for the purpose of producing child pornography.  Thus, no unanimity instruction was required.  To the extent that one could argue that each photograph captures a discrete act of "posing" (§ 311.4, subd. (b)), the acts were so closely connected as to form a single transaction, such that the continuous course of conduct exception applies and no unanimity instruction was required.

With respect to counts 14, 15, 16, 18 and 19, Whitmore was charged with committing a lewd act upon a child (§ 288, subd. (a)).  Section 288, subdivision (a) provides in relevant part, "Any person who willfully and lewdly commits any

lewd or lascivious act . . . upon or with the body, or any part or member thereof, of a child who is under the age of 14 years, with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child, is guilty of a felony and shall be punished by imprisonment in the state prison for three, six, or eight years." While Whitmore notes that multiple photographs supported each of the counts, the photographs that were introduced as to each count documented a single act of lewd conduct. For example, Whitmore notes that the People presented exhibit Nos. 76 and 77 in support of count 14. [Footnote: Whitmore does not provide record citations in his brief to connect each of the counts with the evidence he claims the People presented in support of the counts. However, in resolving Whitmore's claim, we have reviewed each of the images contained in the exhibits that Whitmore contends support each of the challenged counts.] The images all appear to have been taken during a single molestation session. With respect to each of the other counts Whitmore challenges, each set of images appears to depict a single molestation session. To the extent that each set of photographs could be said to depict a series of lewd acts, the acts were so closely connected as to form a single transaction, such that the continuous course of conduct exception applies and no unanimity instruction was required.

(Lodgment No. 6, <u>People v. Whitmore</u>, No. D048294, slip op. at 23-27.)

It is clearly established that a state criminal defendant does not have a federal constitutional right to a unanimous jury verdict. <u>Apodaca v. Oregon</u>, 406 U.S. 404, 406 (1972); <u>Johnson v. Louisiana</u>, 406 U.S. 356, 363 (1972). Petitioner is therefore not entitled to federal habeas relief based simply on his allegation that the jury may not have reached a unanimous verdict as to any particular count. <u>Richter</u>, 131 S.Ct. at 786-87; <u>Andrade</u>, 538 U.S. at 75-76.

Petitioner argues that there was no evidence presented at trial that each series of images represented a single molestation session as the state court found, even though it would have been easy to ascertain that information from the trial witnesses if it were true, and therefore the failure to give a unanimity instruction may have resulted in an improper conviction under state law. (Traverse at 19.) To the extent this claim presents only an issue of state law Petitioner is not entitled to relief because federal habeas relief is not available for an alleged error in the application or interpretation of state law. <u>McGuire</u>, 502 U.S. at 68 ("In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws or treaties of the United States.") Rather, in order to show a federal due process violation by a failure to instruct, Petitioner must demonstrate that the failure to give the instruction "so infected the entire trial that the resulting conviction violates due process.'" <u>McGuire</u>, 502 U.S. at 72, quoting <u>Cupp v. Naughten</u>, 414 U.S. 141, 147 (1973); <u>see also United States v. Fejes</u>, 232 F.3d

696, 702 (9th Cir. 2000) ("A defendant is entitled to have the judge instruct the jury on his theory of defense provided it is supported by law and has some foundation in the evidence."). "It is well established that the instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." McGuire, 502 U.S. at 72, quoting Cupp, 414 U.S. at 147; see also Francis v. Franklin, 471 U.S. 307, 324 n.9 (1985) ("The Court presumes that jurors, conscious of the gravity of their task, attend closely the particular language of the trial court's instructions in a criminal case and strive to understand, makes sense of, and follow the instructions given them.")

As set forth above, the appellate court found that a unanimity instruction was given as to all but seven of the counts challenged by Petitioner. In addition, the jury was instructed several times that their verdicts must be unanimous, and were instructed to "[c]onsider the instructions as a whole and each in light of all the others." (RT 3216, 3254-55.) Petitioner has not supported his concern that the failure to give a pinpoint unanimity instruction as to seven counts resulted in uncertainty as to which image each juror used to determine guilt as to those counts. For example, the evidence presented in support of count 8 was a series of three still images taken from a video which Petitioner sent to the Jensen computer depicting Petitioner's daughter on Petitioner's bed spreading her legs to expose her vagina and inserting a vibrator into her vagina while saying "Hi April"; the first two still images show her using a vibrator and the third shows her without the vibrator but wearing the same shirt. (Lodgment No. 6, People v. Whitmore, No. D048294, slip op. at 25; RT 896-909, 921-22, 2695-99.) As the state court correctly found, those three images, as with the series of images supporting the other six counts at issue, depict acts which are so closely connected to each other as to demonstrate a continuous course of conduct sufficient to satisfy the legal elements of the offense of posing a minor for the purpose of preparing an image involving sexual conduct. The failure to instruct the jury that they had to be unanimous as to which image in a series of images constituted a violation when the series itself clearly showed a violation, and where the jury was provided with a general instruction that their verdicts must be unanimous, could not have "so infected the entire trial that the resulting conviction violates due process." McGuire, 502 U.S. at 72.

Furthermore, any error in this regard is clearly harmless.  When a state criminal court allegedly causes a constitutional violation by failing to instruct, a federal habeas court must determine whether the alleged error had a "substantial and injurious effect or influence in determining the jury's verdict." Penry v. Johnson, 532 U.S. 782, 795 (2001), quoting Brecht, 507 U.S. at 637; California v. Roy, 519 U.S. 2, 5-6 (1996).  Any due process violation arising from the failure to give a unanimity instruction in this regard would be harmless because the images were so closely connected to each other as to constitute a continuous course of conduct, and because Petitioner was not individually charged as to each separate image.  Thus, any possibility that the jurors disagreed as to which image in a series of images supported a finding that Petitioner posed the victim for the purpose of producing pornography, could not have had a substantial and injurious effect or influence on their verdicts. Brecht, 507 U.S. at 637; Roy, 519 U.S. at 5-6.

Accordingly, the Court finds that the state court's adjudication of Claim 4 did not involve an unreasonable application of clearly established federal law.  Richter, 131 S.Ct. at 786-87; Andrade, 538 U.S. at 75-76; Williams, 529 U.S. at 412.  The Court also finds that to the extent a federal constitutional violation occurred, it was harmless.  Penry, 532 U.S. at 795; Roy, 519 U.S. at 5-6; Brecht, 507 U.S. at 637.  Because this claim can be denied on the merits solely with reference to the state court record, and because Petitioner's allegations, even if true, do not provide a basis for federal habeas relief, an evidentiary hearing is unnecessary.  Campbell, 18 F.3d at 679.  The Court therefore recommends habeas relief be denied as to Claim 4.

**F.    Claim 7**

Petitioner contends in Claim 7 that he was denied his Sixth and Fourteenth Amendment rights to due process and a fair trial because there was insufficient evidence to support the jury's finding that he tied or bound his victim with respect to counts 1, 9, 10, 33, and 37.  (Pet. at 14, 104-109, 144-45.)  He argues that the jury was not instructed that the tying or binding must have increased the victim's vulnerability.  (Id.)

Respondent contends that the state appellate court correctly applied the relevant clearly established United States Supreme Court precedent regarding sufficiency of the evidence in

1  rejecting this claim. (Ans. at 18-24.) Because the state court adjudication is objectively

2  reasonable, Respondent argues, federal habeas relief is unavailable. (Id.)

3       Petitioner replies that evidence presented at trial established that the handcuffs he used

4  on his daughter were "trick" handcuffs from which she could easily release herself, and that she

5  testified that she could "usually" release herself from the ropes with which Petitioner tied her.

6  (Traverse at 20-21.) He argues that the failure to instruct the jury on the need to demonstrate

7  increased vulnerability of the victim as a result of the binding lowered the prosecution's burden

8  of proof, and that an evidentiary hearing is necessary. (Id.)

9       The Court will look through the silent denial of this claim by the state supreme court and

10 apply 28 U.S.C. § 2254(d) to the appellate court opinion, which, after noting that the Jackson

11 v. Virginia standard applied to this claim, stated:

12         Although styled as a sufficiency claim, Whitmore does not address the
           specific evidence of tying or binding that the People offered to prove each count.

13         Rather, he makes the general assertion that "[t]he evidence in this case was
           undisputed that the tying or binding was not intended to, nor did it make (M.W.),

14         'more vulnerable.'" At the outset, we reject Whitmore's claim that there is
           insufficient evidence to support the findings because he did not intend to make

15         M.W. more vulnerable by tying or binding her. Whitmore's intent in tying and
           binding M.W. is irrelevant. (Campbell, supra, 82 Cal.App.4th at p. 78.)

16
           Assuming for the sake of argument that Campbell stands for the

17         proposition that the only tying and binding that is proscribed by section 667.61,
           subdivision (e)(6) is that which renders a victim more vulnerable, the jury could

18         have reasonably found that the photographic evidence described above
           demonstrated that Whitmore's tying or binding M.W. rendered her more

19         vulnerable. In many of the photographs, M.W.'s hands or legs are bound-a state
           that the Campbell court noted clearly demonstrates the increased vulnerability

20         of a victim. In other photographs, M.W. was even more elaborately constrained,
           with her torso fully encircled in rope. In the video, M.W.'s wrists are bound

21         together. The jury plainly had a sufficient basis on which to find true the One
           Strike "tying or binding" (§ 667, subd. (e)(6)) allegations.

22
                                     * * *

23         We assume for the sake of argument that the Campbell court was correct
           in stating that "[a] reasonable and practical construction of the phrase 'tying or

24         binding' necessarily includes only those actions which render a victim more
           particularly vulnerable, (footnote omitted) whether by restricting her or his

25         freedom of movement or by depriving her or him of one or more senses."
           (Campbell, supra, 82 Cal.App.4th at p. 80.) We assume further that the trial court

26         erred in denying defense counsel's request to further define the terms "tying or
           binding" in accordance with this portion of Campbell.

27
           However, Whitmore has failed to demonstrate reversible error. As the

28         Campbell court itself noted, "(T)he increased vulnerability of a victim whose

                                    -45-                              09cv1324

1   hands or feet (or both) are tied is immediately clear. . . ." (*Campbell*, *supra*, 82
2   Cal.App.4th at p. 78.)   The video and photographic evidence described above
    clearly demonstrates that Whitmore "restrict(ed) (M.W.'s) freedom of movement.
3   . . ." (*Id.* at p. 80.)   We therefore conclude that the photographic and video
    evidence demonstrates beyond a reasonable doubt that any instructional error was
    harmless.
4

5   (Lodgment No. 6, People v. Whitmore, No. D048294, slip op. at 39-41.)

6       The appellate court applied the correct clearly established federal law with respect to the

7   sufficiency of the evidence aspect of this Claim, which is set forth in Jackson v. Virginia, and

8   correctly determined, with specific reference to the substantive elements under state law, that

9   there was sufficient evidence to support the jury's finding that Petitioner tied or bound his

10  victim.  Petitioner argues that an additional element under state law was required, an increase

11  in vulnerability of his victim as a result of the tying or binding.  This Court, however, must

12  address this claim "with explicit reference to the substantive elements of the criminal defense

13  as defined by state law," which the appellate court articulated as not involving an increase in

14  vulnerability. Jackson, 443 U.S. at 324 n.16; see also Aponte v. Gomez, 993 F.2d 705, 707 (9th

15  Cir. 1993) (holding that federal courts "are bound by a state court's construction of its own penal

16  statutes.")  Petitioner has not demonstrated that the state appellate court was wrong with respect

17  to its interpretation of state law.  Thus, addressing the claim with explicit reference to state law

18  as interpreted by the appellate court, which does not require a finding of increased vulnerability,

19  and resolving any conflicts regarding whether the jury made the proper findings in favor of the

20  verdict, as this Court must, it is clear that sufficient evidence was presented at trial to meet the

21  elements of the enhancement allegation.  Applying the doubly deferential standard of review

22  necessitated by AEDPA, the Court finds that the state court adjudication of the claim was neither

23  contrary to, nor involved an unreasonable application of, Jackson or Winship.  Richter, 131 S.Ct.

24  at 786-87.  In any case, as set forth below, any error in this regard was clearly harmless because

25  the vulnerability of the victim was established by the evidence presented at trial.

26      With respect to the failure to instruct aspect of the claim, the relevant issue is whether the

27  failure to give the instruction "so infected the entire trial that the resulting conviction violates

28  due process." McGuire, 502 U.S. at 72; Cupp, 414 U.S. at 147; see also Fejes, 232 F.3d at 702

("A defendant is entitled to have the judge instruct the jury on his theory of defense provided it is supported by law and has some foundation in the evidence.").  "[T[he instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." <u>McGuire</u>, 502 U.S. at 72, quoting <u>Cupp</u>, 414 U.S. at 147; <u>Franklin</u>, 471 U.S. at 324 n.9 ("The Court presumes that jurors, conscious of the gravity of their task, attend closely the particular language of the trial court's instructions in a criminal case and strive to understand, makes sense of, and follow the instructions given them.")

Petitioner contends it was error to fail to instruct the jury that it was necessary to find that the binding of the victim resulted in an increase in vulnerability.  He argues that the evidence did not establish an increase in his daughter's vulnerability, relying on M.W.'s trial testimony stating that she could easily release herself from the "trick" handcuffs, that she could sometimes untie herself, that Petitioner would always untie her immediately after photographing her or if she complained of any discomfort, and that she considered it to be posing and not punishment. (Pet. at 104-05, citing RT 2048, 2069, 2129-29.)  However, M.W. also testified that she usually did not like to be tied up, that she was not always able to release herself, that she often asked Petitioner not to perform sex acts on her, that she submitted to the sex acts against her will because Petitioner was her father and she did not think she could say no, and that Petitioner warned her not to tell anyone or he would be arrested.  (RT 2047-51, 2056-58, 2063-65, 2069.) A reasonable juror could draw an inference of an increase in vulnerability from evidence of a young victim who has told her father-abuser she does not want to submit to sex acts but was nevertheless subjected to sex acts after being tied and bound in a manner: (a) which she knows from experience she is not always able to release herself; and (b) from which she did not release herself, even though she may have been able to do so.  Thus, Petitioner has not demonstrated that the failure to give the instruction "so infected the entire trial that the resulting conviction violates due process." <u>McGuire</u>, 502 U.S. at 72.

Furthermore, when a state court has allegedly caused a constitutional violation by failing to properly instruct the jury, a federal habeas court must determine whether the error had a "substantial and injurious effect or influence in determining the jury's verdict." <u>Penry</u>, 532 U.S.

at 795, quoting <u>Brecht</u>, 507 U.S. at 637; <u>Roy</u>, 519 U.S. at 5-6.  Even assuming Petitioner is correct that state law requires a showing of increased vulnerability of a tied or bound victim in order to find the enhancement allegation true, and further assuming the failure to so instruct the jury rose to the level of a federal due process violation, any error was clearly harmless because there was sufficient evidence to support a finding that M.W.'s vulnerability was increased as a result of the tying and binding.  She testified that she did not like to submit to sex acts but did not think she could say no because Petitioner was her father, demonstrating her vulnerability to Petitioner.  She also testified that she did not like to be tied up, that sometimes the bindings hurt, and that even though she could sometimes release herself she did not do so when the videos and photographs which supported the enhancement allegations were taken of her.  This constitutes testimony from which a reasonable jury could infer that M.W. was even more vulnerable when tied or bound.  The failure to instruct the jury that an increase in vulnerability needed to be shown, even if error, could not have had an adverse effect or influence in determining the jury's enhancement findings.

Accordingly, the Court finds that the state court's adjudication of Claim 7 was neither contrary to, nor involved an unreasonable application of, clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  <u>Richter</u>, 131 S.Ct. at 786-87; <u>Andrade</u>, 538 U.S. at 75-76; <u>Miller-El</u>, 537 U.S. at 340; <u>Williams</u>, 529 U.S. at 412.  The Court also finds that any constitutional violation was clearly harmless.  <u>Penry</u>, 532 U.S. at 795; <u>Roy</u>, 519 U.S. at 5-6; <u>Brecht</u>, 507 U.S. at 637.  Because Petitioner's allegations, even if true, do not provide a basis for federal habeas relief, an evidentiary hearing is unnecessary.  <u>Campbell</u>, 18 F.3d at 679.  The Court therefore recommends denying habeas relief as to Claim 7.

## G.     Claim 8

Petitioner contends in Claim 8 that he was denied his Sixth and Fourteenth Amendment rights to due process and a trial by jury because the trial court invaded the jury's deliberative efforts by providing verdict worksheets.  (Pet. at 14-15, 109-14, 145-46.)  He argues that the worksheets, unlike the verdict forms, "provided the names of the persons [the court] believed

were the victims in these counts," thus invading the jurors' responsibility in deciding the victim of each charged crime.  (Id. at 111-12.)

Respondent contends that the state appellate court's rejection of the claim is consistent with clearly established United States Supreme Court precedent which provides that as long as the worksheets did not coerce a verdict or redefine the elements of the offenses, no federal due process violation occurred.  (Ans. at 27-29.)  Petitioner replies that the state court misapplied existing state and federal law regarding invasion of the jury's fact finding process, and that an evidentiary hearing is necessary to resolve factual issues.  (Traverse at 21-22.)

The Court will look through the silent denial of this claim by the state supreme court and apply 28 U.S.C. § 2254(d) to the appellate court opinion, which stated:

> Whitmore claims that the trial court erred in providing each juror with the verdict forms in tabular form and in providing each juror with a document that provided basic information pertaining each count. Whitmore claims that the trial court's action invaded the fact-finding province of the jury.

> ### 1.   *Factual and procedural background*

> Prior to submitting the case to the jury, the court indicated to both parties that it intended to provide each juror with two documents, a "verdict worksheet" and a "worksheet."  The verdict worksheet listed each of the possible verdicts in the case in tabular format.  The worksheet set forth, as to each count, the count number, the charged offense and any lesser included offenses, a description of the charged offense taken from the verdict forms, the victim's name, and a blank space for the jurors to write notes.  The court provided the documents to the jurors in an effort to assist the jurors in "keep[ing] track of their own verdicts" in light of the "complexity of this case and the number of counts."  Defense counsel objected to the court providing the jurors with the documents.  The trial court overruled the objection.

> ### 2.   *Governing law*

> Neither the People nor Whitmore have cited any statute or rule that governs a trial court's providing the jury with documents such as those the trial court provided in this case.  Nor has our independent research uncovered any such statute or rule.  However, it is well established that trial courts possess the inherent authority to develop procedures necessary for the orderly administration of justice.  In *People v. Ruiloba* (2005) 131 Cal.App.4th 674, 690, the court described this authority as follows:

>> "'All courts have inherent powers which enable them to carry out their duties and ensure the orderly administration of justice.  The inherent powers of courts are derived from article VI, section 1 of the California Constitution and are not dependent on statute.  (Citations.)  These powers entitle courts to "'. . . adopt any suitable method of practice, both in ordinary actions and special

proceedings, if the procedure is not specified by statute or by rules adopted by the Judicial Council.'" (Citation.) Thus, a trial court has the inherent authority to create a new form of procedure in a particular case, where justice demands it. (Citations.) "'The . . . power arises from necessity where, in the absence of any previously established procedural rule, rights would be lost or the court would be unable to function.'"" (Citation.)"

3.     *The trial court did not err in providing the worksheets to the jury*

The trial court possessed the inherent authority to provide the worksheets to the jury as a method by which to assist the jury in managing the large number of verdicts in the case. With respect to the verdict worksheet, the document provided nothing more than the various possible verdicts, in tabular form. We see nothing objectionable about such a document, and Whitmore does not raise any specific objection concerning this document.

With respect to the worksheet, Whitmore claims that this document invaded the fact-finding province of the jury in that, for some of the counts, the worksheet provided the name of the victim, while the information and the verdict forms did not. Whitmore argues that as to each count, the jury was required to find that there was a victim. He contends that in providing the name of the victim, "the court took the matter away from the jury and, in effect, negated the necessity of a finding on that element of the referenced count." We disagree. Even assuming for the sake of argument that the People were required to prove the name of each victim, rather than simply that a victim existed, the trial court's providing the name of each victim was, at the very worst, fair comment on the evidence. (See § 1093, subd. (f) ("the judge may state the testimony, and he or she may make such comment on the evidence and the testimony and credibility of any witness as in his or her opinion is necessary for the proper determination of the case"); *People v. Sturm* (2006) 37 Cal.4th 1218, 1232 ("A trial court may comment on the evidence . . . but such comments 'must be accurate, temperate, nonargumentative, and scrupulously fair.' (Citation)").) Whitmore has failed to challenge, much less demonstrate, that the trial court listing of the of victim's names was not an accurate and fair summary of the evidence.

*People v. Clark* (1943) 59 Cal.App.2d 760 (*Clark*), on which Whitmore primarily relies, is plainly distinguishable. In *Clark*, "the blank form of verdict finding the defendant guilty, which was given to the jury for their use and was actually signed by the foreman and returned as the verdict of the jury, had the name of the trial judge signed to it, with a penstroke drawn through the signature." (*Id.* at p. 761.) The *Clark* court reversed the conviction, reasoning, "juries are alert to take their cue from any intimation, real or fancied, of the trial judge as to what verdict he believes they should return." (*Id.* at p. 762.) Unlike in *Clark*, the trial court's verdict worksheets did not provide the jurors with a cue as to the verdict the court believed the jury should return.

We conclude that the trial court did not err in providing the jurors with the verdict worksheet and worksheet documents.

(Lodgment No. 6, <u>People v. Whitmore</u>, No. D048294, slip op. at 41-44.)

Clearly established federal law provides that a Fourteenth Amendment violation may arise if the worksheets "so infused the trial with unfairness as to deny due process of law."

-50-

09cv1324

McGuire, 502 U.S. at 75. "Whether the comments and conduct of the state trial judge infringed the defendant's due process right to an impartial jury and fair trial turns upon whether the trial judge's inquiry would be likely to coerce certain jurors into relinquishing their views in favor of reaching a unanimous decision." Jiminez v. Myers, 40 F.3d 976, 979 (9th Cir. 1994).

As the appellate court found, the worksheets provided to the jurors did not unfairly comment on the evidence or direct the jurors toward a verdict. The jury was provided with a copy of the second amended information which identified the names of the victims with respect to 26 of the 55 counts alleged against Petitioner, namely, counts 13-14, 16-22, 29-32, 36-38, 40, 44, 46-53. (CT 708-23.) Many of the other counts in the second amended information listed the videos which supported them, which were identified at trial by the name under which they were listed on the Jensen computer, such as "Bond108" (count 1), "butt_fuck" (count 2), "finger_butt" (count 3), "suck 1" (count 4). etc. (Id.) Still other counts were listed in the second amended information with more descriptive information, such as the "Hi April series" (count 8), "dildo movie entitled MPN 8313.3" (count 39), "veil series" (count 55), etc. (Id.) The verdict forms contained similar descriptions. (CT 1275-1326.) Thus, the evidence presented at trial was sufficient to allow the jury to match the evidence offered in support, including the identities of the victims, with the corresponding charge in the verdict forms and in the second amended information. In addition, the prosecutor took the jury step by step through the counts and the evidence presented in support of each count during closing argument. (RT 3280-3343.) It is clear that the jury was provided with sufficient information to match the counts in the second amended information with the evidence presented at trial without the worksheets, which did not supply any additional information regarding the identity of the victims. The worksheets were merely an aid to help the jury with the 51 counts and 23 special circumstance allegations they were called upon to decide, and there is no showing of unfairness, confusion or coercion necessary to demonstrate that the worksheets "so infused the trial with unfairness as to deny due process of law." McGuire, 502 U.S. at 75; Jiminez, 40 F.3d at 979.

In addition, even assuming Petitioner could demonstrate a federal due process violation arising from the jury having been provided with the worksheets, any error was clearly harmless.

A copy of the second amended information was marked as a court exhibit and made available to the jury. (RT 503.) As set forth above in Section III of this Report detailing the evidence presented at trial, the evidence supporting each count was matched to the victims as alleged in the second amended information. In addition, the prosecutor meticulously walked the jury through each count and every charge during closing argument, leaving no room for confusion. (RT 3280-3343.) Any error in providing the jury with a shortcut to matching the evidence presented against Petitioner with the names of the children he was alleged to have victimized could not have had a "substantial and injurious effect or influence in determining the jury's verdict." Penry, 532 U.S. at 795, quoting Brecht, 507 U.S. at 637.

Accordingly, the Court finds that the state court's adjudication of Claim 8 was neither contrary to, nor involved an unreasonable application of, clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Richter, 131 S.Ct. at 786-87; Andrade, 538 U.S. at 75-76; Miller-El, 537 U.S. at 340; Williams, 529 U.S. at 412. The Court also finds that any constitutional violation was clearly harmless. Penry, 532 U.S. at 795; Brecht, 507 U.S. at 637. Because Petitioner's allegations, even if true, do not provide a basis for federal habeas relief, an evidentiary hearing is unnecessary. Campbell, 18 F.3d at 679. The Court therefore recommends denying habeas relief as to Claim 8.

## H.    Claim 9

Petitioner contends in Claim 9 that his Sixth and Fourteenth Amendment rights to due process and a fair trial were denied because there was insufficient evidence presented at trial to support his conviction for aggravated sexual assault of a child as charged in count two. (Pet. at 15, 115-17, 147-48.) Petitioner describes the evidence supporting this count as a ten-second video titled "butt_fuck," which he contends is dark and grainy and depicts M.W. bound with ropes with Petitioner on top of her making a rocking motion just before removing his penis from her buttocks and ejaculating upon her. (Id.) Petitioner contends that because the video does not clearly show that his penis penetrated M.W.'s anus, the evidence is insufficient to support a finding of sodomy. (Id.)

Respondent contends that the state appellate court correctly applied the relevant clearly established United States Supreme Court precedent regarding sufficiency of the evidence in rejecting this claim. (Ans. at 18-24.) Petitioner replies that at trial M.W. confused her anus with her vagina and did not testify that penetration occurred in this instance, and that it was error for the state court to find that Petitioner's statement in the internet chat that M.W. "let me cum in her butt only recently" supported a finding of penetration. (Traverse at 22.) He contends that no reasonable trier of fact could have found that anal penetration had occurred, and that an evidentiary hearing is necessary to resolve this dispute of fact. (Id. at 24.)

The Court will look through the silent denial of this claim by the state supreme court and apply 28 U.S.C. § 2254(d) to the appellate court opinion, which applied the Jackson v. Virginia standard to this claim:

> Whitmore claims that there is insufficient evidence to support his conviction on count 2 for aggravated sexual assault on a child. We apply the sufficiency of the evidence standard of review discussed in part III.C.1., *ante*.

> 1.   *Governing law*

> Whitmore was convicted of aggravated sexual assault of a child (§ 269) (count 2). Section 269 provides in relevant part:

> "(a) Any person who commits any of the following acts upon a child who is under 14 years of age and seven or more years younger than the person is guilty of aggravated sexual assault of a child: (¶) . . . (¶)
> (3) Sodomy, in violation of paragraph (2) or (3) of subdivision (c), or subdivision (d), of Section 286."

> Section 286 defines sodomy as follows: "Sodomy is sexual conduct consisting of contact between the penis of one person and the anus of another person. Any sexual penetration, however slight, is sufficient to complete the crime of sodomy." "(P)enetration may be established by circumstantial evidence." (Citation.)" (*People v. Adams* (1993) 19 Cal.App.4th 412, 429.)

> 2.   *The People presented sufficient evidence that Whitmore sodomized M.W.*

> Whitmore claims that there is insufficient evidence to establish that he penetrated M.W.'s anus with his penis. Whitmore does not dispute that the People played a video for the jury entitled "butt-fuck," that "shows (M.W.) naked and tied with rope, with (Whitmore) behind her making a rocking back and forth motion." The video also shows Whitmore removing his penis from M.W.'s buttocks and ejaculating. While the video does not contain actual depictions of penetration, the jury could plainly infer from the video that Whitmore had penetrated M.W. Further, in a July 10, 2001, chat with Eggert Jensen, Whitmore

states that M.W., "Lets me cum in her butt only recently." [Footnote: The information alleged that Whitmore had committed the aggravated sexual assault at some point between "January 1, 2000 and November 16, 2001."] Accordingly, we conclude the People presented sufficient evidence that Whitmore sodomized M.W.

(Lodgment No. 6, People v. Whitmore, No. D048294, slip op. at 44-45.)

As set forth above, in order to establish a violation of the Fourteenth Amendment's Due Process Clause, Petitioner must show that based "upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." Jackson, 443 U.S. at 324. This Court must respect the province of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts by assuming the jury resolved all conflicts in a manner that supports the verdict. Id. at 319, 324 n.16. "After AEDPA, we apply the standards of Jackson with an additional layer of deference." Juan H., 408 F.3d at 1275. Because the state appellate court here identified and applied the correct clearly established federal law, this Court must ask whether that decision reflected an "unreasonable application of Jackson and Winship to the facts of this case." Id. at 1275.

Direct evidence presented at trial in support of count two consisted of a video sent by Petitioner to the Jensen computer with the file name "butt_fuck," which depicted Petitioner on top of M.W. who is bound with ropes and ejaculated upon after Petitioner is seen removing his penis from her buttocks following a rocking motion. Even if penetration is not actually seen in the video, circumstantial evidence was presented in the form of the chat log which contained Petitioner's admission that he had recently "cum in her butt," referring to his daughter, and by the name Petitioner assigned to the video. From this evidence the jury could have reasonably concluded that penetration had occurred. As the appellate court noted, even if the video did not provide direct evidence, circumstantial evidence is sufficient to support a finding of sodomy. Jackson, 443 U.S. at 324 n.16 (requiring federal habeas court to examine claim "with explicit reference to the substantive elements of the criminal defense as defined by state law"); Aponte, 993 F.2d at 707 (holding that federal courts "are bound by a state court's construction of its own penal statutes.") This Court must respect the province of the jury to draw such reasonable

inferences from proven facts by assuming the jury resolved all conflicts in a manner that supports the verdict, and must consider the evidence "in the light most favorable to the prosecution." Jackson, 443 U.S. at 319, 324; see also Johnson, 566 U.S. at ___, 2012 WL 1912196 at *4 ("[T]he only question under Jackson is whether [the jury's] finding was so insupportable as to fall below the threshold of bare rationality.") Applying the Jackson standard, it is clear that a reasonable jury could have found sufficient evidence to support a finding of aggravated sexual assault of a minor as charged in count two.

Even were this Court to agree with Petitioner that the evidence was not sufficient for a reasonable juror to find that penetration occurred, there is another layer of deference this Court owes to the state court findings under AEDPA. Juan H., 408 F.3d at 1275. This Court may not provide habeas relief "simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. . . . Rather, that application must be objectively unreasonable." Andrade, 538 U.S. at 75-76; see also Richter, 131 S.Ct. at 786-87 ("If this standard is difficult to meet, that is because it was meant to be . . . [as it] preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court decision conflicts with this Court's precedents. . . . and reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal.") Applying this doubly deferential standard, it was objectively reasonable for the state court to find that sufficient evidence of penetration was presented to the jury.

The Court finds that the state court's adjudication of this claim did not involve an unreasonable application of clearly established federal law. Richter, 131 S.Ct. at 786-87; Andrade, 538 U.S. at 75-76; Williams, 529 U.S. at 412; Jackson, 443 U.S. at 324; Winship, 397 U.S. at 364; Juan H., 408 F.3d at 1274-75. Because this claim can be denied on the merits solely with reference to the state court record, and because Petitioner's allegations, even if true, do not provide a basis for federal habeas relief, an evidentiary hearing is unnecessary. Campbell, 18 F.3d at 679. The Court therefore recommends habeas relief be denied as to Claim 9.

/ / /

1    ///

2    **I.    Claim 10**

3    Petitioner contends in Claim 10 that he was denied his right to due process under the

4    Sixth and Fourteenth Amendments because the trial court abused its discretion in failing to sever

5    the child pornography counts from the more serious offenses.  (Pet. at 15-16, 118-22, 148-49.)

6    He argues that joinder prevented him from testifying, and that the most compelling reason to

7    grant severance was the sheer number of counts and the shocking allegations of incestuous child

8    molestation underlying them, which so inflamed the passions of the jurors that they issued over

9    50 verdicts in less than five hours.  (Id.)  Petitioner argues that the nature of the case was so

10   inflammatory as to cause the trial judge to comment that this was the worst case she had seen

11   in 28 years and Petitioner the most despicable person to appear in her court, and to cause the

12   preliminary hearing judge to comment that "this is the most disgusting case I've ever been

13   associated with in almost 39 years in the criminal justice system.  And I pity the trier of fact that

14   has to deal with this case."[6]  (Id. at 120.)

15   Respondent contends that the state appellate court correctly found that joinder of the

16   claims was not prohibited under state law and Petitioner was not prejudiced as a result of joinder,

17   and argues that the state court's opinion was consistent with, and was an objectively reasonable

18   application of, clearly established United States Supreme Court precedent.  (Ans. at 29-32.)

19   Petitioner replies that prejudice is obvious from the number of counts against him, that joinder

20   prevented him from testifying to contradict the internet chat, which he contends was a key piece

21   of evidence against him, and that an evidentiary hearing is necessary.  (Traverse at 24-25.)

22   The Court will look through the silent denial of this claim by the state supreme court and

23   apply 28 U.S.C. § 2254(d) to the appellate court opinion, which stated:

24

25   ───────────────

         [6] Petitioner also quotes from his co-defendant's motion to sever:  "[Petitioner]'s alleged actions
26   are so numerous, grotesque, and revolting as to transcend even tolerable conceptions of the realm of
     demonic and monstrous.  Were there seven levels of Hell reserved solely for child molesters, a person
27   found guilty of Rowland's conduct might reasonably anticipate eternal condemnation to perhaps the
     second level.  Yet, for his vile deeds, a person of [Petitioner]'s caliber should expect no less than to
28   spend eternity in the inner (sanctum) of Satan's lair at the molten-filled core of the seventh level."  (Id.
     at 121.)

Whitmore asserts that the joinder of all of the counts was improper under section 954.  However, he provides no legal argument as to why this is so. Accordingly, we reject this argument.

Whitmore also claims that he suffered prejudice from the trial court's denial of his motion to sever.  The first step in assessing the propriety of a trial court's ruling on a motion to sever is to determine whether evidence as to all of the counts was cross-admissible.  Whitmore acknowledges that "some of the evidence in this case would be 'cross-admissible'" and fails to demonstrate that any of the evidence would not have been cross-admissible.  Whitmore has thus failed to demonstrate that he was prejudiced by the trial court's denial of his motion to sever.  (*Bradford*, *supra*, 15 Cal.4th at pp. 1315-1316.)

Finally, Whitmore argues that the "most compelling reason to grant a severance in this case was the she(e)r number of counts and the shocking allegations underlying those counts."  However, Whitmore provides no authority that severance is required where the counts are numerous or the allegations underlying those counts are unusually shocking, particularly where a defendant has failed to demonstrate a lack of cross-admissibility.

Accordingly, we conclude that the trial court did not err in denying Whitmore's motion to sever.

(Lodgment No. 6, People v. Whitmore, No. D048294, slip op. at 45-48.)

Clearly established federal law provides that Petitioner can establish a violation of his federal due process right to a fair trial if he carries his "burden of demonstrating that the state court's denial of his severance motion rendered his trial 'fundamentally unfair.'"  Grisby v. Blodgett, 130 F.3d 365, 370 (9th Cir. 1997), quoting Hollins v. Department of Corrections, State of Iowa, 969 F.2d 606, 608 (8th Cir. 1992), citing McGuire, 502 U.S. at 68.  The Ninth Circuit has summarized the test as follows:

[T]he propriety of a consolidation rests within the sound discretion of the state trial judge.  The simultaneous trial of more than one offense must actually render petitioner's state trial fundamentally unfair and hence, violative of due process before relief pursuant to 28 U.S.C. § 2254 would be appropriate.

Bean v. Calderon, 163 F.3d 1073, 1084 (9th Cir. 1998), quoting Featherstone v. Estelle, 948 F.2d 1497, 1503 (9th Cir. 1991).  Additionally, even if the trial court's denial of the severance motion violated Petitioner's due process rights, habeas relief would not be available in this Court unless the error had a "substantial and injurious effect or influence in determining the jury's verdict."  Brecht, 507 U.S. at 637; Roy, 519 U.S. at 5.

Petitioner argues that the state court's finding of no prejudice is absurd in light of the fact

that the jury convicted him of many extremely serious crimes, and found true numerous enhancement allegations which carry life sentences, after deliberating only five hours. (Traverse at 24-25.)  He contends "[t]he jury saw the evidence as one large mass and convicted on a wholesale basis," and that joinder prevented him from testifying. (Id. at 25.)  However, the evidence supporting the most serious charges was graphic and unrefuted.  The suggestion that the jury was more likely to convict on the more serious charges, which were supported by the trial testimony of his victims as well as the video and photographic evidence of molestation created by Petitioner, simply because evidence was also presented regarding his having made videotapes and taken photographs of nude children he contends were not being molested, is without support in the record.  Although Petitioner is correct that the body of evidence against him as a whole could be accurately characterized as overwhelming, there is nothing in the record to suggest the jury would not have convicted him of every single offense even if the charges had been tried one at a time.  Thus, even if Petitioner could demonstrate an error arising from the failure to sever the counts, he has not demonstrated that it had any effect whatsoever on the jury's verdicts, must less a substantial and injurious one, and any error was therefore clearly harmless.

Accordingly, the Court finds that the state court's adjudication of Claim 10 was neither contrary to, nor involved an unreasonable application of, clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  Richter, 131 S.Ct. at 786-87; Andrade, 538 U.S. at 75-76; Miller-El, 537 U.S. at 340; Williams, 529 U.S. at 412.  The Court also finds that any constitutional violation was clearly harmless.  Penry, 532 U.S. at 795; Brecht, 507 U.S. at 637.  Because this issue can be resolved on the basis of the state court record, and because Petitioner's allegations, even if true, do not provide a basis for federal habeas relief, the Court finds that an evidentiary hearing is unnecessary for the resolution of this claim.  Campbell, 18 F.3d at 679.  The Court therefore recommends denying habeas relief as to Claim 10.

**J.    Claim 11**

In his final claim, Petitioner contends that he was denied his Sixth and Fourteenth

Amendment rights to due process and a fair trial by the cumulative effect of the multiple constitutional errors identified in his Petition.  (Pet. at 16-17, 123-25, 150.)  He contends the most damaging evidence came in the form of the videos, photographs and text documents retrieved from the Jensen computer, including the 91-page transcript of the internet chat, the introduction of which he contends caused a Confrontation Clause violation, and all of which were not properly authenticated or subjected to a proper chain of custody.  (Id. at 123.) Petitioner contends that the errors alleged in the Petition, even if not individually prejudicial, cumulatively caused him prejudice.  (Id. at 123-25.)

Respondent contends this claim is without merit because Petitioner has not established a single constitutional error to accumulate.  (Ans. at 32.)  Respondent urges this Court to deny this claim on the same basis the state appellate court denied the claim, because even assuming errors occurred they do not require reversal, either individually or cumulatively.  (Id. at 33.) Petitioner replies by reiterating the arguments set forth in his Petition, and contends that an evidentiary hearing is necessary to resolve the disputed fact whether the errors were prejudicial. (Traverse at 26.)

The Court will look through the silent denial of this claim by the state supreme court and apply 28 U.S.C. § 2254(d) to the appellate court opinion, which stated:

> Whitmore claims that, to the extent this court concludes that no individual error merits reversal, the cumulative error doctrine requires reversal of the judgment.
>
> "Under the 'cumulative error' doctrine, errors that are individually harmless may nevertheless have a cumulative effect that is prejudicial." (In re Avena (1996) 12 Cal.4th 694, 772, fn. 32.)
>
> We have concluded that nearly all of Whitmore's claims of error are without merit.  We have further concluded that any assumed errors that the trial court may have committed, whether considered individually or together, do not require reversal.  Accordingly, there was no cumulative error that requires reversal of the judgment.

(Lodgment No. 6, People v. Whitmore, No. D048294, slip op. at 48-49.)

"The Supreme Court has clearly established that the combined effect of multiple trial court errors violates due process where it renders the resulting trial fundamentally unfair." Parle v. Runnels, 505 F.3d 922, 927 (9th Cir. 2007), citing Chambers v. Mississippi, 410 U.S. 284,

298 (1973).  Where no single trial error in isolation is sufficiently prejudicial to warrant habeas relief, "the cumulative effect of multiple errors may still prejudice a defendant."  United States v. Frederick, 78 F.3d 1370, 1381 (9th Cir. 1996).  Where "there are a number of errors at trial, 'a balkanized, issue-by-issue harmless error review' is far less effective than analyzing the overall effect of all the errors in the context of the evidence introduced at trial against the defendant."  Id., quoting United States v. Wallace, 848 F.2d 1464, 1476 (9th Cir. 1988).  "Where the government's case is weak, a defendant is more likely to be prejudiced by the effect of cumulative errors."  Frederick, 78 F.3d at 1381.

As set forth above, Petitioner has not demonstrated that any constitutional errors occurred at his trial, and this Court has concluded that even assuming errors occurred, they were harmless.  Moreover, this is not a case where the prosecution's case was weak.  Rather, there was direct documentary evidence created and distributed around the world by Petitioner, as well as testimony from Petitioner's co-defendant and victims, including his own children, and circumstantial evidence in the form of the internet chat with the Jensens.  It is therefore unlikely that Petitioner could have been prejudiced by the accumulation of errors which individually did not prejudice him.  Frederick, 78 F.3d at 1381.  The adjudication of this claim by the appellate court on the basis that "any assumed errors that the trial court may have committed, whether considered individually or together, do not require reversal," is neither contrary to, nor involved an unreasonable application of clearly established federal law, and is not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  Richter, 131 S.Ct. at 786-87; Andrade, 538 U.S. at 75-76; Miller-El, 537 U.S. at 340; Williams, 529 U.S. at 412; Frederick, 78 F.3d at 1381.  Because Petitioner's allegations, even if true, do not provide a basis for federal habeas relief, an evidentiary hearing is unnecessary to the resolution of this claim.  Campbell, 18 F.3d at 679.  The Court therefore recommends denying habeas relief as to Claim 11.

## VI.

## CONCLUSION AND RECOMMENDATION

For all of the foregoing reasons, **IT IS HEREBY RECOMMENDED** that the Court

issue an Order: (1) approving and adopting this Report and Recommendation, and (2) directing that Judgment be entered denying the Petition.

**IT IS ORDERED** that no later than **July 3, 2012**, any party to this action may file written objections with the Court and serve a copy on all parties.  The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **July 17, 2012.**  The parties are advised that failure to file objections with the specified time may waive the right to raise those objections on appeal of the Court's order.  See Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153, 1156 (9th Cir. 1991).

DATED:  June 12, 2012

Hon. Mitchell D. Dembin
U.S. Magistrate Judge

09cv1324